T.C. Memo. 2017-147

UNITED STATES TAX COURT

EATON CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5576-12.            Filed July 26, 2017.

P and R entered into two advance pricing agreements (APAs)
establishing a transfer pricing methodology for covered transactions
between P and its subsidiaries. The first APA (APA I) applied for P's
2001-05 tax years, and the second APA (APA II) applied for P's
2006-10 tax years. P and R agreed that the legal effect and
administration of APA I and APA II were governed by Rev. Proc. 96-
53, 1996-2 C.B. 375, and Rev. Proc. 2004-40, 2004-2 C.B. 50,
respectively.

In 2011 R determined that P had not complied with the
applicable terms of the revenue procedures and canceled APA I,
effective January 1, 2005, and APA II, effective January 1, 2006. As
a result of canceling the APAs, R determined that under I.R.C. sec.
482 an adjustment was necessary to reflect an arm's-length result for
P's intercompany transactions.

[*2]   P contends that R's cancellation of APA I and APA II was an abuse of discretion because there was no basis for the cancellation under the applicable revenue procedures.  R contends that the determination to cancel both APA I and APA II was not an abuse of discretion because P did not comply in good faith with the terms and conditions of either APA I or APA II and failed to satisfy the APA annual reporting requirements.

As an alternative position, R determined that P transferred intangible property compensable under I.R.C. sec. 367(d) to P's controlled foreign affiliates for tax year 2006.

On July 15, 2005, P entered into a stock purchase agreement to purchase all of the outstanding stock of THI.  THI planned to enter into bonus agreements with certain executives that provided for stock option grants.  THI entered into agreements with certain executives to provide them with cash bonuses in exchange for their release of claims related to any stock options.

For tax year 2005 P claimed a deduction for the bonus amount payments.  R determined that P was not entitled to the deduction and that the bonus payments should have been capitalized under I.R.C. sec. 263.  P contends that it is entitled to a deduction under I.R.C. sec. 162(a) because the bonus payments represented additional employee compensation.

Held:  R's determination to cancel APA I and APA II was an abuse of discretion.

Held, further, P did not transfer intangibles subject to I.R.C. sec. 367(d).

Held, further, P's bonus payments represented employee compensation, entitling P to a deduction under I.R.C. sec. 162(a).

[*3]   Joel V. Williamson, John T. Hildy, Charles P. Hurley, Brian W. Kittle, Erin G. Gladney, Geoffrey M. Collins, James B. Kelly, John W. Horne, Rajiv Madan, Julia Kazaks, Royce L. Tidwell, Kiara L. Rankin, Christopher P. Murphy, Sonja Schiller, Nathan P. Wacker, and Pamela C. Martin, for petitioner.

John M. Altman, Justin L. Campolieta, Ronald S. Collins, Jr., Matthew J. Avon, Michael S. Coravos, Michael Y. Chin, Jennifer A. Potts, Laurie Nasky, and William T. Derick, for respondent.

## CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.   Overview of Eaton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     A.   Corporate Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     B.   Overview of Eaton's Breaker Products . . . . . . . . . . . . . . . . . . . . 13
     C.   The Island Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          1.   Background and Restructuring . . . . . . . . . . . . . . . . . . . . . 16
          2.   Operations During 2005 and 2006 . . . . . . . . . . . . . . . . . . 22
     D.   Domestic Assembly and Equipment Plants. . . . . . . . . . . . . . . . . 23
     E.   Domestic Component Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
     F.   Third-Party Distributors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.  Tax & Financial Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     A.   Financial Reporting System. . . . . . . . . . . . . . . . . . . . . . . . . . . 26
     B.   The VISTA System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     C.   Mirror Ledgers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III. Background to APA Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     A.   The APA Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     B.   The 1994-97 Audit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**[*4]**   1.   The Audit Team Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        2.   Historical and Proposed Transfer Pricing Methods . . . . . . . 34
             a.   Historical TPM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
             b.   Proposed TPM  Provided to the 1994-97
                  Audit Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        3.   Information Shared . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
             a.   Mirror Ledgers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
             b.   U.S. Assembly and Breaker Products . . . . . . . . . . . . 38

IV.   The APAs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      A.   Covered Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      B.   APA I:  2001-05 Tax Years . . . . . . . . . . . . . . . . . . . . . . . . . . 41
           1.   Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
           2.   APA Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
                a.   Prefiling Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . 43
                b.   APA I Team's Questions. . . . . . . . . . . . . . . . . . . . . 44
                c.   APA I Application Submission . . . . . . . . . . . . . . . . 45
                     i.    Proposed APA I TPMs . . . . . . . . . . . . . . . . . 45
                     ii.   Information Petitioner Provided With Its APA I
                           Application Submission . . . . . . . . . . . . . . . . . 48
                d.   APA I Team's Due Diligence Questions . . . . . . . . . 50
                     i.    VISTA Response . . . . . . . . . . . . . . . . . . . . . . 51
                     ii.   Profit Split Response . . . . . . . . . . . . . . . . . . . 51
                     iii.  Volume Discounts Response . . . . . . . . . . . . . 53
                     iv.   SG&A Expense Allocations . . . . . . . . . . . . . . 55
                     v.    Other Business Operations . . . . . . . . . . . . . . 56
                     vi.   Markup Analysis. . . . . . . . . . . . . . . . . . . . . . 57
                     vii.  Berry Ratio Negotiation . . . . . . . . . . . . . . . . 59
                     viii. Petitioner's Concessions. . . . . . . . . . . . . . . . . 61
           3.   APA I Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
                a.   TPM and Berry Ratio for Breaker Product
                     Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
                b.   SG&A Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
                c.   APA I TPMs for Intangibles Transfer and
                     Cost-Sharing Payment. . . . . . . . . . . . . . . . . . . . . . . 65
                d.   Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
                e.   Materiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**[*5]**               f.     Critical Assumptions. . . . . . . . . . . . . . . . . . . . . . . . . . . 67

          4.    APA I Implementation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

               a.    Canadian Adjustment . . . . . . . . . . . . . . . . . . . . . . . 68

               b.    Disclosure of Book-Tax Difference and APA Multiplier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

               c.    2005 Tax Return . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

     C.   APA II:  2006-10 Tax Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

          1.    Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

          2.    APA II Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

               a.    Prefiling Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

               b.    APA II Application . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

               c.    APA II Team's Due Diligence Questions. . . . . . . . . . 77

                    i.     Profit Split. . . . . . . . . . . . . . . . . . . . . . . . . . . 78

                    ii.    Installed Base Marketing Intangible. . . . . . . . . 80

                    iii.   Technology Intangibles . . . . . . . . . . . . . . . . . . 83

                    iv.   Volume Discounts. . . . . . . . . . . . . . . . . . . . . . . 83

               d.    SG&A Expense Allocations . . . . . . . . . . . . . . . . . . . . 84

               e.    EEI U.S. Distribution as the Tested Party . . . . . . . . . 85

               f.    Licensing of Intangible Property Not Included . . . . . . 87

          3.    APA II Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

               a.    SG&A Expenses and TPM for Breaker Products Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

               b.    Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

                c.    Materiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

               d.    Critical Assumption . . . . . . . . . . . . . . . . . . . . . . . . . 90

          4.    2006 Tax Return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

V.     Implementation of APAs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

     A.   Difference Between Mirror Ledgers and Constructed Income Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

     B.   APA Multiplier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

     C.   APA Annual Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

     D.   APA Annual Reports and Book-Tax Differences. . . . . . . . . . . . . . . . 95

     E.   Petitioner's Data or Computational Errors . . . . . . . . . . . . . . . . . . . 95

          1.    Discovery and Reporting of Errors . . . . . . . . . . . . . . . . . . . 96

          2.    APA Multiplier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

**[\*6]** 3. Errors Affecting the Computation of the Transfer Price Under the APA TPM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
  a. OEM Categorization . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
  b. Purchase Resale Error . . . . . . . . . . . . . . . . . . . . . . . . . 103
  c. Operating Expenses Associated with Breaker Products Not Manufactured by the Island Plants. . . . . . . . . . . 105
  d. International Sales Error . . . . . . . . . . . . . . . . . . . . . . . 106
  e. Error in Identifying Sales of Industrial Breakers Through Lincoln . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
  f. Lincoln Multiplier Error . . . . . . . . . . . . . . . . . . . . . . . 109
  g. Error in Computation of Manufacturing Costs for Nonexact Matches. . . . . . . . . . . . . . . . . . . . . . . . . . . 110

VI. Petitioner's Supplemental and Third APA . . . . . . . . . . . . . . . . . . . . . . . 111

VII. Cancellation of APAs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

VIII. Notice of Deficiency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

IX. Tractech Bonuses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

I. Cancellation of APAs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
  A. Overview of Parties' Positions . . . . . . . . . . . . . . . . . . . . . . . . . 119
    1. Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
    2. Respondent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
  B. History of the APA Program . . . . . . . . . . . . . . . . . . . . . . . . . . 120
  C. Applicable Revenue Procedures . . . . . . . . . . . . . . . . . . . . . . . . 126
    1. Rev. Proc. 96-53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
    2. Rev. Proc. 2004-40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
  D. Background on Section 482 and Applicable Regulations. . . . . . . 129
  E. Scope and Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . 131
  F. APA Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
    1. Profit Split . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
    2. Tested Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
    3. Business Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

**[*7]**        4.    Mirror Ledgers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

        5.    Relationship Between Breaker Products and
            U.S. Assembly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

        6.    SG&A Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

        7.    Southbound Transactions . . . . . . . . . . . . . . . . . . . . . . . 148

        8.    APA Multiplier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

        9.    Lincoln Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

    G.    Analysis Regarding APA Negotiations . . . . . . . . . . . . . . . . . . . . . 151

    H.    APA Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

        1.    Error in Supporting Data and Computations. . . . . . . . . . . . 164

        2.    Errors Affecting the Computation of the Transfer Price
            Under the APA TPM. . . . . . . . . . . . . . . . . . . . . . . . . . . 170

            a.    OEM Categorization . . . . . . . . . . . . . . . . . . . . . . 170

            b.    Purchase Resale Error . . . . . . . . . . . . . . . . . . . . . 170

            c.    Operating Expenses Associated With Breaker
                Products Not Manufactured by the Island Plants . . . . 171

            d.    International Sales Error . . . . . . . . . . . . . . . . . . . . . 171

            e.    Sales of Industrial Breakers Through Lincoln . . . . . . 172

            f.    Lincoln Multiplier Error . . . . . . . . . . . . . . . . . . . . 173

            g.    Error in Computation of Manufacturing Costs for
                Nonexact Matches. . . . . . . . . . . . . . . . . . . . . . . . 173

            h.    Analysis of Errors Affecting the Computation of
                the Transfer Price Under the APA TPM. . . . . . . . . . 174

        3.    Compliance With the Terms of the APAs. . . . . . . . . . . . . . 180

            a.    Book-Tax Differences and Compensating
                Adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

            b.    Forms 1120 and Compliance With the APA . . . . . . . 181

            c.    Canadian Adjustment . . . . . . . . . . . . . . . . . . . . . . 184

            d.    VISTA Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

            e.    Analysis of Compliance . . . . . . . . . . . . . . . . . . . . 187

        4.    Critical Assumptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

        5.    Amended APA II Annual Reports. . . . . . . . . . . . . . . . . . . 189

    I.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

II.    Transfer of Intangibles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

[*8] III.    Tractech Bonuses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  The Internal Revenue Service (IRS or respondent) determined deficiencies in petitioner's Federal income tax of $19,714,770 and $55,323,229 for tax years 2005 and 2006, respectively, and accuracy-related penalties of $14,281,960 and $37,329,600 for tax years 2005 and 2006, respectively.[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

Petitioner and respondent entered into two advance pricing agreements (APAs).  The first APA covered petitioner's 2001 through 2005 tax years (APA I), and the second APA covered petitioner's 2006 through 2010 tax years (APA II).  In 2011 respondent canceled APA I effective January 1, 2005, and canceled APA II effective January 1, 2006.

---

[1]The notice of deficiency includes several adjustments that are computational.

[*9]    The first issue for our consideration is whether respondent's cancellation of petitioner's APAs covering tax years 2005 and 2006 was an abuse of discretion. The Court's resolution of this issue will determine whether additional issues need to be considered.  If we conclude that the cancellation of the APAs was not an abuse of discretion, we must decide whether respondent's section 482 adjustments to petitioner's intercompany transfer pricing for tangible and intangible property between petitioner's U.S. affiliates and its controlled foreign affiliates were arbitrary and capricious.  Alternatively, if the Court does not hold for respondent on the section 482 adjustments and the cancellation of the APAs for tax years 2005 and 2006, we must consider whether Eaton Electrical de Puerto Rico, Inc. (EEPR), transferred intangible property compensable under section 367(d) to petitioner's controlled foreign affiliates for tax year 2006.  If we sustain respondent's determination to cancel APA I and APA II for tax years 2005 and 2006, respectively, and we hold for respondent on the section 482 adjustments, we will need to consider whether petitioner is liable for penalties pursuant to section 6662(e) and (h).

The unrelated remaining issue for our consideration is whether bonus payments to Tractech executives were deductible for tax year 2005 pursuant to section 162(a) or should have been capitalized pursuant to section 263.

**[*10]**  On August 5, 2015, the Court issued a protective order to prevent disclosure of petitioner's proprietary and confidential information.[2]  The facts and opinion have been adapted accordingly, and any information set forth herein is not proprietary or confidential.

## FINDINGS OF FACT

I.     Overview of Eaton

Eaton Corp. is an Ohio corporation.  Its principal place of business was in Cleveland, Ohio, when it timely filed its petition.  During 2005 and 2006 Eaton Corp. was the parent corporation of a group of consolidated corporations and multinational affiliated subsidiaries (collectively, Eaton or petitioner).  Eaton is a global manufacturer of electrical and industrial products.  Eaton was incorporated in Ohio in 1916 as a successor to a New Jersey company incorporated in 1911.

A.     Corporate Structure

During the tax years at issue Eaton was the publicly held parent corporation of a group of U.S. and foreign companies, including:  (1) Eaton Electrical, Inc. (EEI); (2) EEPR; (3) Cutler-Hammer Industries, Ltd. (CHIL); (4) Eaton Industries Manufacturing GmbH (EIMG); (5) Cutler-Hammer Co. (CHC); and (6) Cutler-Hammer Electrical Co. (CHEC).

---

[2]The Court amended paragraph 7(c) of this order on August 17, 2015.

**[*11]** EEI is a Delaware corporation formerly known as Cutler-Hammer, Inc. (CHI). On August 23, 2003, CHI changed its name to EEI.[3] During the tax years at issue EEI was a first-tier, wholly owned subsidiary of Eaton. EEI supplied electrical power and control products through a network of manufacturing and distribution facilities. EEPR owned and operated a number of these manufacturing and distribution facilities. EEPR is a Delaware corporation formerly known as Cutler-Hammer de Puerto Rico, Inc. (CHPR). On October 23, 2003, CHPR changed its name to EEPR. During the tax years at issue EEPR was a first-tier, wholly owned subsidiary of EEI and operated as a possession corporation, pursuant to an election under section 936, through December 31, 2005. Effective January 1, 2006, the remainder of EEPR's operations functioned as a branch of CHC.

CHIL is a Cayman Islands corporation. On December 31, 2002, CHIL acquired all the assets of Cutler-Hammer, S.A., a corporation organized under the laws of the Dominican Republic. During 2005 and until April 28, 2006, CHIL was a direct subsidiary of EEI. On April 28, 2006, CHIL's stock was contributed

---

[3]As the exhibits did, we reference CHI and EEI with the understanding that they refer to the same entity. We use CHI when referring to it before August 23, 2003. We use EEI when referring to it after August 23, 2003. We use CHI/EEI when referring to years that cover before and after August 23, 2003.

[*12] to EIMG, a Swiss corporation and indirect subsidiary of Eaton. On April 29, 2006, CHIL elected to be treated as a disregarded entity for U.S. tax purposes. During the tax years at issue CHIL conducted branch operations in the Dominican Republic.[4]

CHC is a Cayman Islands corporation. From its organization on November 23, 2000, until July 31, 2006, CHC was a first-tier, wholly-owned subsidiary of EEPR. On July 31, 2006, EIMG acquired CHC in a section 368(a)(1)(D) reorganization. On August 26, 2006, for U.S. tax purposes CHC elected to be treated as a disregarded entity, effective August 2, 2006. CHC conducted branch operations in Puerto Rico.

On November 16, 2005, CHEC was organized under the laws of the Cayman Islands. From November 16, 2005, until July 31, 2006, CHEC was a first-tier, wholly owned subsidiary of EEPR. CHEC did not conduct any business activity during tax year 2005. CHEC conducted branch operations in Puerto Rico during tax year 2006. On July 31, 2006, the stock of CHEC was contributed to EIMG, and on August 26, 2006, CHEC elected to be treated as a disregarded entity for U.S. tax purposes, effective August 2, 2006.

---

[4]For the services CHIL provided on behalf of CHC and CHEC, CHIL was compensated through a monthly fee equal to its costs plus a fixed markup. The compensation to CHIL is not at issue.

[*13]  B.    Overview of Eaton's Breaker Products

During the years at issue Eaton developed, manufactured, and sold circuit breaker and electrical control products (collectively, breaker products) through various manufacturing plants (collectively, Island plants) in Puerto Rico and the Dominican Republic.  The Island plants operated through EEPR, CHC, CHEC, and CHIL, and manufactured most of petitioner's breaker products.

Breaker products are safety products, designed to regulate and manage the flow of electricity.  Breakers open and close electrical circuits safely upon detection of abnormal circuit conditions.  A breaker should trip when it detects too much electricity being drawn through the attached wires or when it senses a short circuit.  Control products, such as starters, push buttons, and contractors, control electricity that powers electrical or electromechanical devices.  Control products protect operators of equipment and the machinery itself by safely turning the machinery on or off or by governing its speed.

Breaker products are heavily regulated because of their safety aspect.  In the United States, Underwriters Laboratories, Inc. (UL), is the organization that evaluates and approves breaker products.  The National Electrical Code (NEC) specifies that certain devices used in an electrical system must be "listed" devices, defined as devices that have been evaluated and approved by an organization with

[*14] the authority to make such a determination.  See NEC 2005, NFPA 70: National Electric Code, International Electric Code Series, at 70-29, http://dsps.wi.gov/Documents/Industry%20Services/Forms/Elevator/HistoricalCodes/2005%20NEC.pdf.  UL is a private company, approved by the U.S. Department of Labor as a Nationally Recognized Testing Laboratory.  See United States Department of Labor, Occupational Safety and Health Administration (OSHA):  OSHA's Nationally Recognized Testing Laboratory (NRTL) Program, Current List of NRTLs, https://www.osha.gov/dts/otpca/nrtl/nrtllist.html.  If a breaker product meets UL requirements, it receives a UL label.  If a breaker product does not meet UL requirements, it cannot be sold in the United States.

During the tax years at issue the U.S. breaker product manufacturing industry was composed of Eaton and four major competitors:  Schneider Electric (Schneider), General Electric Corp. (GE), Siemens A.G. (Siemens), and to a lesser extent, ASEA Brown Boveri, Ltd. (ABB).  These same competitors, as well as Rockwell Automation, manufactured control products.

The Island plants manufactured a wide variety of breaker products on a large scale.  Eaton manufactured component parts used to make breaker products in various feeder plants on the Islands.  The feeder plants assembled the various component parts into final breaker products.  A single breaker product can have as

[*15] many as 100 component parts. In 2005 and 2006 the Island plants manufactured most of the component parts that went into the breaker products. Eaton's U.S. plants manufactured the component parts that were sold and shipped to the Island plants for incorporation into the products that the Island plants manufactured and assembled. Eaton's U.S. plants manufactured a small number of the component parts used by the Island plants to assemble finished breaker products.

Eaton sold the same breaker products both internally to its assembly operations and to third parties. The Island plants sold the finished breaker products to two parts of EEI in the United States: (1) EEI's assembly plants (U.S. assembly), which inserted the breaker products into the electrical panelboards and switchgear, and (2) EEI's distribution department (U.S. distribution), which was responsible for selling breaker products to third parties. Third parties that purchased breaker products could be categorized as original equipment manufacturers (OEMs), distributors, or other large direct customers such as retailers, large contractors, or industrial users. OEMs used the breaker products that they purchased as components in larger products such as the panelboards and switchgears. OEMs often competed with EEI's assembled products. Hundreds of OEMs manufactured assembled products, and most of them did not manufacture

[*16] the components that they needed for assembly. Only a few companies, such as Eaton, manufactured breaker products and produced assembled products. Whether the breaker products were sold to U.S. assembly, OEMs, or any other customer, the Island plants manufactured them in the same manner.

C.    The Island Plants

1.    Background and Restructuring

On January 31, 1994, petitioner acquired the Westinghouse Distribution and Control Business Unit (DCBU) from Westinghouse Electric Corp. (Wesco). Petitioner acquired facilities in Puerto Rico which manufactured three product lines: miniature circuit breakers (MCBs), molded case circuit breakers (MCCBs), and control products.

In connection with the DCBU acquisition from Wesco, CHPR purchased the business owned and conducted by Westinghouse de Puerto Rico, a Delaware corporation, including manufacturing intangible assets. The purchase agreement defined manufacturing intangible assets as those defined by section 936(h)(3)(B)(i) and section 1.936-6(c), Income Tax Regs. As part of the purchase agreement petitioner acquired the following three facilities in Puerto Rico: (1) an MCB facility in Aguas Buenas, Puerto Rico, (2) an MCCB manufacturing facility in Toa Baja, Puerto Rico, and (3) a control product manufacturing facility in

[*17] Coamo, Puerto Rico.[5]   The Toa Baja facility was moved and consolidated with existing operations in Arecibo in 2001.  The Island plants manufactured different breaker products in different manufacturing plants because the equipment, materials, and skills required to manufacture them varied among the plants.

Westinghouse began manufacturing MCBs in Puerto Rico in 1973.  It began making MCCBs and control products in Puerto Rico in 1968 and 1976, respectively.  Before the DCBU merger CHPR had it own operations in Puerto Rico.  The Cabo Rojo facility opened in 1975.

In response to the phaseout of section 936 benefits, CHPR transferred assets to CHC and CHEC in a series of transfers between December 29, 2000, and January 1, 2006.  CHPR/EEPR transferred assets to CHC and CHEC at various times between December 29, 2000, and January 1, 2006.  For each tangible asset transfer, CHI/EEI licensed certain intangible property related to the transferred tangible assets to CHC or CHEC.  Licensing agreements were executed on the following dates: (1) December 29, 2000, (2) December 1, 2001, (3) June 1, 2005, and (4) January 1, 2006.

---

[5]The record does not explain what happened to the Aguas Buenas facility.

[*18]  Effective December 29, 2000, CHI and CHC entered into a license agreement whereby CHI granted a nonexclusive license to use, including the right to sublicense, a broad class of intangible property that CHC used to manufacture and assemble certain breaker products.  The categories of intangible property that CHI licensed to CHC included all patents, trademarks, copyrights, maskworks, and "information" necessary to, or used in, the operation of CHC in manufacturing breaker products.

In exchange for the license CHC agreed to pay CHI a royalty of 4% of CHC's net sales of the licensed breaker products.  CHC also granted back to CHI a royalty-free exclusive license to use, including the right to sublicense, all patents, trademarks, copyrights, maskworks, and information related to the breaker products that were developed by CHC.

The CHI and CHC license agreement was amended on December 1, 2001, and again on June 1, 2005, to include intangible property associated with additional breaker products.  The amendments increased the royalty rate from 4% to 6.45% of net sales.  All other terms and conditions generally remained the same.

Effective January 1, 2006, EEI and CHEC entered into a license agreement whereby EEI granted to CHEC a nonexclusive license to use a broad class of intangible property that CHEC used to manufacture certain additional breaker

[*19] products.  The terms of the EEI and CHEC license agreement were substantially similar to the terms of the CHI and CHC license agreement (as amended), including the royalty rate of 6.45% of net sales, except that under the terms of the EEI and CHEC license agreement:  (1) EEI licensed to CHEC all intangible property related to breaker products that was subsequently developed or acquired by EEI and (2) CHEC agreed to reimburse EEI for the intangible development costs associated with any subsequently developed or acquired intangible property.

On December 29, 2000, CHPR transferred assets with a net book value of $4,736,230 and a certain number of employees to CHC.  CHC received the assets as a contribution to capital and agreed to offer immediate employment to the employees.

On December 1, 2001, CHPR agreed to transfer assets with a net book value of $6,086,194 and a number of employees located and employed at the Coamo facility to CHC.  CHC received the assets as a contribution to capital and agreed to offer immediate employment to the employees.  The December 1, 2001, asset transfer agreement listed that assets would be transferred to CHC on three particular dates:  December 17, 2001, January 29, 2002, and February 13, 2002.

[*20] On its 2001 Form 926, Return by U.S. Transferor of Property to a Foreign Corporation, dated June 29, 2002, CHPR reported that on December 17, 2001, it had transferred assets in a section 351 nonrecognition transaction. Petitioner checked "yes" for the question whether intangible property within the meaning of section 936(h)(3)(B) was transferred. The attachment to the Form 926 explained that the transferee entered into an intellectual property license with CHI.

On January 2, 2002, CHPR agreed to transfer assets with a net book value of $3,697,284 and a number of employees located and employed at the Las Piedras facility to CHC. CHC received the assets as a contribution to capital.

On its 2002 Form 926 dated September 12, 2003, CHPR reported that it had transferred assets to CHC on January 2, January 29, and February 13, 2002, respectively, in three section 351 nonrecognition transactions. Petitioner checked "yes" for the question whether intangible property within the meaning of section 936(h)(3)(B) was transferred. The attachment to the Form 926 explained that the transferee entered into an intellectual property license with CHI.

On June 1, 2005, EEPR entered into two asset transfer agreements with CHC. Pursuant to the first asset transfer agreement, EEPR transferred assets and employees from the Arecibo, Cabo Rojo, and Las Piedras facilities as contributions to the capital of CHC. Pursuant to the second asset agreement,

[*21] EEPR contributed an undivided joint interest in certain common assets owned by EEPR and jointly used by CHC and EEPR since June 1, 2005, in support of the manufacturing operations of the two companies at the Cabo Rojo, Las Piedras, and Arecibo facilities.

On its 2005 Form 926 EEPR reported that it had transferred assets to CHC on June 1, 2005, in a section 351 nonrecognition transaction. Petitioner checked "yes" for the question whether intangible property within the meaning of section 936(h)(3)(B) was transferred. The attachment to the Form 926 explained that the transferee entered into an intellectual property license with EEI .

On January 1, 2006, EEPR agreed to transfer assets and a number of employees to CHEC. CHEC received the assets as a contribution to capital and agreed to offer immediate employment to the employees. The asset agreement did not provide a net book value amount for the transferred assets.

On its 2006 Form 926 EEPR reported that it had transferred various operating assets to CHEC on January 1, 2006, in a section 351 nonrecognition transaction. Petitioner checked "no" for the question whether intangible property within the meaning of section 936(h)(3)(B) was transferred. The attachment to the Form 926 made no mention of an intellectual property license.

**[*22]**     2.     Operations During 2005 and 2006

In 2001 MCCB operations took place in Puerto Rico, and those operations remained there until 2007.  During 2005 and 2006 petitioner had four manufacturing facilities in Puerto Rico and an assembly plant in the Dominican Republic.  Starting in 2007 and ending in 2008, MCCB assembly operations were transferred to the Dominican Republic, while manufacturing operations remained in Puerto Rico.  Since 1976 control products have been manufactured in Puerto Rico.

During 2005 and 2006 the Island plants included an assembly plant in Haina, Dominican Republic, and the following four manufacturing facilities in Puerto Rico:  the Las Piedras plant, the Arecibo plant, the Cabo Rojo plant, and the Coamo plant.  The Haina assembly facility had designated space for each of the product types that it received from the Puerto Rico plants.  In 2005 and 2006 the Las Piedras plant manufactured finished breaker products, parts, and subassemblies for final assembly at the Haina facility.  As of September 2005 the Arecibo plant, along with its sister operations in Haina, produced, assembled, and tested finished industrial MCCBs.

During 2005 and 2006 the Cabo Rojo plant manufactured industrial fuses and switch-gear circuit breakers for low and medium voltage circuits.  In 2005 and

[*23] 2006 the Coamo plant, along with its sister operation in Haina, manufactured electromechanical relays, contractors, starters, and operator-interface products, such as pushbuttons, indicating lights, and selector switches.

D.     Domestic Assembly and Equipment Plants

Eaton owned and operated a number of facilities that manufactured and/or assembled products that incorporated Island plants manufactured products and other products.  These facilities were in Asheville, North Carolina, Lincoln, Illinois, Cleveland, Tennessee, Fayetteville, North Carolina, Greenwood, South Carolina, and Sumter, South Carolina.

The Lincoln plant produced a complete residential breaker product offering that covered three primary product groups:  loadcenters, meter products, and air conditioning disconnects.  The Lincoln plant's steel fabrication operation fed its residential product offering business.

CHI sold industrial breaker products directly to unrelated OEMs and to unrelated distributors through the Lincoln plant.  These industrial breaker products consisted of breaker products manufactured by the Island plants as well as the Lincoln plant.  The Lincoln plant stopped manufacturing industrial breaker products in 2006.  Starting in April 2006 industrial breaker products were manufactured only in the Island plants.

**[*24]** E.     Domestic Component Plants

EEI operated domestic plants, which manufactured components and parts that were sold and shipped to the Island plants for incorporation into the products that the Island plants manufactured and assembled.  These facilities were in Horseheads, New York, Beaver, Pennsylvania, and Watertown, Wisconsin.  The Horseheads plant manufactured vacuum interrupters which were in systems that distribute, protect, and control electricity.  The Island plants purchased vacuum interrupters from the Horseheads plant.  The Beaver plant manufactured and assembled MCCBs, automatic transfer switches, low-voltage power breakers, and circuit breakers.

The Watertown plant manufactured count control products, specific purpose control products, adjustable frequency drive, open and enclosed drives, metering products, relays, printed circuit boards, and operator interface equipment.  The Watertown plant supplied printed circuit boards to the Island plants and to the Lincoln and Beaver plants.

The Island plants purchased approximately $8 to $10 million of components per year from CHI out of more than $300 million of cost of goods sold (COGS), which the Island plants used to manufacture breaker products.  These southbound transactions included the Island plants' purchase of vacuum interrupters that were

[*25] manufactured in petitioner's Horseheads plant. The Island plants incorporated the vacuum interrupters into the breaker products that it manufactured. The Island plants purchased other raw materials and components from unrelated third parties.

### F. Third-Party Distributors

Third-party distributors played a role in the sale of CHI/EEI products. Third-party distributors resold the products they bought from CHI/EEI to smaller OEMs and industrial or utility customers, as well as to contractors. Most third-party distributor sales involved large, well-established electronics distribution companies. These companies offered broad lines of products and had developed complete distribution networks in the United States. A national third-party distributor typically carried a complete range of products from a large number of various-sized suppliers, including CHI/EEI and its direct competitors. During the years at issue the largest third-party distributor of CHI/EEI products was Wesco. CHI/EEI also had sales relationships with a number of regional electrical product distributors.

## II. Tax & Financial Reporting

For the tax years at issue petitioner was a calendar year taxpayer that filed consolidated Federal income tax returns. Petitioner reported its income for

[*26] financial purposes on a calendar year and prepared its income statements and balance sheets in accordance with U.S. Generally Accepted Accounting Principles (GAAP).

A.     Financial Reporting System

Petitioner used a financial reporting and management system called Hyperion for various purposes, including financial and legal consolidation of its several accounting ledgers.  Petitioner used Encore, a system that received data from its ledgers, and Corptax, a system that consolidated its ledger data for U.S. tax reporting purposes.  Accounting ledger data was maintained in an Oracle data base system.

To prepare its tax returns petitioner ran a "Path8" Hyperion report, which mapped individual ledgers into legal entities.  Petitioner's financial reporting to the Securities and Exchange Commission (SEC) included financial results segmented by business area and geographic region.  In 2005 and 2006 Eaton's reported business segments included electrical, fluid power, truck, and automotive. The electrical segment comprised numerous financial accounting ledgers, including ledgers for EEI and the Island plants' operations.

**[*27]** B.     The VISTA System

VISTA is a comprehensive legacy electronic order management system, which included sales and other functions that Eaton used for its electrical business. Third parties, Eaton's salespersons, and Eaton's internal purchasers could place product orders in VISTA.  Westinghouse developed VISTA before Eaton acquired DCBU in 1994.

Each VISTA invoice contained information relating to an invoice transaction, including transactional data such as customer name, customer ID, billing address, billing line, shipped-to address, invoice date, catalog number, product description, product code, the quantity of product sold, the unit sale price, the customer discount, and the total sale amount.  Each VISTA invoice contained information necessary to reprint a hard copy invoice. The VISTA database recorded and retained transactional data.

VISTA functioned like a relational database in that various related pieces of data on separate files were linked by key fields.  The VISTA database stored native VISTA data on a direct-access storage device.  The native VISTA data was stored and processed in extended binary coded decimal interchange code format, which is an eight-bit character code used in computing and data transmission.

[*28] VISTA data was processed on a mainframe computer. Mainframe computers are typically used by large organizations to perform large-volume activity, such as bulk data processing, statistics, and transaction processing. In 2005 and 2006 an end user, such as a salesperson or customer, could communicate with Eaton's mainframe computer by using a PC or Eaton's online order-entry application.

When its mainframe executed a batch job or jobstream, the computer created a job log that documented the job statistics and cataloged the name of any files created from the successful or unsuccessful execution of the job. VISTA contained numerous files within its system. Once booked, the invoice data records within the invoice files did not change. To obtain annual invoice data, the database was filtered on the booking date to extract data inclusive of the year.

EEI's invoice information for sales to third parties and interunits were entered into VISTA. To create an invoice the VISTA system populated various data fields in the VISTA invoice files. One field was the "billing line" field, which included a three-digit code petitioner used to identify a set of financial accounts associated with a product and plant location. A particular plant might have multiple billing line codes associated with it. Each billing line code was

[*29] associated with a single Oracle ledger within petitioner's financial reporting and accounting systems.

Some of the relevant master files used in the VISTA system to populate certain fields in the VISTA invoice files included billing lines, country codes, customer category, invoice type codes, product families, and warehouse codes. The master files were dynamic and were updated in the ordinary course of petitioner's business. The master files could change multiple times within the same business day. Most of the information of the master files changed very little over time. Petitioner did not archive copies of the VISTA system master files that were used each day during 2005 and 2006.

During 2005 and 2006 petitioner's mainframe computer ran a daily data extraction batch process called the daily billing wire to capture pertinent sales data from selected fields of the VISTA transactional files. The daily billing wire was appended daily to a weekly file, which was cataloged and permanently maintained in the VISTA system. After the daily billing wire was appended to the permanent weekly file, the daily billing wire was deleted.

The weekly billing wire file was appended to an annual file named the market reporting sales billed extract (MRSB). Eaton used the MRSB data for reporting purposes. The MRSB data was cataloged and permanently archived on

[*30] petitioner's mainframe systems.  Eaton's MRSB file contained information on EEI's sales to the Puerto Rico operations.  The MRSB file did not contain information on sales from the Puerto Rico operations to EEI.  The sales invoices from Puerto Rico operations to EEI were recorded manually in the Oracle reporting system.

Eaton's VISTA programmers were responsible for creating reports used to show orders and sales specialists.  These programmers generated reports used for transfer pricing calculations.

C.     Mirror Ledgers

EEI maintained a group of ledgers that recorded EEI U.S. distribution's purchase of breaker products from the Island plants and subsequent transfers of those products (hereinafter, mirror ledgers).  EEI recorded the arm's-length transfer price for the breaker products as an expense on the mirror ledgers.  These expenses, or COGS, reduced the net income of EEI as reflected on the mirror ledgers.  For 2005 and 2006 EEI maintained six mirror ledgers related to the Island plants' operations.

The mirror ledgers reflected revenue from sales of breaker products:  (1) to third parties, including OEMs and distributors, at arm's-length prices, and (2) to internal assembly plants at the price petitioner set for internal management

[*31] purposes (internal management price). The revenue from the sales to third parties at arm's-length prices was included in EEI's overall net U.S. taxable income.

EEI sold or transferred breaker products as reflected on the mirror ledgers through various channels, including domestic OEMs, domestic distributors, domestic affiliates or operations, and international customers. For transfers of breaker products to domestic affiliates or operations, the mirror ledgers recorded the price paid for the breaker products at the internal management price.

For internal purposes only EEI set the price for breaker products transferred internally within EEI to be approximately 1.3 times the cost of manufacturing the products. Setting the internal management price consistently at a lower markup on costs over time allowed EEI's management to evaluate and compare the ongoing financial performance of different business segments within EEI. Maintaining a consistent internal management price avoided unnecessary disagreements between business units regarding the appropriate price for internal transactions. The transfer price for EEI U.S. distribution's purchase of breaker products could be expressed as a mathematical equivalent markup on the Island plants' cost for manufacturing the breaker products. Generally, during the years at issue, the transfer price computed under petitioner's APAs was equivalent to approximately

[*32] 1.8 times the cost of manufacturing the breaker products. Petitioner's internal management price was less than the transfer price computed under petitioner's APAs.

The mirror ledgers always showed operating losses because a significant portion of the revenue resulted from sales to internal assembly plants at the lower internal management price of 1.3 times cost, rather than 1.8 times cost--the arm's-length price. The fact that the mirror ledgers always reflected losses was not indicative of the profitability of EEI or the breaker products. The profitability of EEI could be assessed only when all of its business ledgers were consolidated and all internal transactions--such as the sales of breaker products from EEI's U.S. distribution to U.S. assembly at the internal management price--were eliminated because they had no economic effect on EEI's overall profitability. The internal transactions did not make EEI's total overall profits bigger or smaller.

III.    Background to APA Negotiations

    A.    The APA Program

The APA Program is a dispute resolution process designed to resolve actual or potential future transfer pricing disputes between the IRS and the taxpayer. See Announcement 2000-35, 2000-1, C.B. 922. The ultimate goal of the process is to enable taxpayers and the IRS to agree on three issues:  (1) the intercompany

[*33] transactions to which the APA applies (covered transactions); (2) the

transfer pricing methodology (TPM) applicable to the covered transactions; and

(3) the expected arm's-length range of results after applying the agreed-upon TPM

to the covered transactions. See id., 2000-1 C.B. at 924.

Before determining the appropriate APA TPM, the APA team and the

taxpayer must reach an understanding of the relevant facts through a due diligence

process, during which the APA team asks the taxpayer for any information it

thinks necessary to verify that the taxpayer's statements regarding the facts in the

taxpayer's APA application are true and complete. This due diligence process can

be lengthy, and it typically involves one or more meetings between the taxpayer

and the APA team over a period ranging anywhere between one and two years.

Due diligence questions relate mostly to the taxpayer's business, the mechanics of

the TPM, and the economic issues associated with the TPM.

B.    The 1994-97 Audit

Respondent audited petitioner's 1994-97 tax returns, rejecting its proposal

to use a comparable uncontrolled price (CUP) method for its TPM. Petitioner

agreed to apply for an APA for its 2001 tax year as part of the settlement reached

with respondent regarding the audit for petitioner's 1994-97 tax years, and

respondent agreed to work with petitioner in obtaining an agreement. The

[*34] settlement was finalized in February 2002. The APA process would provide respondent with the opportunity to further review petitioner's proposed use of the CUP method.

### 1. The Audit Team Members

The IRS audit team for the 1994-97 audit (audit team) included, among others, an international exam manager and two international examiners. Each of those audit team members was also a member of the APA I exam team. Petitioner's primary participants in the 1994-97 audit were its senior vice president of tax, its vice president of Federal tax strategy, a senior manager from its tax department, and an economic consultant.

### 2. Historical and Proposed Transfer Pricing Methods

#### a. Historical TPM

Before its proposal to use a CUP method, petitioner used the cost-plus method. The cost-plus method evaluates whether the amount charged in an intercompany sale is arm's length by reference to the gross profit markup realized in comparable uncontrolled transactions. See sec. 1.482-3(d)(1), Income Tax Regs. The CUP method evaluates whether the amount charged in a controlled transaction is arm's length by reference to the amount charged in a comparable uncontrolled transaction. See id. para. (b).

[*35] Petitioner chose to use the cost-plus method as its preferred TPM for the Island plants' transfer of breaker products to CHI. Part of the Island plants' breaker product manufacturing process included manufacturing and assembling electrical distribution and control equipment. The general manufacturing for the Island plants' products involved processes that formed, manipulated and/or assembled plastics and metals. These activities were generally routine activities that were undertaken by many independent companies. Petitioner concluded that the availability of financial information for companies comparable to the Island plants' operations allowed for the use of the cost-plus method. According to petitioner the cost-plus method treated the Island plants as the controlled party whose profitability was tested.

        b.     <u>Proposed TPM Provided to the 1994-97 Audit Team</u>

During the course of the 1994-97 audit petitioner proposed using the CUP method for determining the level of profitability associated with the breaker products manufactured in the Island plants and met with the IRS audit team to discuss its proposal on January 17, 2001. Petitioner believed the CUP method was better than the cost-plus method that it had used previously. The IRS audit team was not familiar with petitioner's proposed model. They wanted the controlled and uncontrolled transactions to involve identical products that were compared on

[*36] an individual basis rather than by groups of similar products. They also wanted relevant uncontrolled sales for purposes of a CUP method to be limited to sales to OEMs, rather than the combined sales to OEMs and U.S. distributors.

To address concerns raised about the CUP method petitioner provided the audit team with a study on the CUP method dated March 19, 2001. Some of petitioner's breaker products that were produced by the Island plants were sold to EEI and some were integrated into other assembled products. Other breaker products were sold to unrelated third-party OEMs. Petitioner's proposal contemplated using an income stream from products the Island plants sold to third-party OEMs as the income CHI would have earned on the Island plants' components that it integrated into its assembled products.

To determine an income stream petitioner's CUP method developed a constructed income statement that was generated using CUPs it discovered and assumptions regarding the allocation of costs. This constructed income statement differed from the mirror ledgers. It was not an actual part of EEI's accounting system. The income stream and a comparable profits method (CPM) would then be used to determine whether the distribution profit was reasonable.

In its 2001 CUP method study petitioner took steps to make the CUP method more precise, including using both catalog and style (or part) numbers to

[*37] more precisely match controlled and uncontrolled sales of the same product, identifying 29 product groups of common products, and identifying sales specifically to third-party OEMs, rather than all third parties. Petitioner provided the audit team with an extract from its VISTA database identifying the 29 product groups, the product codes within each group, and the standard costs for each product sold to different categories of third parties in the United States, and a sample extract of raw VISTA data that was used for application of the CUP method. As part of the information about the CUP method proposal, petitioner showed the audit team the mirror ledgers that recorded losses in their book income line.

### 3. Information Shared

#### a. Mirror Ledgers

As part of the 1994-97 audit, the audit team requested that petitioner explain the losses reported on the CHPR U.S. mirror ledgers. On October 31, 2000, petitioner provided a written explanation to the audit team. Petitioner explained that: (1) the losses occurred because the arm's-length price paid to the Island plants for breaker products as reflected on the mirror ledgers was higher than the amount recorded on the mirror ledgers as revenue from U.S. assembly based on CHI's internal management price; (2) the mirror ledgers were just a few of CHI's

[*38] hundreds of ledgers, all of which must be combined--with intracompany transfers eliminated--to determine the overall financial results of CHI; and (3) the profits and losses on the mirror ledgers were unrelated to the economics of arm's-length sales because a substantial portion of the revenue recorded on the mirror ledgers was calculated on the basis of the internal management price.

### b.     U.S. Assembly and Breaker Products

Petitioner's October 31, 2000, response regarding its mirror ledgers addressed the relationship between U.S. assembly and breaker products.  This response indicated that profit or loss generated by the assembly activities could not control the price paid to the component plants.  This response explained that CHI's ability to sell its assembly products at a high profit would not justify the Island plants' charging an above-market price for its components, and likewise, U.S. assembly's inability to be profitable due to inefficiencies or market factors would not justify paying CHPR a below-market price for the components it manufactures.

On June 2, 2000, respondent issued a Form 4564, Internal Revenue Service Information Document Request (IDR), to petitioner requesting an explanation of the relationship between U.S. assembly and breaker products.  In June 2000 petitioner provided the audit team with a written response explaining why it

**[*39]** believed the price paid by CHI to CHPR for breaker products was not overstated. Petitioner's response explained that total U.S. sales were important for both the CUP and the profit-split analysis. Petitioner's response further explained that the suggestion that OEM sales were the most relevant comparable did not reflect the fact that its electrical business is an integrated business.

This response explained that a substantial portion of CHI's distributor sales were directly related to sales of components it previously made to OEMs and sales of customized electrical assemblies that it previously made to unrelated third parties. The response explained further that because of the nature and life cycle of assembled products, third-party purchasers regularly purchased the Island plants' products for customized electrical assemblies from unrelated distributors. The response included a letter from petitioner's outside economic consultant which described the many ways in which the distributor products are analogous to blades and the sales to related or unrelated OEMs are analogous to razors.

Upon further review petitioner's outside economist discovered that his description of the relationship between U.S. assembly and the breaker products was inaccurate. Clarification of this inaccurate description was included in a letter to the APA II team leader on April 21, 2006. This letter explained that there were no volume replacements for breaker products because of a failure rate of less than

[*40] 2%. It explained further that the theory of an installed base is the classic razor and blade situation in which a manufacturer sells only razors that can be used only with its brand of replacements. Under this theory the blades can be sold at a higher price, covering the low profitability on the razors. This response explained that a profitable replacement market required the product compared to the blade to be replaced frequently, which was not the case for breaker products.

IV.   The APAs

On November 14, 2003, petitioner and respondent reached an agreement on the terms of petitioner's first APA, which covered petitioner's 2001-05 tax years. APA I was executed on April 14, 2004. On June 23, 2005, petitioner submitted its application for the renewal of APA I (APA II), which covered petitioner's 2006-10 tax years. APA II was executed on December 20, 2006.

A.   Covered Transactions

Petitioner's APA I applied to three covered transactions: (1) breaker product transfers from CHPR/EEPR[6] to CHI/EEI, (2) CHI/EEI's license of intangible property to CHC, and (3) CHPR/EEPR's cost sharing payments to CHI/EEI. APA II applied only to CHC's and CHEC's sale of breaker products to EEI.

_____

[6]We use CHPR/EEPR because in 2003 CHPR changed its name to EEPR.

**[*41]** CHI/EEI U.S. distribution purchased breaker products from the Island plants and either resold those products to unrelated U.S. and foreign parties, or transferred the breaker products to affiliated U.S. assembly plants and foreign subsidiaries. During 2005 and 2006 EEI U.S. distribution purchased 100% of the Island plants' manufactured breaker products.

CHI/EEI licensed intangible property to the Island plants, which the Island plants used to manufacture breaker products, pursuant to two licensing agreements. Under the licensing agreements, CHI/EEI licensed approximately 800 patents related to the breaker products. The patents related primarily to modifications of existing technologies and breaker products. There was a cost sharing arrangement between CHPR/EEPR and CHI/EEI that covered research and development expenses.

B. APA I: 2001-05 Tax Years

1. Participants

The APA I team's participants in the APA I negotiations (APA I team) included personnel from both the APA Program office and respondent's exam team. The participants from the APA Program office included the APA I team leader and several APA economists. The participants from the exam team included three members of the 1994-97 audit team, including the 1994-97 audit

[*42] team's international exam manager. Although not employees of the APA

Program office,[7] the exam team members constitute a portion of an APA team and

assist throughout the entire APA process, including negotiations with the taxpayer.

In general the role the exam team plays in the APA process is to support the APA

team by providing background information regarding the taxpayer and performing

needed calculations.

An APA team leader coordinates several team members for the APA

negotiations and initiates the APA application process. The APA team leader

communicates with the taxpayer's representatives to coordinate logistics,

including scheduling meetings. Before an initial meeting is conducted with the

taxpayer, a team leader will generally collect thoughts regarding questions that

should be asked of the taxpayer. The team leader is responsible for drafting the

APA, as well as drafting a memorandum to the Associate Chief Counsel

(International) explaining the reasons for accepting an APA.

Before working in the APA Program office, the APA I team leader was a

member in the office of the Associate Chief Counsel (International). In 2001 or

2002 she started in the APA Program office and worked there until moving back

---

[7]The exam team members generally come from the IRS field organization. See Announcement 2006-22, 2006-1 C.B. 779, 780.

**[*43]** to the office of the Associate Chief Counsel (Tax Exempt and Government

Entities) in 2005. The APA I team leader worked as a team leader on several

APAs during her time in the APA Program office.

Petitioner's primary participants in the APA I negotiations were its senior

vice president of tax and its vice president of Federal tax strategy. Petitioner's

outside representatives in the APA I negotiations included employees of

PricewaterhouseCoopers, LLP (PwC), and KPMG, LLP, including two economists

and two attorneys. The PwC employees included a former Director of the APA

program and a former employee of the U.S. Department of the Treasury on

international tax matters, who later became head of transfer pricing at the

Organization for Economic Co-operation and Development (OECD) in Paris,

France.

### 2. APA Negotiations

The APA I request began with a prefiling conference, and the total APA I

process lasted 18 months.

#### a. Prefiling Meeting

Before making any commitment or filing a formal application, a taxpayer

may, through a prefiling conference, approach the APA Program to discuss its

preliminary views of the taxpayer's potential APA request, including whether an

[*44] APA would be appropriate under the facts, what types of information would be necessary to support the request, and whether the taxpayer's proposed TPM would be acceptable.  See Announcement 2000-35, 2000-1 C.B. 924.  The first APA negotiations between petitioner and respondent began in the middle of 2002, and on May 8, 2002, petitioner and the APA I team had a prefiling meeting to discuss petitioner's anticipated APA I application.

During this meeting petitioner described the scope of CHI/EEI's business, including its various operating divisions for both components and assembled products, as well as its customer base.  The APA I team indicated that if the CUP method were to be used, the uncontrolled transactions would have to be limited to the sales to OEMs, rather than sales to OEMs and distributors.  The APA I team's concerns were similar to those expressed by the 1994-97 audit team.

b.    APA I Team's Questions

Before petitioner formally submitted its APA I application, an APA I team economist asked petitioner's economist about inputs that the Island plants purchased from CHI/EEI, referred to as the southbound transactions.  Petitioner's economist communicated to the APA I team that out of the Island plants' $300 million COGS, approximately $8 to $10 million related to materials purchased from CHI/EEI.

**[*45]**                    c.        APA I Application Submission

On August 22, 2002, petitioner submitted its formal application for an APA. Petitioner's APA I application responded to issues related to product comparability, which echoed the issues that the 1994-97 audit team raised. This application explained that most sales to distributors involved large, well-established distribution companies. These companies offered broad lines of products and had developed complete distribution networks in the United States. In its APA I application petitioner explained that CHI/EEI also manufactured and distributed other electrical component products, but these functions, risks, and assets were unrelated to CHI/EEI's intercompany transactions involving the Island plants.

i.        Proposed APA I TPMs

Petitioner's APA I application included proposed TPMs for the covered transactions.

(1).    Transfer of Tangible Property

CHI/EEI U.S. distribution purchased breaker products from the Island plants that were either sold to unrelated U.S. and foreign parties or transferred to affiliated U.S. assembly plants and foreign subsidiaries. Petitioner's proposed arm's-length price that CHI/EEI paid the Island plants for breaker products

[*46] derived from a combination of the CUP and CPM methods. According to petitioner the CUP and CPM methods were the best methods to evaluate the arm's-length nature of prices paid by CHI/EEI to CHPR/EEPR because of the availability and abundance of reliable unrelated transaction data. Petitioner's proposed method combined the use of the CUP and CPM methods to determine the revenues of CHI/EEI on the basis of prices paid by unrelated parties, and compared CHI/EEI's resulting income with the income that CHI/EEI would have received, on the basis of a Berry ratio--gross profit as a percentage of operating expenses--which was determined using independent distributors.

Petitioner used a three-step process to test whether the prices CHI/EEI U.S. distribution paid to CHPR/EEPR for breaker products were arm's length. The first step was to identify third-party prices and revenues CHI/EEI U.S. distribution earned on sales of breaker products to unrelated U.S. parties. On the basis of prices paid by unrelated U.S. OEM customers, third-party equivalent arm's-length revenues for CHI/EEI U.S. distribution's transfer of products to U.S. affiliated manufacturing plants were constructed using a CUP method. The second step was to create a constructed income statement for CHI/EEI's distribution activities using: (1) third-party sales revenues, (2) the third-party equivalent intercompany sales revenues calculated in the first step, (3) CHI/EEI's actual revenue from

[*47] international sales of CHPR/EEPR products, (4) the transfer prices paid by CHI/EEI to CHPR/EEPR, and (5) the selling, general and administrative (SG&A) expenses incurred by CHI/EEI in its distribution of CHPR/EEPR products. The third step was to calculate CHI/EEI's Berry ratio from the data in the constructed income statement created in the second step and compare it to an arm's-length range of Berry ratios established by reference to a sample of comparable independent distributors.

### (2). License of Intangible Property

To establish an appropriate royalty rate between CHI/EEI and CHC, the comparable uncontrolled transaction (CUT) method was applied. On December 1, 2001, CHI/EEI and CHC amended the license agreement to cover additional products. The amended license provided that effective January 2, 2002, CHC would pay CHI/EEI a royalty of 6.45% of CHC's net sales of the licensed breaker products.

In its APA I application submission, petitioner explained that it checked the reasonableness of the results of the CUT method with the research and development (R&D) cost capitalization method to establish the arm's-length royalty rates for manufacturing intangibles in its electrical industry. The CUT method analysis yielded a royalty rate range between 3.6% and 6.0%. The R&D

**[*48]** cost-capitalization method, however, resulted in a royalty rate of 6.9%. To reconcile the different results, petitioner averaged the upper quartile CUT method result (6%) with the royalty rate established by the R&D cost-capitalization method (6.9%), yielding a royalty rate of 6.45%.

### (3). Cost-Sharing Methodology

There was a cost sharing arrangement between CHI/EEI and CHPR/EEPR. The determination of the appropriate allocation of R&D costs between CHPR/EEPR and CHI/EEI was in accordance with regulations under section 936. See secs. 1.936-6 and 1.936-7, Income Tax Regs. Pursuant to regulations under section 936(h)(5)(C)(I), CHPR/EEPR made a cost-sharing payment to CHI/EEI based on the product area research expenses incurred by both parties and certain related affiliates. Id.

### ii. Information Petitioner Provided With Its APA I Application Submission

Petitioner provided the APA I team with a CD-ROM containing the data, including VISTA data, used to derive third-party equivalent pricing for the exact catalog number matching revenues. Petitioner also provided a data set referred to as a VISTA extract, or the IRS report. The primary source of VISTA data for the IRS report was the MRSB report, which provided certain annual sales and

[*49] cost data. Petitioner cataloged and permanently maintained each year's MRSB report.

The IRS reports contained approximately 22,000 line items that summarized sales and cost data for breaker and control products used in computing the APA I TPM. Petitioner's IRS report provided the transaction pricing data for CHI/EEI third-party sales of each breaker product, including manufacturing costs, net extended sale prices, and quantity sold. These reports contained the intercompany quantity sold. Petitioner explained in its APA I application that for purposes of determining the SG&A expenses related to sales of the breaker products, petitioner used the expense allocation methodology CHI used for management reporting purposes.

Petitioner included an income statement showing CHI net income with respect to the breaker products from 1998-2001. On September 16, 2002, petitioner provided the APA I team with an amended income statement, which reflected finalized financial data for 2001 that had not been available at the time petitioner submitted its APA I application. The income statement was constructed to show that CHI net income related solely to the purchase and distribution of breaker products to both third parties and internal assembly plants.

**[\*50]** Petitioner's APA submission explained that most of the sales of the Lincoln plant to the Island plants were made to distributors and were treated as distributor sales for the analysis of determining the TPM. It further explained that a small share of the Lincoln sales was made directly to unrelated OEMs. The submission noted that the Lincoln plant did not modify or physically alter the Island plants' manufactured breaker products in any way.

### d.    APA I Team's Due Diligence Questions

As part of its APA I application due diligence, the APA I team requested access to petitioner's VISTA database and asked a series of followup questions. The APA I team's questions covered several areas, including:  the intellectual property license agreement between CHI/EEI and CHC; the sales functions and rebate procedures of CHI/EEI; sales to OEMs; CHI/EEI's allocation of SG&A expenses; the information, data and documents petitioner used in its 2001 CUP study; the VISTA database; the profit split between CHI/EEI and the Island plants; CHI/EEI's income statement data; and CHI/EEI's international sales. Petitioner provided responses to all of the APA I team's due diligence questions on December 13, 2002. The formal due diligence process lasted about 13 months.

[*51]                    i.    VISTA Response

Petitioner provided the APA I team with a disk containing VISTA database information in text file format relied upon for the analysis presented in its APA I application submission. Petitioner provided a large extract of the VISTA database that was in the same format that petitioner and the APA I team reviewed together during several meetings they held regarding VISTA. In response to the APA I team's request for a data dictionary for VISTA, petitioner provided a description of each VISTA billing wire column heading. The data dictionary includes the names and descriptions of various files and their contents plus additional details, such as the type of format and length of each data element. The billing wire is a program that records individual sales transactions for Eaton's domestic plants. Petitioner explained that a team of forensic technology solution experts reviewed the data for accuracy.

                    ii.   Profit Split Response

Petitioner provided the APA I team with financial information that allowed the APA I team to compare the relative amount of profit split between CHI/EEI and the Island plants under the proposed TPM. The response broke down CHI/EEI's total overall business unit operating profits for 1998-2001 into three categories: (1) the Island plants' income; (2) CHI/EEI's income from distribution

**[*52]** of the Island plants' products; and (3) other consolidated industrial and commercial controls operating income, including income derived from the manufacture of components outside Puerto Rico, the manufacture of assemblies, and sales and distribution activities other than those specifically related to the Island plants' products.

This response showed that the Island plants had the greatest portion of operating profit in each year under both petitioner's old TPM and its proposed TPM, and that "other" operations, including U.S. assembly, incurred either losses or substantially lower operating profit relative to the Island plants each year. The response explained that the publicly reported financials for its electrical business segment included the results of U.S. and foreign operations relating to the manufacture, assembly, sale, and distribution of industrial and commercial control products.

Petitioner further explained that the financial performance of the business activities in the "other" category, including U.S. assembly's activities, was independent from the financial performance of the breaker products manufactured in the Island plants and should not be aggregated with the Island plants' breaker products. The response noted that applying a profit split analysis in lieu of a proposed CUP method would result in a failure to reflect the excess costs that

[*53] petitioner was aggressively seeking to eliminate in its non-Island plant operations. Petitioner provided a similar explanation to the 1994-97 audit team.

In March 2003 the APA I team prepared a spreadsheet analyzing the profit split that resulted from petitioner's proposed TPM for its APA I application. The APA I team's analysis showed that over 80% of the profits were allocated to the Island plants. Some exam team members of the APA I team contended that the Island plants should be treated as the tested party. The APA I team's international exam manager, who was also the 1994-97 audit team's international exam manager, was not convinced that petitioner's proposed TPM was the "best method". In July 2003 the APA I team conveyed to petitioner that it wanted to focus on treating the Island plants--rather than CHI/EEI U.S. distribution--as the tested party, because the proposed TPM profit split resulted in the Island plants' having significant profits and small profits or losses in the United States. The APA I team further reported to petitioner that it did not believe that the proposed TPM sufficiently compensated CHI/EEI for the risks it assumed as distributor.

### iii. Volume Discounts Response

Petitioner addressed volume discounts in its response to the APA I team's due diligence questions about rebates, discounts, and deductions granted to petitioner's customers. The response explained that CHI/EEI granted cash

[*54] discounts to all customers, whether they were OEMs or distributors, if those customers paid for petitioner's products within a specified time. CHI/EEI also granted specified and limited quantity discounts to distributors that purchased a specified volume of products. The response explained that determining the exact amount of cash and quantity discounts granted to each customer was difficult because the discounts were either aggregated in the VISTA database with other deductions or were recorded manually and separate from the VISTA database. The response noted that the CUP analysis presented in its APA I submission took into account all rebates, discounts, and deductions granted to all customers, whether they were entered into VISTA or separately from VISTA, by subtracting the rebate and aggregated deductions from the gross sale price to reach a net sale price.

During a January 15, 2003, meeting between petitioner's advisers and the APA I team, petitioner's advisers explained that no volume-based adjustments were necessary to ensure the reliability of petitioner's CUP method, even where there were differences in volume between uncontrolled and controlled sales. On February 14, 2003, petitioner sent the APA I team a letter following up on its discussion at the January 15, 2003, meeting. The letter explained that even if there were a theoretical basis to apply a volume-based discount when comparing

[*55] CHI/EEI purchases to those of small companies, there was no justification for an arbitrary assumption that CHPR/EEPR would extend a larger discount to global corporations merely because a global corporation had sophisticated purchasing organizations that purchased a large volume of products. More than 70% of CHPR/EEPR's OEM sales came from customers that purchased more than $500,000 worth of product in 2001. The response noted that these customers had sufficient bargaining power to ensure that they were obtaining prices comparable to the price that CHI/EEI would pay the Island plants for similar products.

The response further explained that no bottom line prices existed for CHI/EEI products. In some cases if a customer demanded a significant discount, petitioner's sales personnel could discuss the transaction with product line managers for approval, but prices were generally negotiated on a case-by-case basis.

### iv. SG&A Expense Allocations

The APA I team inquired about how CHI/EEI allocated SG&A expenses.[8] On December 13, 2002, petitioner provided an explanation and a diagram of how

---

[8]APA I defined SG&A expenses as "[o]perating costs within the meaning of treasury regulation sec. 1.482-5(d)(3), specifically including depreciation and excluding any interest expense, Product Area Research Expenses, and any items characterized as extraordinary for financial statement purposes." SG&A expenses are also referred to as breaker product operating expenses.

[*56] it allocated SG&A expenses. Petitioner's explanation noted that SG&A expense allocations followed its longstanding business practices and were not affected by tax considerations. The SG&A expense allocation process began with three corporate cost centers located in Pittsburgh, Pennsylvania: Global Sales & Solutions, Supply Chain, and Cutler-Hammer Group. Each cost center allocated its expenses to three business units: (1) Power Control Systems Operations, (2) Electrical Distribution Products Operations, or (3) CH Engineered Services and Systems. The methodology used to distribute these expenses allocated field sales expenses on the basis of U.S. third-party sales and the remainder of the expenses on direct effort (individuals directed to a specific business unit). This explanation identified the highest level of corporate expenses in the SG&A expense allocation as coming from CHI's division headquarters. Petitioner further discussed its response with a presentation about SG&A expense allocations at a January 15, 2003, meeting with the APA I team.

v.     Other Business Operations

The APA I team inquired about CHI/EEI's "other" business operations during 1998-2001. Specifically, the APA I team asked petitioner to explain an apparent inconsistency between CHI/EEI's income statement and the consolidated data for petitioner's Industrial and Commercial Controls Division. Petitioner's

[*57] response, dated December 13, 2002, provided the APA I team with financial information that segregated the consolidated line of business income data into three categories: (1) CHPR/EEPR income; (2) CHI/EEI income from distribution of CHPR/EEPR products; and (3) "other" consolidated industrial and commercial controls operating income.

Petitioner's response explained that the "other" category, which incurred small losses in 1998 and 1999 but positive profits in 2000 and 2001, included income derived from the manufacture of components outside of Puerto Rico, the manufacture of assemblies, and sales and distribution activities other than those specifically related to CHPR/EEPR products. Petitioner explained that the gradual improvement of results in the "other" category, with positive profits generated during difficult economic periods in late 2000 and 2001, reflected petitioner's efforts to reduce inefficiency and excess capacity in that part of its operations outside of Puerto Rico. Petitioner further noted that not using its proposed CUP method would fail to reflect the excess costs that petitioner was aggressively seeking, with some success, to eliminate in its non-Puerto Rico operations.

### vi. Markup Analysis

In January 2003 the APA I team's economist prepared an analysis of the markup on the manufacturing costs the Island plants would receive under

[*58] petitioner's proposed TPM. His analysis compared the markups the Island plants received on sales to unrelated OEMs, affiliated assembly plants, and unrelated distributors.

Petitioner updated and completed the markup analysis that the APA I team's economist started and provided a final analysis on February 14, 2003. In petitioner's markup analysis, 1998-2000 reflected the results of the historical TPM, and 2001 reflected the proposed TPM for its APA I application. Petitioner's analysis showed that its proposed TPM resulted in a markup on the Island plants' costs of over 70% in 2001, whereas the historical TPM resulted in markups ranging from 51% to 52.8%.

Petitioner further explained as part of the markup analysis that the transfer price reported on its 1998-2001 tax returns differed somewhat from the transfer price derived from the VISTA data because of timing differences between the VISTA data (record of when product is sold by CHI/EEI) and the general ledgers (record dated when product sold by Island plants to CHI/EEI). Petitioner's economists explained the timing difference in an email to the APA I team's economist.

An APA I team economist requested an explanation on how the VISTA data was used in conjunction with petitioner's markup analysis. Petitioner provided a

[*59] memorandum detailing how the VISTA data provided to the APA I team was used for the CUP method computations and the markup analysis. The memorandum explained numerous formulas and calculations used in the CUP method computations and identified how specific columns of data that had been provided to the APA I team were used in these computations.

After receiving petitioner's markup analysis and additional explanation, the APA I team's economist prepared a summary on his markup analysis. He recognized twice in his summary that the Island plants' weighted average markup on sales to petitioner's assembly plants under the CUP method was higher than the weighted average markup for sales to third-party OEMs. His summary stated that "[t]he difference between weighted averages is simply due to different product mixes." His summary further stated that "[t]his analysis demonstrates convincingly that the CUP * * * [method] proposed by the taxpayer is an appropriate TPM in this case."

### vii. Berry Ratio Negotiation

The APA submission proposed a TPM for the transfer of tangible property using a Berry ratio as part of its calculations. The Berry ratio represented CHI/EEI's gross profit from sales of breaker products divided by breaker product operating expenses (SG&A).

[*60] In June 2003 the APA I team informed petitioner that it wanted a more detailed description of how petitioner computed SG&A. The APA I team explained to petitioner that it was considering a formulary SG&A expense minimum requirement.

In July 2003 petitioner became concerned that some members of the APA I team wanted to focus their attention on treating the Island plants, rather than EEI U.S. distribution, as the tested party because the profit split that resulted from petitioner's proposed TPM allocated significant profits to the Island plants and small profits to the United States. One APA I team analysis showed that 80% of the profits were allocated to the Island plants.

The APA I team leader set a deadline of September 30, 2003, for the APA I team to either complete its analysis of petitioner's APA application and provide an alternative TPM that did not use CHPR as the tested party or an arbitrary profit split methodology, or have petitioner accept the conclusion of the APA Program office. Petitioner learned that some exam team members of the APA I team believed that petitioner's proposed TPM did not sufficiently compensate EEI for the risks it assumed as a distributor.

In October 2003 representatives of the APA I team thought that a Berry ratio of 1.13 might be sufficient, on the basis of work being done by the APA I

**[*61]** team's economist. A Berry ratio of 1.13 means that gross profit divided by operating expenses equals 1.13, or the operating profit equals 13% of operating expenses. At that time petitioner was proposing a Berry ratio of 1.18. In November 2003 the APA I team informed petitioner that it sought to increase the operating profit for EEI's distribution function in order to reach an agreement on petitioner's proposed TPM. The APA I team proposed increasing the Berry ratio to a range of 1.20 to 1.27, which had the effect of increasing the operating profit for EEI's distribution functions. The final agreement included a range of 1.20 to 1.27.

### viii. Petitioner's Concessions

In addition to agreeing to a higher Berry ratio, petitioner made several concessions during the APA I process. Petitioner agreed to use third-party OEM prices to set the revenue in the CUP method instead of a blended price of third-party OEM and third-party distributor prices. Petitioner abandoned a cost-sharing arrangement for CHI/EEI's technology and continued to maintain intangibles in the United States. Petitioner agreed to include stock options for purposes of calculating CHPR/EEPR's cost-sharing payments.

**[*62]**       3.       APA I Terms

On November 14, 2003, petitioner and the APA I team reached an agreement on the terms of APA I for petitioner's tax years 2001-05 effective on April 14, 2004. APA I applied to the covered transactions in petitioner's APA I submission. Rev. Proc. 96-53, 1996-2 C.B. 375, governs the interpretation, legal effect, and administration of APA I.

                    a.       TPM and Berry Ratio for Breaker Product Transfer

APA I defined breaker product transfer as CHI/EEI's purchase of breaker products from CHPR/EEPR for distribution to affiliated U.S. assembly plants, third-party U.S. OEM customers, and other related and third-party customers. The TPM for CHPR/EEPR's transfer of breaker products to CHI/EEI was a two-step method. In the first step CHI/EEI would apply the CUP method to determine its constructed intercompany revenue. Then it would create a constructed income statement, similar to petitioner's explanation in its proposed TPM, for its distribution of breaker products based on the following: (1) U.S. third-party sales revenue, (2) constructed intercompany revenue, (3) international sales revenue, (4) cost of sales, and (5) breaker product operating expenses. APA I defined U.S. third-party sales revenue as CHI/EEI revenue from the sale of breaker products

[*63] acquired from CHPR/EEPR and CHC and sold without incorporation into other products to third-party customers in the United States.

APA I defined constructed intercompany revenue as the following:

For each APA year, the sum of the following three amounts:

(1) For Breaker Products with an Exact Catalog Number Match, the average per unit OEM Sales Price for such a product multiplied by the number of units transferred by CHI to Affiliated U.S. Assembly Plants.

(2) For Breaker Products without an Exact Catalog Number Match but within a given Product Category, the average OEM Sales Price Markup for the Product Category multiplied by CH-Puerto Rico's manufacturing costs of such products within the Product Category transferred by CHI to Affiliated U.S. Assembly Plants.

(3) For any other products, the average OEM Sales Price Markup for all Product Categories multiplied by CH-Puerto Rico's manufacturing costs of such products transferred by CHI to Affiliated U.S. Assembly Plants.

In the second step the CPM would be applied to test CHI/EEI's constructed income statement using a Berry ratio as the profit level indicator. CHI/EEI was required to achieve a Berry ratio between 1.20 and 1.27 for its distribution of breaker products, and the ratio of SG&A expenses to CHI/EEI's sales revenue for breaker products was to meet or exceed 13% for each APA year.

For each APA year, if CHI/EEI's yearend Berry ratio was not in compliance with the TPM, APA I required CHI/EEI to make an adjustment to the purchase

[*64] price of the breaker products acquired from the Island plants that would bring CHI/EEI's Berry ratio within the range of 1.20 to 1.27. Once this occurred, the covered transaction would be considered to be in compliance with section 482 and would not be adjusted further by respondent. The APA defined the breaker product Berry ratio as CHI/EEI's gross profit from sales of breaker products divided by its breaker product operating expenses, which had the same meaning as SG&A expenses.

b.    SG&A Expenses

APA I set a floor for the amount of SG&A expenses allocated to EEI's distribution function equal to 13%, which acted as a floor for EEI's distribution function's profit level. "SG&A expenses" was a metric used to calculate the Berry ratio. Higher SG&A expenses resulted in higher profit that would be allocated to EEI under the Berry ratio.

If the ratio of SG&A to CHI/EEI's sales revenue for breaker products was below 13% or greater than 20% for each APA year, APA I required petitioner to adjust SG&A so that ratio was between 13% and 20%. Once this occurred the ratio would be considered to be in compliance with section 482 and would not be adjusted further by respondent.

**[\*65]**    c.  <u>APA I TPMs for Intangibles Transfer and Cost-Sharing Payment</u>

Before APA I CHI/EEI entered into a license agreement, effective December 29, 2000, in which CHI/EEI granted a nonexclusive license to use, including the right to sublicense, a broad class of intangible property that CHC used to manufacture and assemble breaker products. In exchange for the license CHC agreed to pay CHI/EEI a royalty of 4% of CHC's net sales for the licensed breaker products.

APA I required CHC to pay CHI/EEI a royalty payment of 6.45% of CHC's sales revenue, which was consistent with the royalty rate in the amended CHI/EEI and CHC license agreement that was in effect. The TPM for CHPR/EEPR's cost-sharing payment was the section 936 cost-sharing method.

    d.  <u>Compliance</u>

APA I provided generally:

  a.  For each APA Year, if * * * [petitioner] complies with the terms and conditions of this APA, then the IRS will not make or propose any allocation or adjustment under I.R.C. section 482 to the Covered Transactions.

  b.  If * * * [petitioner] does not comply, then the IRS may:

    1.  enforce the terms and conditions of this APA and make or propose allocations or adjustments under I.R.C. section 482 consistent with this APA;

**[\*66]**          2.          cancel or revoke this APA under Revenue Procedure 96-53, section 11.05 or 11.06; or

3.          revise this APA, if the Parties agree.

APA I required petitioner to file an annual report for each APA year (APA annual report) in accordance with the APA and Rev. Proc. 96-53, sec. 11.01, 1996-2 C.B. at 383.  APA annual reports for 2003-05 were due no later than 90 days after the time prescribed by law (including extensions) for filing petitioner's Federal income tax return for the year covered by the report.  Petitioner's 2005 annual report was due on December 15, 2006.  APA I also required an independent certified public accountant to render an opinion that petitioner's financial statements presented fairly, in all material respects, petitioner's financial position under U.S. GAAP.  Under the terms of APA I the IRS would review petitioner's compliance with the APA using its U.S. tax returns, financial statements, and other APA records, for the APA term and any other year necessary to verify compliance.  If petitioner's actual transactions did not result in compliance with the TPM, petitioner was required to report its taxable income in an amount that was consistent with the TPM and all other requirements of the APA on its timely filed U.S. tax return.

**[*67]** APA I required petitioner to maintain its APA records in accordance with Rev. Proc. 96-53, sec. 11.04, 1996-2 C.B. at 384, and make them available to the IRS in connection with an examination under Rev. Proc. 96-53, sec. 11.03, 1996-2 C.B. at 384. APA I provided that compliance with the record maintenance requirement constituted compliance with the record maintenance provisions of sections 6038A and 6038C for the covered transactions for any taxable year during the APA term.

### e. Materiality

For APA I the terms "material" and "materially" were to be interpreted consistently with the definition of material facts in Rev. Proc. 96-53, sec. 11.05(1), 1996-2 C.B. at 385.

### f. Critical Assumptions

The critical assumptions of APA I were the following:

1. The business activities and financial and tax accounting methods and classifications of * * * [petitioner] in relation to the Covered Transactions will remain materially the same as described or used in * * * [petitioner's] APA Request. A mere change in business results will not be deemed a material change.

2. The terms of * * * [APA I] shall not be negatively affected by acts of God, fire, flood, strikes, labor troubles or other industrial disturbances, acts of Government laws and regulations, riots, insurrections, or any other cause beyond the control of the parties to the APA.

**[*68]** 3.     CHC's projected and actual sales revenue and CHI's projected and actual research and development costs will remain within 20 percent of the amounts set forth in Exhibit 1 to * * * [APA I].  In the event that CHC's actual sales revenue and CHI's actual research and development costs are greater than 120 percent or less than 80 percent of the amounts set forth in Exhibit 1 to *  *  * [APA I], the royalty will be recalculated to comport with the revised amounts in a manner consistent with the methodology presented in Exhibit 1.

4.     CHPR will continue to qualify as a possessions corporation pursuant to I.R.C. section 936 and will continue to make the required cost-sharing payment through the term of the APA.

5.     Any transfer of ownership of intangibles from CHPR to CHC is outside the scope of this APA.  If such a transfer of ownership should occur, the transfer of manufactured products to CHI related to the use of such intangibles will not be covered by this APA.

### 4.     APA I Implementation

#### a.     Canadian Adjustment

In its 2001 and 2002 APA annual reports petitioner included an item labeled "Canadian Adjustment--Eaton Yale" as an increase to revenue from international sales in the TPM calculation table.   Eaton Yale Ltd. (Eaton Yale) was Eaton's Canadian affiliate, a Canada corporation and wholly owned subsidiary of Eaton. On November 4, 2004, the IRS sent petitioner an IDR regarding an adjustment that was not included in the original APA, the Canadian Adjustment--Eaton Yale. Petitioner responded on December 1, 2004.  This response explained that EEPR

[*69] sold its entire output of breaker products to EEI. EEI either resold the EEPR-produced breaker products to U.S. and foreign unrelated parties or transferred the breaker products to affiliated Eaton Electrical U.S. assembly plants or foreign subsidiaries of Eaton Electric. Eaton Yale was among the related parties to which EEI sold EEPR products. Eaton Yale purchased products from EEI for resale into the Canadian market or for incorporation into custom assemblies manufactured by Eaton Yale. This response explained that an increase in the sale price was needed in accordance with the APA I TPM.

On May 4, 2005, respondent issued a notice of proposed adjustment related to the Canadian adjustment. The adjustment was for the same amounts included in APA I annual reports for 2001 and 2002. Petitioner agreed to the proposed adjustments for 2001 and 2002. The Canadian adjustment was discussed during the prefiling conference for APA II. The APA II submission mentioned the Canadian adjustment as a relevant issue under audit and that relief from double taxation could be needed.

b. Disclosure of Book-Tax Difference and APA Multiplier

On December 9, 2004, petitioner responded to an IDR issued by respondent's exam team regarding the transfer price for the breaker products in the 2001 tax year. The IDR inquired about an adjustment made on Schedule M-1,

[*70] Reconciliation of Income (Loss), that appeared to be included in the annual report. The IDR requested an explanation of how the Schedule M-1 adjustment conformed to APA I.

In its response petitioner explained that it had a book-tax difference with respect to the transfer price for breaker products, because its accounting books were closed at the end of 2001 using an estimated transfer price that was computed with the information available at that time. Petitioner's tax returns, which were filed the following September 2002, reflected the finalized transfer price that was computed using final financial information that was not available until the first quarter after the close of 2001. Petitioner provided the detailed computations to show how the Schedule M-1 adjustment was computed and explained that the purpose of the adjustment was to adjust book income reported in Puerto Rico to the APA I TPM. Petitioner explained that its 2001 APA I annual report did not mention the Schedule M-1 adjustment because the adjustment conformed to the APA I TPM. As part of its response petitioner explained how the APA I multiplier was computed and applied.

c.    2005 Tax Return

On September 6, 2006, petitioner filed electronically its Form 1120, U.S. Corporation Income Tax Return, and Form 8453-C, U.S. Corporation Income Tax

[*71] Declaration for an IRS e-file Return, for its 2005 tax year. On its Form 1120, petitioner reported worldwide book income of $804,928,420. Petitioner removed income and loss, including intercompany eliminations, from nonincludible U.S. and foreign affiliates, subtracting a net income amount of $603,138,308 from its worldwide income. For U.S. tax purposes, petitioner reported net U.S. book income of $201,790,112.

Petitioner filed Schedules M-1 and M-2, Reconciliation of Income (Loss) and Analysis of Unappropriated Retained Earnings per Books, and Schedule M-3, Net Income (Loss) Reconciliation for Corporations with Total Assets of $10 million or More. It reported book-to-tax adjustments of $38,681,828, resulting in taxable income of $240,471,940. The Schedules M adjustments reflected a timing difference between petitioner's estimated APA I transfer price calculation at the end of the 2005 taxable year and its final transfer price calculation, which could not be determined until May 2006. Petitioner's 2005 Schedules M attached to its tax return identified this difference. Petitioner did not include this adjustment in the 2005 APA I annual report because the adjustment conformed to the APA I TPM.

**[\*72]** C.     APA II:  2006-10 Tax Years

        1.     Participants

The APA II team's participants in the APA II negotiations included personnel from both the APA Program office and the exam team, commonly referred to as the field team.  The participants from the APA Program office included the APA II team leader and an APA II team economist.  The participants from the exam team included the team coordinator, a group international manager, two international examiners, a computer audit specialist, an attorney, and an economist.  The APA II team was generally composed of personnel different from the APA I team.  However, some exam team members from the APA I team, including the international examiner, the team coordinator, and an economist, were also exam team members for the APA II team.  The APA I exam team economist acted as manager to the new economist assigned to the APA II team. There is no rule specifying whether a new team leader is assigned to an APA renewal request.

Before joining respondent's APA Program office the APA II team leader had held various positions in respondent's National Office, working primarily with the corporate groups in the Office of Chief Counsel.  In 1999 he joined respondent's APA Program office as a team leader.  In 2002 he moved to Branch 4

[*73] of respondent's international group in the Office of Chief Counsel. In 2004 he moved back to the APA Program office as a team leader, and in 2007 he was promoted to APA Program office branch chief.

During his time in the APA Program office, the APA II team leader worked as a team leader for approximately 50 separate APAs. He rarely accepted the facts included in a taxpayer's APA application at face value. In every APA that he worked on, he or some member of his team saw something that required the team to file additional questions about the facts presented in the taxpayer's APA application. The major role of the team leader was to build consensus among the APA team by holding discussions and determining whether there were disagreements about the taxpayer's APA application.

The APA II team leader started a renewal APA application process by generally reviewing the initial APA request. He reviewed the initial APA submission, the resulting APA, and questions and answers that arose in the course of the initial APA negotiations. The APA II team leader reviewed petitioner's APA I request file and some of its annual reports.

Petitioner's primary participants in the APA II negotiations were its senior vice president of tax and its vice president of Federal tax strategy. Petitioner's outside representatives were mostly the same participants from the APA I

[*74] negotiations, including the former Director of the APA Program and principal at PwC, a PwC partner who as a former employee of the U.S. Department of the Treasury and later former head of transfer pricing at the OECD in Paris, France, two economists, and an attorney.

### 2.  APA II Negotiations

The APA II team conducted a de novo review of APA I.  An APA renewal typically involves a completely independent review by a second APA team, including different team leaders and economists.

### a.  Prefiling Process

On January 26, 2005, petitioner sent the APA II team leader a letter before formally filing its APA II application.  Petitioner's prefiling letter provided background on its structure with a focus on breaker products, including EEI's sale and transfer of CHC products.  This letter explained that petitioner was not aware of any significant changes in facts of functionality of the original APA and that it would be using the previously agreed-upon TPMs in its APA renewal request.

On February 2, 2005, petitioner and the APA II team held a prefiling conference.  Petitioner presented a detailed overview of its six operating divisions. Petitioner further explained and illustrated EEI's TPM calculation for the

[*75] distribution of breaker products for 2001-03 and the TPM for CHC's license of intangibles from EEI for 2001-03.

### b.     APA II Application

On June 23, 2005, petitioner submitted its formal APA II application for the renewal of APA I.  Petitioner's APA II application requested renewal of TPMs for the following covered transactions:  (1) the transfer of breaker products from CHC to EEI and (2) the amount of an arm's-length royalty payment from CHC to EEI and EEPR for the right to use technology intangibles by CHC in its manufacturing processes.[9]  Petitioner noted that its reference to EEI throughout its APA renewal submission referred to EEI's distribution of CHC products, not EEI as a diversified company.

The APA II application provided detailed information on EEI's electrical business, including EEI's sale and transfer of CHC products from 2001-03.  The application noted that most of the sales of CHC products made by the Lincoln plant were treated as distributor sales and not part of the CUP computations.  The application explained that only a small number of the Lincoln sales were made directly to unrelated OEMs.  It further explained that the breadth of product lines

---

[9]The cost-sharing payment made by CHPR to CHI was not included in the APA renewal request because of the 2005 sunset of sec. 936.

**[*76]** and its ability to efficiently manufacture breaker products in high volume were important profit drivers in the industry.

Petitioner's APA II application included responses to two particular issues that the APA II team raised during the prefiling conference: (1) whether EEI had marketing intangibles with respect to the breaker products and (2) the effect of volume discounts on the CUP method.

The APA II team had concerns about the marketing intangibles issue from the beginning of the APA II negotiations. Petitioner's response explained that no valuable marketing intangibles existed with respect to EEI's breaker products, primarily because these products were industrial, not consumer, products. The response detailed how the name change from CHI to EEI did not have a significant impact. The APA II team was concerned with whether petitioner's assembled products created an installed base that was effectively a marketing intangible because it generated an aftermarket for sales of breaker products to be used in the assembled product. The APA II team's concern focused on whether petitioner's assembled products created potential future sales of breaker product components as a result of already having the products assembled and available in the market. Petitioner reiterated in its APA II application that any rebates or customer

[*77] discounts granted to unrelated OEM customers were factored into the CUP method analysis and therefore the CUP method accounts for volume discounts.

### c. APA II Team's Due Diligence Questions

The APA II team leader conducted a full due diligence investigation. The process consisted of hundreds of questions.

After the submission of the APA II application and before a meeting with the APA II team, the APA II team leader sent petitioner, on September 16, 2005, a list of 28 questions, which included numerous multipart questions. The APA II team's questions generally focused on petitioner's transfer of tangible and intangible assets from EEI to the Island plants, the Island plants' operating profits, the Island plants' manufacturing process for breaker products and other high-volume products, EEI's sales process and customer base, SG&A allocation methodology, and system profit for breaker products produced by the Island plants and sold to EEI.

Additional questions were sent to petitioner on October 5, 2005. These questions focused on system profit and CHC intangibles. On January 31, 2006, petitioner responded to the APA II team's due diligence questions. On February 16, 2006, petitioner and the APA II team held a meeting to discuss petitioner's responses. On March 13, 2006, the APA II team leader sent petitioner an

[*78] additional set of questions that focused on issues discussed during the course of the February 16, 2006, meeting or arose afterwards as a result of information discussed during the meeting. This additional set of questions focused on whether EEI had any marketing intangibles with regard to its breaker products, EEI's technology, the nature and importance of the Island plants' manufacturing function, location savings in Puerto Rico, and the internal CUP for intracompany sales.

### i. Profit Split

The APA II team asked about the profit split between the Island plants and EEI. They asked petitioner to explain the Island plants' high operating margins in an industry which, petitioner stated in its APA II submission, faced strong competitive pressure.

In its response petitioner explained why it did not agree with the characterization of the Island plants' operating profits and margins as being extraordinarily high. Petitioner provided an analysis of the profitability of the Beaver facility, which manufactured breaker products. The analysis stated that the difference in profits between the Beaver facility and the Island plants reflected that the Island plants operated in a low-cost jurisdiction. Petitioner believed that this analysis confirmed the reliability of the CUP method in APA I. Petitioner's

**[*79]** response stated that the profit-split analysis confirmed that in their business the bulk of profits was properly attributable to the manufacturers of the product and resulted from the manufacturer's ability to produce a diverse number of styles of complex, highly regulated products at low cost, in high volume, and with absolute adherence to the exacting standards of product quality.

The APA II team also asked for information about whether, in concert, the Island plants and EEI earned extraordinary intangible profits. The APA II team wanted a profit and loss statement showing the system profit (consolidating the operating profits of the Island plants and EEI) for the Island plants-produced breaker products sold to EEI, which EEI then sold to its customers and own domestic plants. This definition of system profit did not include sales from assembled products that EEI's domestic plants manufactured, i.e., U.S. assembly sales to third-party customers.

Petitioner's response acknowledged that the "IRS exam team has expressed concern regarding the split of profit between the factory operations of CHC and the distribution operations of EEI under the CUP methodology." To demonstrate that the Island plants received an appropriate level of profit under the APA I TPM, petitioner provided the APA II team with two separate confirming analyses. The scope of the relevant business activity used in both analyses was consistent and

[*80] included the Island plants' manufacturing of breaker products and EEI's sales of those breaker products to third parties and internal assembly plants. Other business activities, such as EEI's assembly plants' sales of assembled products, were not included in this analysis. The first analysis compared the gross profit margin on the sale of breaker products manufactured at the Beaver plant and the sale of breaker products manufactured at the Island plants' facilities.

The second analysis was an activity based profit-split analysis. Petitioner provided an actual system profit resulting from an application of the APA I TPM for 2004. This profit split yielded an allocation of 14.8% of profit to EEI and 85.2% to the Island plants. Other revenue and costs related to, for example, assembly plants' sales of assembled products were not included in this analysis.

### ii. Installed Base Marketing Intangible

As a followup to a meeting held on February 17, 2006, between petitioner and the APA II team, petitioner provided the APA II team with a letter, answering specific questions and addressing concerns that were raised at the meeting. The APA II team inquired whether petitioner had an installed customer base that constituted a marketing intangible for the sale of CHC products. Petitioner's response explained that, if applicable at all, the installed base affects no more than 4% of EEI's total sales of CHC breaker products. The letter further explained that

[*81] for there to be an installed base intangible, substantial aftermarket sales must exist.  Petitioner explained that while EEI had some aftermarket sales, there were a large number of distributor sales that were initial sales to customers rather than aftermarket sales.  It also explained that for there to be an installed base intangible, EEI would have to charge premium prices, and that many of these products were competitive products that limited EEI's ability to charge higher prices for the aftermarket sales than for initial sales to customers.

Its response further explained that if an installed base intangible was applicable at all, it would apply to less than 10% of distributor sales.  Petitioner's response stated:

This must be the case because:

(1)    there is no volume replacement market for breaker products because they have long lives and the products are engineered to meet exacting Underwriters Laboratories, Inc., standards,

(2)    many breaker products from competing suppliers are interchangeable, so that price premiums that might be created by any installed base are competed away,

(3)    retrofitting and reconditioning of certain breaker products leads to further erosion of the value of any installed base intangible, and

(4)    the existence and growing importance of the grey market further erodes the value of any installed base intangible that might otherwise exist.

**[*82]** One of the APA II team's questions regarding installed based intangibles addressed petitioner's 1995 Ernst & Young (E&Y) Study, which supported petitioner's previous treatment of the Island plants as the tested party under a cost-plus method. The APA II team inquired how petitioner reconciled the conclusion of the previous study and its position during the APA II negotiations that EEI owned no nonroutine marketing intangibles. Petitioner's response explained that the E&Y report was outdated and that the IRS had had prior concerns about the report. Petitioner further explained that the E&Y report referred to a time when, under the Wesco acquisition agreement, all breaker products that Eaton sold carried the "circle W" trademark and benefited from Wesco's advertisement. At the time of the response, petitioner had not used a Wesco trademark for nearly 10 years.

This response also addressed the classic razor and blade analogy and clarified petitioner's erroneous information on this issue. The response explained that Gillette sold razors that can only be used with Gillette brand replacement blades. Once a sale of a razor is made, Gillette would continue to generate sales volume and profits from the use of Gillette brand replacement blades customized for its razors. The response further explained that because of the nature of circuit breakers, the replacement market was not a volume business.

**[*83]**                            iii.    <u>Technology Intangibles</u>

Petitioner provided the APA II team with information regarding the role of

its patented technology in the Island plants' breaker products.  The response

explained that its patents have little impact on the economic performance of circuit

breakers because the breaker product industry was a highly regulated and mature

industry.  Petitioner explained that most of its patented technology covered

primarily tweaks or modifications to existing technologies instead of innovative

technology.  Petitioner explained that the electrical code policy for this regulatory

industry effectively precluded the use of patents to establish monopoly positions.

                            iv.    <u>Volume Discounts</u>

The APA II team addressed volume discounts as part of its due diligence

questions.  This issue had been raised previously at the APA II prefiling meeting.

Petitioner's response directed the APA II team to the prefiling discussion included

in petitioner's APA II request, where petitioner explained that

> [s]imilar to its competitors, EEI provides volume discounts to OEM
> customers that purchase breaker products.  The size of the orders
> enables the OEM customers to negotiate volume discounts for their
> purchases.

> The analysis conducted to determine EEI's revenue attributable to
> related party sales of breaker products for APA II * * * uses a CUP
> analysis that draws on pricing related to OEM sales.  Any rebates or
> customer discounts are factored into the CUP analysis, and thus, the

[*84] CUP analysis presented herein implicitly accounts for volume discounts.

[EEI] competes with other large companies such as GE, Schneider Electric/Square D, Siemens, and ABB that sell the same or similar electrical products as those sold by EEI. Each of these companies have large worldwide operations, have competed within the electrical products industry for as long, if not longer than, EEI, and have larger marketing budgets compared to EEI. * * * Because there are a number of sophisticated and successful companies selling similar electrical products, EEI's third party customer pricing must remain in-line with these OEMs, or else it risks losing orders to its competitors. EEI's third party customer pricing is always determined in a competitive market, which is reflected in the CUP analysis.

* * * * * * *

[A]ny rebates or customer discounts granted to unrelated OEM customers are factored into the CUP analysis, and thus, the CUP analysis accounts for volume discounts. Consequently, based on the fact that EEI operates in a competitive market and must keep its prices on sales to third party customers in-line with other large, well known competitors, * * * and given the CUP analysis used to evaluate the arm's-length nature of EEI's intercompany tangible goods transaction takes into account customer rebates and discounts, it is believed that the CUP comparability requirements specified by the section 482 regulations has been met.

> d. SG&A Expense Allocations

The APA II team asked petitioner to provide a description of the allocation methodology used to assign SG&A expenses to EEI's distribution of CHC-manufactured products. In its January 31, 2006, response petitioner explained that

[*85] the SG&A expense allocation is the same as that agreed to in APA I and contained in the APA I annual reports. The APA II team leader and one of petitioner's representatives from PwC discussed SG&A expense allocations during the APA II negotiations. The APA II team leader wanted to understand why petitioner's APA II application did not include a minimum floor for SG&A expenses as the APA I had required. According to the APA II team leader petitioner's SG&A expense allocation methodology was not unusual but having a floor was unusual. Petitioner's APA II proposal did not include an adjustment where the ratio of breaker product operating expenses to EEI's sales revenue was below 13% or above 20% for the APA year.

### e. EEI U.S. Distribution as the Tested Party

On May 11, 2006, an APA II team economist sent a memorandum, through his manager who had been part of the APA I team, to the APA II team leader analyzing problems with the use of EEI U.S. distribution as the tested party . He disagreed with petitioner's assertion that EEI U.S. distribution owned no material marketing intangibles. The economist's memorandum specified that petitioner's proposed method resulted in the Island plants' receiving the "lion's share of profits" while petitioner had not proven that the Island plants were entitled to such profits from location savings. His memorandum further stated that "if CHC were

**[\*86]** dealing with EEI at arm's length, it would be prudent if it would share more of its profits with EEI to prevent further or more rapid erosion of its market."

The APA II team economist was concerned with petitioner's assertion that a high degree of regulation and complexity of the Island plants' manufacturing processes were reasons they should be entitled to high profits. His memo stated that "there are many other products produced under heavy regulation and/or complex manufacturing conditions that do not earn supernormal profits." He was also concerned with petitioner's suggestion that the Island plants' participation in the product development process, through its engineering function, was not an unusual function for a manufacturing licensee that would attribute higher profits to the Island plants.

His memorandum described EEI as "the leader of a U.S. circuit breaker oligopoly, which is sustained by high barriers to entry." His memorandum concluded that "EEI was entitled a larger share of the oligopoly profits than those represented by the Berry ratio 'bone' offered by taxpayer."

During the APA II negotiations petitioners made it clear that their position was to keep EEI U.S. distribution as the tested party, similar to APA I. The January 31, 2006, letter sent to the APA II team stated that "EEI as the distributor is the least complex party, and therefore, the appropriate tested party to the

**[*87]** covered transactions". According to the APA II team leader there was concern about EEI U.S. distribution being the tested party because usually the party that has the significant intangibles is not the party that is used as the tested party. Petitioner argued for EEI U.S. distribution to be the tested party because technology was not the driving force behind its considerable profits.

On July 27, 2006, the APA II team leader sent petitioner's representative a draft of a memorandum he intended to send to the Associate Chief Counsel (International) regarding an issue pertaining to section 367(d). The memorandum stated that "the [APA II] team is currently divided on whether the facts justify treating EEI as the tested party on renewal."

### f.     Licensing of Intangible Property Not Included

Respondent's National Office reserved the right to assert the application of section 367 to EEI's license of intangible property to the Island plants. This reservation prevented the APA II team from agreeing to a royalty rate for licensed intangible property.

### 3.     APA II Terms

APA II was executed on December 20, 2006. APA II applied only to EEI U.S. distribution's purchase of breaker products from CHC and CHEC. Rev. Proc.

**[*88]** 2004-40, 2004-2 C.B. 50, governs the interpretation, effect and administration of APA II.

    a.    <u>SG&A Expenses and TPM for Breaker Products Transfer</u>

The APA II TPM was similar to the APA I TPM.[10]  However, APA II did not require petitioner to report a minimum threshold of SG&A expenses.  As in APA I the APA II TPM for CHC's and CHEC's sales of breaker products to EEI's U.S. distribution function was a two-step method based on the CUP method and the CPM.  First EEI would apply the CUP method to determine its constructed intercompany revenue.  APA II defined constructed intercompany revenue the same as in APA I.  Next EEI would construct an income statement for its distribution of breaker products based on:  U.S. third-party sales revenue, constructed intercompany revenue, international sales revenue, cost of sales, and SG&A expenses.  The elements that EEI would use to construct the income statement were the same as in APA I.  APA II defined U.S. third-party sales revenue the same as in APA I.  EEI's U.S. distribution was the tested party for

---

[10]APA II did not list "breaker product transfer" as a defined term.  In the "Recitals" section, however, APA II explained that the breaker products transfer reflected EEI's purchase of breaker products from CHC and CHEC and manufactured by CHC and CHEC, for distribution to affiliated U.S. assembly plants, third-party OEM customers, and other related and third-party customers-- the same definition of breaker products transfer as in APA I.

[*89] purposes of applying the CPM. APA II required petitioner to achieve a Berry ratio between 1.20 and 1.24 for its distribution of breaker products, whereas APA I required a Berry ratio between 1.20 and 1.27.

For each APA year if EEI U.S. distribution's Berry ratio was not in compliance with the TPM, then APA II required EEI U.S. distribution to make adjustments to the purchase of breaker products acquired from CHC and CHEC to bring EEI U.S. distribution's Berry ratio within the range of 1.20 to 1.24. Once this occurred, the breaker products transfer would be considered to be in compliance with section 482 and would not be adjusted further by respondent.

b. Compliance

APA II provided that for each APA year, if petitioner complied with the terms and conditions of the APA, then respondent would not make or propose any allocations or adjustments under section 482 to the covered transactions. If petitioner did not comply, then respondent could either: (1) enforce the terms and conditions of the APA and make or propose allocations or adjustments under section 482 consistent with the APA; (2) cancel or revoke the APA under Rev. Proc. 2004-40, sec. 10.06 or 10.07, 2004-2 C.B. at 63; or (3) revise the APA, if the parties agreed.

[*90]  APA II required petitioner to file an APA annual report in accordance with the APA and Rev. Proc. 2004-40, sec. 10.01, 2004-2 C.B. at 61.  APA II required petitioner to file its APA annual reports on December 15 of the year immediately following the close of the APA year.  APA II also required an independent certified public accountant to render an opinion that petitioner's financial statements presented fairly, in all material respects, petitioner's financial position under U.S. GAAP.  Respondent would review petitioner's compliance with the APA on the basis of its U.S. tax returns, financial statements, and other APA records, for the APA term and any other year necessary to verify compliance.

### c.  Materiality

For APA II the terms "material" and "materially" were to be interpreted consistently with the definition of "material facts" in Rev. Proc, 2004-40, sec. 10.07(1), 2004-2 C.B. at 63.

### d.  Critical Assumption

The critical assumption of APA II was the following:

> The business activities, functions performed, risks assumed, assets employed, and financial and tax accounting methods and classifications (and methods of estimation) of * * * [petitioner] in relation to the Covered Transaction will remain materially the same as described or used in * * * [petitioner's] APA Request.  A mere change in business results will not be deemed a material change.

**[\*91]**      4.      2006 Tax Return

On its Form 1120 for 2006 petitioner reported worldwide income of $950,329,098, which was the same amount it reported to its shareholders and the SEC. Petitioner subtracted income and loss from nonincludible U.S. and foreign affiliates equal to $605,832,668. Petitioner reported net U.S. book income of $344,496,430 for 2006. Petitioner reported on Schedules M-1 and M-2, and Schedule M-3 book-to-tax adjustments of $79,179,363, resulting in total taxable income of $265,317,067. The Schedules M adjustments reflected a timing difference between petitioner's estimated APA II transfer price calculation at the end of the 2006 taxable year and its final transfer price calculation, which could not be determined until May 2007. Petitioner's 2006 Schedules M attached to its tax return identified this difference.

V.      Implementation of APAs

   A.      Difference Between Mirror Ledgers and Constructed Income Statement

Petitioner's mirror ledgers were distinct from the constructed income statement in the APA TPM. Unlike the mirror ledgers, which exist as part of EEI's accounting system, the constructed income statement did not actually exist outside of the APA TPM. The APA TPM used a constructed or hypothetical

[*92] income statement that did not exist in the records but was created from pulling pieces of information together.

There were a number of key differences between the mirror ledgers and the constructed income statement. The most significant difference was that the constructed income statement included revenue from sales to U.S. assembly based on prices derived from the CUP method, whereas the mirror ledgers included revenue from sales to U.S. assembly at the lower internal management price. Another difference was that revenue from sales of the Lincoln plant were included in the constructed income statement but not included on the mirror ledger, and revenue from non-Island plants manufactured products were excluded from the constructed income statement but included on the mirror ledgers.

APA I and APA II required that the operating profit on the constructed income statement comply with the Berry ratio requirement. APA I and APA II did not require that the operating profit on the mirror ledgers comply with the Berry ratio requirement. APA I and APA II made no references to the mirror ledgers.

B.  APA Multiplier

The APA multiplier was a factor used to express the transfer price as a percentage of manufacturing costs. The product of the APA multiplier and the Island plants' manufacturing costs was the mathematical equivalent of the transfer

[*93] price computed for that year under the APA TPM. Although petitioner's financial records used the term "APA multiplier", the multiplier was not used to compute or modify the transfer price determined under the APA TPM. The APA multiplier was an implementation mechanism that incorporated the transfer price into petitioner's financial statements. The APA multiplier was calculated by dividing EEI's COGS, as implied by the APA TPM analysis, by the associated Island plants' manufacturing costs of the breaker products sold by EEI. For 2005 and 2006 petitioner used an APA multiplier of 1.86 and 1.88, respectively.

According to petitioner the APA multiplier is a different mathematical way to express the transfer price that is determined by reference to third-party CUPs and the CPM, as provided in the APA TPM. The APA multiplier was used in two stages during the tax year. First, a preliminary APA multiplier based on estimated APA TPM calculations was used to book the transfer price on sales of breaker products from the Island plants to EEI U.S. distribution. Second, a final APA multiplier based on a final APA TPM transfer price was computed in the first few months of the following year when all data necessary for determining the final APA TPM transfer price became available. At that time petitioner did a true-up of its books and records for the difference between the estimated APA TPM

[*94] computations that it used to close its books for the year and the final APA TPM computations.

C.    APA Annual Reports

APA I and APA II required petitioner to file an APA annual report for each APA year. The APAs specified what should be included in the annual reports. Petitioner filed timely APA annual reports for tax years 2001-10. For APA year 2005 petitioner submitted an amendment to its report on January 19, 2007. On October 14, 2010, petitioner submitted amended APA annual reports for both 2005 and 2006. Along with the amended reports, petitioner submitted a technical explanation of its adjustments.

Incorporated into petitioner's APA annual reports were petitioner's IRS reports that it sent to KPMG for review. Petitioner's VISTA team first provided the IRS reports to petitioner's Tax Department in Excel format and then downloaded the mainframe file to a PC. The VISTA team saved the files on their PCs, giving them a new name because the mainframe file name was not a valid PC filename. For 2005 and 2006 the VISTA team named the IRS Report file "PR 2005 Format3.xls" and "PR 2006 Format3.xls". The mainframe files for 2005 and 2006 remained on the mainframe in their original format after the files were extracted and transferred to the VISTA team's PCs.

**[*95]** D.    APA Annual Reports and Book-Tax Differences

APA I and APA II required that petitioner's APA annual reports, among other things, fully identify, describe, analyze, and explain the amounts, description, reason for, and financial analysis of any book-tax differences relevant to the TPM for the APA year, as reflected on Schedule M-1, M-2, or M-3 of the U.S. tax return for the APA year.

Petitioner's amendment to its 2005 APA annual report, filed on January 19, 2007, replaced two tables that provided incomplete supporting data.  The letter accompanying the amended report stated that the results of the analysis did not change and Eaton remained in compliance with the terms of the APA.

Petitioner did not disclose book-tax differences that were subject to audit before APA II in its APA annual reports.  Petitioner did disclose book-tax differences in the APA annual reports when those differences had an effect on the methodology for computing the transfer price.  In its 2006 APA annual report petitioner disclosed a book-tax difference related to stock option compensation because it had an effect on the SG&A allocations used in the APA TPM.

E.    Petitioner's Data or Computational Errors

In early 2010 petitioner discovered that it had made some errors in its APA TPM computations and tax reporting.  In October 2010 petitioner corrected those

[*96] errors with amended APA annual reports and technical explanations of the amendments.  On August 17, 2011, petitioner submitted Forms 1120X, Amended U.S. Corporation Income Tax Return, for tax years 2005-09.  Respondent did not accept petitioner's Forms 1120X and disallowed petitioner's claims for refund on its Forms 1120 for tax years 2005-09 in full.

Petitioner's data and computational errors can be divided into two categories:  (1) an error in the APA multiplier that caused the transfer price computed under the APA TPM to be reflected incorrectly in petitioner's books and records, and therefore reflected incorrectly on its tax returns, and (2) errors that affected the computation of the transfer price under the APA TPM.

### 1.      Discovery and Reporting of Errors

Petitioner discovered its data and computational errors after two of its transfer pricing managers took over responsibility for gathering the information and data necessary for the APA TPM in early 2009, following the departure of the prior tax manager.  This prior tax manager had been responsible for the information gathering process since the early 2000s.  When petitioner's new transfer pricing managers and their team began working on the APA TPM, they noticed a difference between the manufacturing costs computed using the plant variance and freight factor (PVFF) and the actual manufacturing costs reflected on

[*97] the Island plants' ledgers. A PVFF for a plant was equal to the sum of that plant's standard costs, variances, and distribution costs divided by standard costs. Such a difference could affect the accuracy of the APA multiplier.

When these transfer pricing managers first noticed this difference in 2009, they had only just begun working on the data gathering process that had been in place for at least four years. After reporting the difference to their supervisors-- petitioner's director of transfer pricing and vice president of international tax-- petitioner's transfer pricing managers decided to wait until data for all of 2009 was available to determine whether any discrepancies still existed, or whether the discrepancies were just an anomaly caused by the interim computations being run during the course of the year. Petitioner's transfer pricing managers received full- year data for 2009 in February 2010. After reviewing this data, they concluded that there was still a difference between the manufacturing costs computed using the PVFF and the actual manufacturing costs reflected on the Island plants' ledgers. These transfer pricing managers did a full review which resulted in the identification of additional errors.

Petitioner's director of transfer pricing and its vice president of international tax wanted more information regarding the discrepancy in manufacturing costs. They directed the transfer pricing managers to analyze the underlying data of the

[*98] calculations in order to determine the discrepancy. In March 2010 petitioner's transfer pricing managers began having conversations with the controllers and finance teams in the Island plants to understand their accounting. After their conversations petitioner's transfer pricing managers realized that there were miscommunications or misinterpretations of the data that the Island plants reported versus the data that petitioner's tax department personnel reported in its VISTA system.

For the purpose of the APA multiplier calculation the transfer pricing managers used a VISTA report that provided standard cost data for each of its products. They multiplied the standard costs by a factor that transformed standard costs into manufacturing costs. The factor was calculated using the individual plant's comparison of its manufacturing costs to its standard costs. The error occurred because there was a difference between the standard costs the Island plants used and the VISTA standard costs. This error resulted in there being a discrepancy between the tax transfer price reported on the APA and the tax transfer price actually booked in the ledgers.

After the transfer pricing managers' analysis petitioner's tax director convened a meeting with accounting, finance, and IT personnel to further review the errors. In April 2010 petitioner notified respondent that it had identified

**[*99]** certain errors in its APA TPM computations and was in the process of correcting them. According to petitioner's tax director they would never have found the errors if a change of personnel had not occurred.

Petitioner and respondent met regarding the errors on July 1, 2010. As a followup to the meeting petitioner submitted additional information in July and August of 2010. Respondent sent petitioner a letter on September 8, 2010, which stated that "neither the IRS Exam team nor the APA team request that Eaton submit amended APA annual reports". This letter requested detailed and comprehensive information concerning adjustments resulting from each specific "VISTA Data Issue" for all the APA years 2001-2008.

2. APA Multiplier

Petitioner's 2005 and 2006 tax returns failed to reflect the transfer price computed under the APA TPM. The failure resulted from an error affecting the APA multiplier. This failure caused the transfer price, as recorded in EEI's COGS, to be inconsistent with the transfer price computed under the APA TPM. The APA multiplier was incorrect because petitioner's computations of the Island plants' manufacturing costs--the denominator in the APA multiplier calculation-- was incorrect.

**[*100]** To determine actual breaker product manufacturing costs for purposes of the APA TPM computations, petitioner started with the projected standard costs for the breaker products as recorded in its VISTA system. Because the VISTA system did not record actual manufacturing costs, petitioner needed to adjust the standard costs in VISTA by variances in order to determine actual manufacturing costs. The PVFF was an adjustment factor reflecting cost variances between the Island plants' actual costs and their expected standard costs of making breaker and control products as well as freight costs. It was computed by dividing each plant's actual costs by their expected standard costs. According to the new transfer tax pricing manager, petitioner should have used the Island plants' ledgers, not the VISTA system, to derive a PVFF that reflected how each plant's actual manufacturing costs varied from its expected standard costs.

Using a PVFF derived from the plant's ledgers would correctly adjust VISTA standard costs to actual manufacturing costs if the standard costs used in the PVFF computation were the same as the standard costs recorded in the VISTA system. Petitioner's tax manager, who computed the PVFF from 2005 to 2009 assumed that the standard costs from the Island plants' ledgers used to compute the PVFF were the same as the VISTA standard costs.

[*101] In 2010 petitioner determined that the standard costs in the Island plants' ledgers were not the same as the VISTA standard costs because the standard costs in the Island plants' ledgers included additional items. The additional items included invoices from petitioner's Haina plant and tack-on costs such as warranty expenses, scrap allowance, shrinkage, and obsolescence reserves. Including invoices from the Haina plant resulted in duplicate entries associated with the transactions between the Puerto Rico plant and the Haina plant. Incorrect data was gathered, but the data was correctly applied to arrive at the transfer price that was reported on petitioner's tax returns and APA annual reports for 2005 and 2006.

Multiplying the VISTA standard costs by the PVFF resulted in an incorrect manufacturing cost because the standard costs in the Island plants' ledgers used to determine the PVFF were not the same as the VISTA standard costs. The computation of an incorrect manufacturing cost in turn caused the computation of the APA multiplier to be incorrect.

This error led to a higher transfer price being reported on petitioner's tax returns. This error was corrected in petitioner's amended tax returns and amended APA annual reports for 2005 and 2006. The technical explanations of the adjustments in the amended APA annual reports for both 2005 and 2006 provided

[*102] a detailed explanation of this error. These explanations included calculations using the correct PVFF and recalculations of the APA TPM. Because EEI's U.S. distribution was the tested party for purposes of the APA TPM, adjustments were needed to bring EEI's COGS recorded on the mirror ledgers to an amount that resulted in a Berry ratio that fell within the APA's prescribed range for the transfer of breaker products.

>3. Errors Affecting the Computation of the Transfer Price Under the APA TPM

>>a. OEM Categorization

For purposes of its CUP method petitioner used data from its VISTA order-entry system to identify sales to third-party OEMs. Petitioner originally identified these sales using VISTA data for sales to customers. Its tax and information technology departments believed that customers in the category "00" captured "direct customers" that included OEMs as well as other customers that purchased products from Eaton directly rather than through a third-party distributor, and that the sub-channel "99", which was labeled OEM, captured all OEM transactions. In 2010 petitioner's transfer pricing managers determined that although subcode 99 was labeled OEM, it identified customers who purchased breaker products from more than one of petitioner's salespeople and that sales to OEMs would also be

[*103] captured by other subcodes. To correct this misclassification in its amended APA annual reports, EEI's U.S. director of OEM sales compiled a correct and complete list of OEMs for each of the 2005-08 tax years. This error occurred in both 2005 and 2006 and was corrected in the 2005 and 2006 amended APA annual reports.

### b. Purchase Resale Error

EEI purchased and resold products (purchase resales) other than those manufactured by the Island plants. These transactions were captured in the VISTA database and on the mirror ledgers but were not subject to the APAs because they were not Island plants manufactured breaker products. Purchase resale transactions of Island plants manufactured products were identified in the VISTA database by the "billing line" field. Billing lines represented groupings of similar types of transactions, and all purchase resale transactions fell within a number of billing lines that consisted exclusively of purchase resale transactions of products not manufactured by the Island plants. Petitioner excluded the prices, revenue, and SG&A related to the purchase resale products from the TPM analysis by excluding their associated billing line field from the VISTA data extract.

In 2010 petitioner's transfer pricing managers conducted a detailed review of potential errors. During the 2010 review petitioner's transfer pricing managers

**[*104]** discovered that the purchase resale billing lines were not always excluded correctly from the VISTA data extract. The purchase resale error affected the revenue amount and SG&A. SG&A was affected because there were certain operating expenses that were related to purchase resale products but not related to the breaker products from the Island plants, which needed to be excluded from the billing lines. Petitioner's tax department personnel believed originally that from 2005 to 2008 the relevant purchase resale billing lines had correctly been excluded from the VISTA data extract. The VISTA file output that petitioner's tax department received did not have a billing line as a field. There was nothing in the VISTA data that would have explained to petitioner's tax department whether the billing lines were properly included or excluded.

The purchase resale error affected the APA annual reports for 2005 and 2006. The relevant purchase resale billing lines had been correctly excluded from the VISTA data extract in 2007 because the VISTA MR team employee in charge of the APA annual reports for 2005 and 2006 retired. Petitioner was not aware that for 2007 the prices and revenue from the purchase resale billing lines, but not the associated SG&A, had been correctly excluded from the VISTA data extract until its detailed review in 2010.

[*105] Petitioner corrected its error by re-running the VISTA data extracts, comparing the results with the original VISTA extract, and excluding the correct purchase resale billing lines. Petitioner determined that only 13 billing lines were intended to be excluded in 2005 and 2006. The non-Island plants purchase resale transactions were $8.2 million and $11 million of standard costs for 2005 and 2006, respectively.

      c.      Operating Expenses Associated with Breaker Products Not Manufactured by the Island Plants

This error is related to the purchase resale error. Because of the erroneous inclusion of purchase resales to third parties, the SG&A allocated to U.S. distribution included a portion for purchase resales to third parties. The APA covered only the SG&A related to breaker and control products manufactured by the Island plants. This error had no effect for 2005 because APA I required a minimum ratio of SG&A to sales revenue of 13%. APA II had no similar requirement. The 2006 amended APA annual report reduced EEI U.S. distribution's SG&A expenses by the same proportion as manufacturing expenses to account for breaker products not manufactured by the Island plants.

**[\*106]**          d.          <u>International Sales Error</u>

Petitioner determined a data error with respect to the accumulation of aggregate data on its sales to international customers. For purposes of the APA annual reports, international sales were recorded from "channel statements" that petitioner's plant controllers prepared. The definition of international sales differed between sales recorded in petitioner's VISTA system and the international sales recorded by the Island plants' controllers in the channel statements. As a result of this difference, certain international sales of breaker products were mistakenly excluded from EEI's constructed income statement, and the exclusion caused the total amount of revenue on EEI's constructed income statement to be understated. This understatement affected the calculation of the APA TPM.

In 2010 petitioner corrected this error by using the VISTA data to capture both domestic and international sales and no longer used the channel statements for either purpose. Petitioner's use of the VISTA data to correct this issue was not a change in the APA TPM, but rather was an improved way of collecting data for use in the APA TPM. No additional SG&A expenses needed to be allocated due to this error because SG&A expenses associated with this additional revenue were already captured in the apportionment of SG&A expenses to the U.S. distribution mirror ledgers. Petitioner estimated that the increases in international sales from

**[\*107]** the original APA reports to the amended APA reports were $5.9 million

and $4.3 million for 2005 and 2006, respectively. International sales revenue was

not used in the CUP method analysis and was not interrelated with other errors

discussed in this section.

> e. <u>Error in Identifying Sales of Industrial Breakers Through Lincoln</u>

One particular Island plants' manufactured product line, industrial breakers,

were sold to the Lincoln plant and then resold by the Lincoln plant "as is" with no

further processing or assembly. These Lincoln plant "as is" resales were primarily

to unrelated distributors. For petitioner's accounting purposes the transaction flow

for these "as is" products was as follows: (1) a sale from the Island plants to EEI

U.S. distribution, (2) a subsequent sale to Lincoln, and (3) a sale from the Lincoln

plant to its customers. Petitioner's IRS reports recognized the intercompany sales

from EEI U.S. distribution to Lincoln but did not include the subsequent sale from

Lincoln to its customers.

Under the APA TPM the actual revenue earned by Lincoln on these "as is"

sales of breaker products was used as a component of EEI's revenue because the

Lincoln sales represented actual third-party sales revenue. The Lincoln plant

maintained a product line statement, and specified product lines could be

[*108] identified as being "as is" sales of breaker products that were originally manufactured by EEPR.

During 2005 Lincoln's industrial breakers product line reflected a mix of sales of products purchased "as is" from the Island plants and products manufactured at the Lincoln plant. Only the industrial breaker products manufactured in the Island plants should have been included in the APA TPM. For 2005 petitioner determined that there was no reliable way to segregate the Island plants' manufactured industrial breaker products from the Lincoln manufactured products. As a result sales of products in the industrial breakers product line were not treated as "as is" sales of breaker products, and petitioner did not include any revenue from the sales of this product line through Lincoln in the 2005 constructed income statement. No change was made to the 2005 amended APA annual report regarding this issue.[11]

In 2010 petitioner discovered an error in the categorization of the product lines that were sold "as is" through Lincoln during 2006. Starting in April 2006 breaker products in the industrial breaker product line were manufactured only at the Island plants. Because the Lincoln plant was no longer manufacturing breaker products, it was possible to identify the sales of industrial breaker products

---

[11]Respondent contends that this error is not a ground for cancellation.

[*109] through the Lincoln plant, and they should have been included in the APA TPM. Petitioner's 2006 APA annual report understated both EEI's distribution revenue and the associated SG&A for these Island plants' manufactured industrial breakers.

Sales of the industrial breaker products were not included in the original 2006 APA TPM computations because petitioner's tax department was not informed of this change by the business. In 2010 petitioner amended its 2006 APA annual report and corrected the data error. Petitioner estimated that the impact of this correction would be to increase EEI's breaker product operating expenses by $1.3 million.

### f. Lincoln Multiplier Error

Petitioner erred in computing the "Lincoln multiplier" that it used to isolate standard costs for the breaker products sold "as is" through the Lincoln plant. To determine the quantity of product that went through the Lincoln plant, versus the quantity used by the Lincoln plant, petitioner backed the internal management price out of the standard cost at the Lincoln plant.

The Lincoln multiplier that petitioner originally used was incorrect because of misunderstandings and miscommunications between petitioner's tax department, and the accounting personnel responsible for providing the relevant

[*110] information. Petitioner's tax department expected they would receive a markup ratio but instead received a margin ratio. A markup ratio has cost as the denominator, whereas a margin ratio has sales as the denominator. Using a margin ratio as the multiplier did not correctly determine standard costs.

For 2005 this error resulted in the Lincoln multiplier originally being 1.31 instead of 1.4. For 2006 this error resulted in the Lincoln multiplier originally being 1.25 instead of 1.34.

g. <u>Error in Computation of Manufacturing Costs for Nonexact Matches</u>

The PVFF error described previously also affected the computation of manufacturing costs for product categories used in the CUP computations for nonexact match products. The PVFF being incorrect could alter the product matching results because of an issue with the denominator in those calculations. Petitioner's correction of the PVFF corrected this error. According to petitioner the effect on the transfer price was minimal because the PVFF enters into two separate parts of the CUP method adjustment for nonexact match sales in an almost offsetting fashion.

**[*111]** VI.   Petitioner's Supplemental and Third APA

On June 30, 2009, petitioner submitted a request for a second renewal of APA I (APA III)  On August, 10, 2009, petitioner submitted a request for a supplemental APA (APA II supplemental request) which would cover the royalty payment from CHEC to EEI for the right to use intangibles employed by CHEC in its manufacturing process.  The supplemental APA request covered petitioner's 2006-10 tax years.  Petitioner anticipated that any agreement reached with respect to the license of intangible assets from EEI to CHEC would also be relevant for the purpose of the APA III request, which covered tax years 2011-15.

On September 17, 2009, petitioner informed the APA program that it had decided to withdraw its APA III request and APA II supplemental application.  On September 30, 2009, petitioner sent respondent a letter following a meeting referred to as a preopening conference, which was held on September 16, 2009. The letter stated that it was clear from the meeting that petitioner and the IRS were on a "different page" regarding the APA/exam process.  The letter noted that "the APA team clearly stated that the IRS * * * would not use the methodology contained in the existing APAs as even a starting point for purposes of the Supplemental and APA renewal submissions".  The letter further explained that

[*112] petitioner had made the decision to withdraw from both the supplemental APA and APA III.

VII.  Cancellation of APAs

From September 2009 through December 2011, the APA Program reviewed petitioner's compliance with APA I and APA II.  On December 16, 2011, respondent notified petitioner that APA I and APA II would be canceled effective January 1, 2005 and 2006, respectively.  Respondent's letter stated specifically:

> These cancellations are based on numerous grounds, including the failure of a critical assumption, misrepresentation, mistake as to a material fact, failure to state a material fact, failure to file a timely annual report, or lack of good faith compliance with the terms and conditions of the APA ("material deficiencies in APA compliance").
>
> More specifically, as discussed with * * * [Eaton] during a meeting on May 5, 2011, the material deficiencies in the APA compliance include numerous examples of noncompliance with the terms and conditions of APA I and APA II, errors in the supporting data and computations used in the transfer pricing methodologies ("TPMs") specified in APA I and APA II, a lack of consistency in the application of the TPMs, the use of distortive accounting, and material facts that were misrepresented, mistakenly presented, or not presented in Eaton's submissions to the APA office.  In addition, as discussed with * * * [Eaton] during a meeting on December 8, 2011, the IRS has more recently identified additional material deficiencies in APA compliance related to discrepancies between the transfer price reported by Eaton in its APA Annual Reports and the transfer price reflected on Eaton's books and in Eaton's tax returns, and the failure by Eaton to identify, describe, and explain in its APA Annual Reports relevant book-tax differences and Schedule M adjustments.

**[\*113]** In reaching this conclusion to cancel APA I as of January 1, 2005, and APA II as of January 1, 2006, we have considered, inter alia, statements made by Eaton and its counsel during our meeting on December 8, 2011; the materials presented by Eaton during that meeting in response to some of the specific material deficiencies in APA compliance the IRS identified to Eaton during the May 5, 2011, meeting; and information provided by Eaton during our review of Eaton's 2005 and 2006 APA Annual Reports.

VIII.  Notice of Deficiency

As a result of cancelling APA I and APA II, respondent determined that, under section 482, an adjustment was necessary to reflect an arm's-length result for intercompany transactions that petitioner and its U.S. subsidiaries entered into with CHC, CHEC, CHIL and EIMG regarding breaker products and related electrical components and products produced in the Island plants' manufacturing and assembly operations.  On December 19, 2011, respondent issued to petitioner a notice of deficiency determining deficiencies in tax totaling $19,714,770 and $55,323,229 for 2005 and 2006, respectively, and penalties pursuant to section 6662(h) of $14,281,960 and $37,329,600 for 2005 and 2006, respectively.

The notice made section 482 adjustments and stated that in order to properly reflect an arm's-length result for intercompany transactions, Eaton's  taxable income for tax years 2005 and 2006 is increased by $102,014,000 and $266,640,000, respectively.  The notice includes an alternative position.  If the

**[*114]** section 482 adjustments are not sustained, then it is determined that significant value has been transferred to EEI and that pursuant to section 367(d) the taxable income of petitioner is increased in an amount not to exceed $230,630,598 for 2006.

Respondent calculated section 482 adjustments by relying on the report of John A. Hatch. The Hatch report reviewed and considered three transactions between EEI, CHC, and CHEC: (1) EEI's sale of components to either CHC or CHEC for incorporation into the breaker products manufactured by CHC and CHEC; (2) EEI's purchase of breaker products manufactured by CHC and CHEC; and (3) EEI's license of intangible property to CHC and CHEC, which CHC and CHEC then used to manufacture breaker products. Hatch used the CPM and concluded that this method provided CHC and CHEC an arm's-length profit as a manufacturer and licensee that is consistent with the profits earned by comparable independent manufacturers selling to unrelated customers.

IX.    Tractech Bonuses

On August 17, 2005, petitioner acquired Tractech Holdings, Inc. (Tractech), a Delaware corporation, for $54.25 million. Tractech owned all of the capital stock of Tractech, Inc., a Delaware corporation, and TT (Ireland) Acquisition Limited, a limited company organized under the laws of the Republic of Ireland.

**[*115]** TT (Ireland) Acquisition Limited owned all the capital stock of Tractech (Ireland), Limited, a limited company organized under the laws of the Republic of Ireland. Tractech manufactured branded traction, adding differentials, and specialty centrifugal clutches to niche segments of the transportation market. Before this acquisition the following entities and individuals held an interest in Tractech: Peninsula Fund III, LP (51%); Tractech Acquisitions, LLC (45%); Carl Pittner[12] (2.4%); David Mead (0.5%); Joseph Hige (0.4%); Rex Ogg (0.3%); Robert Kress (0.3%); and Richard Lindsay (0.2%) (collectively, sellers).

On July 15, 2005, petitioner entered into a stock purchase agreement (SPA) to purchase all of the outstanding stock of Tractech. The SPA required petitioner to pay the sellers in accordance with their ownership percentage. Before the acquisition Tractech's management team included seven individuals. Tractech planned to give stock option grants to six of the seven: David Mead, Joseph Hige, Richard Lindsay, Robert Kress, Denis O'Conell and Carl Pittner (bonus executives). As of June 2005 Tractech, Inc., employed its bonus executives at the following annual salaries: Carl Pittner, $191,280; Richard Lindsay, $133,056; Joseph Hige, $149,640; David Mead, $138,648; and Robert Kress, $124,344.

---

[12]The stipulation spelled Pittner as Pitter. All exhibits spelled it as Pittner.

[*116] Tractech (Ireland) Limited employed Denis O'Connell at an annual salary of €107,120. On or before August 16, 2005, Tractech planned to give the bonus executives stock option grants as bonuses. Before petitioner's offer to purchase Tractech, a stock option plan was not adopted and approved by Tractech's board of directors .

The disclosure schedule in connection with the SPA regarding capital provided the following about Tractech's plans to enter into bonus agreements with the bonus executives:

> [Tractech] entered into agreements with the * * * [bonus] [e]xecutives that provided for certain stock option grants. A stock option plan was never adopted and approved by * * * [Tractech's] board of directors. In lieu of issuing options to the * * * bonus [e]xecutives, * * * [Tractech] plans to enter into Sale Bonus Agreements pursuant to which the * * * [bonus] [e]xecutives are entitled to the Bonus Amount in accordance with the terms of the Purchase Agreement.

Tractech resolved to enter into agreements with the bonus executives to provide them with cash bonuses. The bonus agreements provided that upon petitioner's acquisition of Tractech, the bonus executives could receive cash bonuses in exchange for their release of claims related to any stock options. Each bonus executive was required to execute a release, consenting to termination of

[*117] any rights the bonus executive may have had to receive Tractech stock option grants.

The disclosure schedules that were part of the SPA include a provision that the bonus executives were among employees eligible for discretionary annual bonuses as a percentage of their annual base salaries. The bonus executives were entitled to receive the following bonus amounts in accordance with the bonus agreements: Carl Pittner, president and CEO, $681,955; Joseph Hige, vice president of sales and marketing, $511,466; David Mead, vice president of operations, $284,148; Robert Kress, vice president of engineering, $284,148; and Denis O'Connell, operations director, $248,148. The bonus agreements stated: "[Y]ou are entitled to receive a bonus * * * following the completion of the transactions contemplated by the Purchase Agreement". These agreements stated: "Please be aware that this letter agreement does not constitute an offer or guarantee of employment with the Company or any of its subsidiaries." The bonus agreements and attached releases were entered into on or before August 16, 2005.

The SPA purchase price excluded the bonus amounts for the bonus executives. The bonus agreements specified that the bonus executives would be paid in a lump sum on November 16, 2005. Eaton agreed to place an amount into an escrow account at closing and covenanted to negotiate an agreement reflecting

[*118] the payments of the bonuses to the bonus executives on reasonably acceptable terms.

After petitioner's acquisition Tractech became a member of its consolidated group for tax year 2005. On November 17, 2005, petitioner, through Tractech and the use of a third-party payroll processor, paid the bonus executives their bonus amounts. The domestic bonus amounts paid totaled $2,306,144.

Tractech withheld from the bonuses Federal and State income tax, as well as Social Security and Medicare tax. Employment of five of Tractech's bonus executives was terminated on the following dates: Carl Pittner, August 18, 2005; Joseph Hige, November 18, 2005; Richard Lindsay, January 30, 2006; David Mead, November 18, 2005; and Robert Kress, September 29, 2006.

For tax year 2005 petitioner filed a disclosure statement, Request to Treat This Statement as a Qualified Amended Tax Return, under Rev. Proc. 94-69, 1994-2 C.B. 804, reporting $2,306,144 of an additional deduction for the bonus amounts never deducted from the acquisition cost of Tractech. Petitioner's request for the additional deduction is equal to the sum of the net bonus amounts paid plus the Federal and State income tax and Social Security and Medicare tax withholdings. Respondent determined in the notice of deficiency that petitioner was not entitled to the deduction because the bonus payments failed to meet the

[*119] compensation rules of section 162(a) and the bonus payments should have been capitalized under section 263.

## OPINION

We must first consider whether it was an abuse of discretion for respondent to cancel APA I as of January 1, 2005, and APA II as of January 1, 2006.

I.      Cancellation of APAs

A.      Overview of Parties' Positions

Both parties presented experts to support their respective positions.  We focus on the degree to which the experts' opinions are supported by the evidence. Our opinion is not based on comparing experts' qualifications, so we do not list or discuss their qualifications, as listing them would unnecessarily lengthen the opinion.  We do not discuss the opinion of any expert that does not pertain to our factual conclusions.

1.      Petitioner

Petitioner contends that it did not omit or misrepresent any material facts in connection with its request for or negotiation of either APA I or APA II. Petitioner argues that the IRS had knowledge of facts that could have led it to implement a significantly different APA or no APA at all.  Petitioner submits that

[*120] it merely committed data and computational errors which did not affect the validity of the TPM and that it corrected these data and computational errors on its amended tax returns. It further contends that it did not commit implementation or compliance errors warranting cancellation of the APAs.

### 2. Respondent

Respondent contends that the cancellation of both APA I and APA II was proper. Respondent contends that petitioner did not comply in good faith with the terms and conditions of either APA I or APA II and failed to satisfy the APA annual reporting requirements. Respondent further contends that petitioner violated a critical assumption set forth in its APA I submission and APA II application materials. Respondent believes that petitioner added favorable steps to its TPM calculations that were not part of either APA I or APA II, failed to disclose timely to respondent mistakes in its TPM calculations, failed to keep adequate records, and failed to maintain adequate internal controls to ensure the integrity of its APA calculations.

### B. History of the APA Program

Section 482 was enacted to prevent tax evasion and to ensure that taxpayers clearly reflect income relating to transactions between controlled entities. Veritas Software Corp. & Subs. v. Commissioner, 133 T.C. 297, 316 (2009). This section

**[*121]** gives the Commissioner broad authority to allocate gross income, deductions, credits, or allowances between two related corporations if the allocations are necessary either to prevent evasion of tax or clearly to reflect the income of the corporations. See Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 163 (1994). Before the issuance of Rev. Proc. 91-22, 1991-1 C.B. 526, there was no formal mechanism for a taxpayer to request advance rulings on transfer pricing questions that arose pursuant to section 482. The Commissioner developed the APA program to resolve actual or potential transfer pricing issues in a principled, cooperative manner, as an alternative to the examination process. Announcement 2000-35, 2000-1 C.B. 922, 922.

The APA program's goal has been to make APAs more practical, affordable, and available to more taxpayers. Id., 2001-C.B. at 923. Since 1991 the APA program's caseload has steadily grown. From 1991 through 2015, 2,147 APA applications were filed and 1,511 APAs were executed. Announcement 2016-12, 2016-16 I.R.B. 589, 591-592. From 1991 through 2015, 11 APAs were revoked or canceled and 200 APA applications were withdrawn. Id. at 593.

An APA is a binding agreement between the taxpayer and the Commissioner on the TPMs within the meaning of section 482 and the regulations. See Rev. Proc. 96-53, sec. 10.01, 1996-2 C.B. 375, 383; Rev. Proc.

[*122] 2004-40, secs. 2.04, 9.01, 2004-2 C.B. 50, 51, 61.  APAs can be "unilateral", "bilateral", or "multilateral".  Announcement 2000-35, 2000-1 C.B. at 923.  The APAs at issue in this case are unilateral, each representing an agreement between only petitioner and the IRS.  See id.  Bilateral and multilateral APAs combine agreements between the taxpayer and the IRS with an agreement between the United States and one or more foreign competent authorities regarding an appropriate TPM.  Id.  The APA program provides a voluntary process whereby the Commissioner and the taxpayer may resolve transfer pricing issues under section 482 and the income tax regulations prospectively.  Rev. Proc. 96-53, sec. 3, 1996-2 C.B. at 376; Rev. Proc. 2004-40, sec. 2.01, 2004-2 C.B. at 51.  The prospective nature of an APA decreases the burden of compliance by providing taxpayers greater certainty with respect to their transfer pricing methods and promotes the principled resolution of these issues through discussion and cooperation.  Rev. Proc. 2004-40, sec. 2.01.

The APA program is intended to supplement traditional administrative, judicial, and treaty mechanisms and is designed as an alternative to the traditional adversarial model.  Id. sec. 2.04(1).  Under the traditional adversarial model "the data gathering, development, and interpretation of a transfer pricing issue is a complex, time-consuming process that often results in an administrative appeal

[*123] * * * [or] litigation". See Announcement 2000-35, 2000-1 C.B. at 922. A significant transfer pricing issue can take up to eight or more years to resolve, which renders the facts in dispute many years old and can leave considerable uncertainty regarding the proper transfer pricing of current transactions. Id., 2001-C.B. at 922-923.

The APA program evaluates each APA request in terms of developing an arm's-length TPM that is consistent with the regulations. Id. at 924. Because transfer pricing cases generally involve complex facts and difficult issues, there is room for disagreement between reasonable people, acting in good faith, about the best method and proper application of this method. Id. The APA program team leaders are willing to consider taxpayer positions to reach a mutually acceptable understanding of the appropriate application of the arm's-length standard to the taxpayer's facts in a manner consistent with the regulations. Id.

In practice an APA is always the result of a voluntary decision by a taxpayer to seek an APA. Id. at 923. The APA process is extensive and requires a detailed submission. See Rev. Proc. 96-53, supra; Rev. Proc. 2004-40, supra. Before filing a formal application, a taxpayer may request a prefiling conference. Announcement 2000-35, 2000-1 C.B. at 923. The prefiling conference provides the opportunity to discuss the IRS' preliminary views of the taxpayer's potential

**[\*124]** APA request and what types of information would be necessary to support the request.  Id. at 923-924.

Each APA request and supplemental submission must include a declaration under penalties of perjury that to the best of the taxpayer's knowledge or belief, the request contains all the relevant facts relating to the request and such facts are true, correct, and complete.  See Rev. Proc. 96-53, sec. 5.11, 1996-2 C.B. at 379; Rev. Proc. 2004-40, sec. 4.09, 2004-2 C.B. at 56.  The APA request is required to include a statement describing all previous issues at the examination, Appeals, and judicial levels related to the proposed TPM, including an explanation of the taxpayer's and the Government's positions and resolutions to any issues.  See Rev. Proc. 96-53, sec. 5.03(11), 1996-2 C.B. at 377; Rev. Proc. 2004-40, sec. 4.03(14)(a), 2004-2 C.B. at 54.  Any previous submitted documents that the taxpayer wishes to associate with the APA request must be referenced.  See Rev. Proc. 96-53, sec. 5.01(2), 1996-2 C.B. at 377; Rev. Proc. 2004-40, sec. 4.01(3), 2004-2 C.B. at 53.

For each taxable year covered by the APA, the taxpayer must file a timely and complete annual report describing the taxpayer's actual operations for the year and demonstrating compliance with the APA's terms and conditions.  See Rev. Proc. 96-53, sec. 11.01(1), 1996-2 C.B. at 383; Rev. Proc. 2004-40, sec. 10.01(1),

[*125] 2004-2 C.B. at 61.  An annual report must include a declaration under penalties of perjury that all relevant facts relating to the APA agreement are true, correct, and complete.  Rev. Proc. 2004-40, sec. 10.01(6), 2004-2 C.B. at 61.  If a filed annual report contains incomplete or incorrect information, or reports an incorrect application of the TPM, the taxpayer must amend its report within 45 days after becoming aware of the need to amend.  The time may be extended for good cause.  Id. sec. 10.01(5).  Revenue procedures provide guidelines for making compensating adjustments and filing amended returns.  See Rev. Proc. 96-53, sec. 11.02, 1996-2 C.B. at 383; Rev. Proc. 2004-40, sec. 10.02, 2004-2 C.B. at 61-62.

If a return for a tax year covered by an APA is examined, the IRS may require the taxpayer to establish that:  (a) the taxpayer has complied in good faith with the terms and conditions of the APA; (b) the material representations in the APA and the annual reports remain valid and accurately describe the taxpayers' operations; (c) the supporting data and computations used in applying the TPM were correct in all material respects; (d) the critical assumptions underlying the APA remain valid; and (e) the taxpayer has consistently applied the TPM and met critical assumptions.  See Rev. Proc. 96-53, sec. 11.03, 1996-2 C.B. at 384; Rev. Proc. 2004-40, sec. 10.03, 2004-2 C.B. at 62.  If the taxpayer complies with the terms and conditions of the APA, the IRS will not contest the application of the

[*126] TPM to the subject matter of the APA, and the taxpayer remains otherwise subject to U.S. income tax laws. See Rev Proc. 96-53, sec. 10.02, 1996-2 C.B. at 383; Rev. Proc. 2004-40, sec. 9.02, 2004-2 C.B. at 61. If a critical assumption has not been met, the APA director and the taxpayer will discuss revising the APA; if an agreement cannot be reached, the APA will be canceled. See Rev. Proc. 96-53, sec. 11.06, 1996-2 C.B. at 385; Rev. Proc. 2004-40, sec. 10.06(1), 2004-2 C.B. at 63. A taxpayer may request renewal of an APA using the same procedures as for the initial APA request. Rev. Proc. 2004-40, sec. 11.01, 2004-2 C.B. at 64.

C.    Applicable Revenue Procedures

Revenue procedures provide the requirements and guidelines of the APA program. Rev. Proc. 91-22, 1991-1 C.B. 526, provided the first guidelines for APAs, and these guidelines have been replaced by a succession of revenue procedures. Rev. Proc 96-53, supra, is effective for APA I and Rev. Proc. 2004-40, supra, is effective for APA II. These revenue procedures are very similar, and their provisions regarding cancellation differ only slightly.

1.    Rev. Proc.  96-53

Rev. Proc. 96-53, supra, is generally effective for an APA request received on or after December 31, 1996, and before August 19, 2004. Rev. Proc. 96-53,

**[\*127]** sec. 14, 1996-2 C.B. at 386; Rev. Proc. 2004-40, <u>supra</u>.[13] The Associate Chief Counsel (International) may cancel the APA if the District Director, with the concurrence of the Associate Chief Counsel (International), determines that there was a misrepresentation, mistake as to material fact, failure to state a material fact, or lack of good-faith compliance with the terms and conditions of the APA (but not fraud, malfeasance, or disregard) in connection with the request for the APA, or in any subsequent submissions (including the annual report). Rev. Proc. 96-53, sec. 11.06(1). Material facts are facts that, if known by the IRS, would have resulted in a significantly different APA or no APA at all. <u>Id.</u>

If an APA is canceled the cancellation will be effective as of the beginning of the year in respect of which the misrepresentation, mistake as to material fact, failure to state a material fact, or noncompliance occurs. <u>Id.</u> sec. 11.06(3). If an APA is canceled the APA will cease to have force and effect with respect to the taxpayer and the IRS as of the effective date of the cancellation for U.S. income tax purposes. <u>Id.</u> sec. 11.06(4). After the effective date of cancellation, the tax treatment of the transactions covered by the APA is subject to all applicable U.S. tax rules. <u>Id.</u>

---

[13]Rev. Proc. 2004-40, 2004-2 C.B. 50, updated and superseded Rev. Proc. 96-53, 1996-2 C.B. 375.

**[\*128]**     2.     Rev. Proc. 2004-40

Rev. Proc. 2004-40, supra, is generally effective for APA requests received after August 19, 2004, and before February 1, 2006. See Rev. Proc. 2004-40, sec. 14, 2004-2 C.B. at 64; Rev. Proc 2006-9, 2006-1 C.B. 278.[14] The Associate Chief Counsel (International) or a designee may cancel an APA on account of the failure of a critical assumption, or because of the taxpayer's misrepresentation, mistake as to a material fact, failure to state a material fact, failure to file a timely annual report, or lack of good-faith compliance with the terms and conditions of the APA. Rev. Proc. 2004-40, sec. 10.06(1). Material facts include facts that, if known by the IRS, could have reasonably resulted in an APA with significantly different terms and conditions. See id. For annual report purposes the Associate Chief Counsel (International) will consider facts as material if the knowledge of the facts would have resulted in a materially different allocation of income, deductions, or credits than reported in the annual report or the failure to meet a critical assumption. Id.

If an APA is canceled, the cancellation is effective as of the beginning of the year in which the critical assumption failed or the beginning of the year to

---

[14]Rev. Proc. 2006-9, 2006-1 C.B. 278, updated and superseded Rev. Proc. 2004-40, 2004-2 C.B. 50.

**[\*129]** which the misrepresentation, mistake as to a material fact, failure to state a material fact, or noncompliance relates. Id. sec. 10.06(3). The APA has no further force and effect with respect to the taxpayer and the IRS for U.S. income tax purposes as of the effective date of cancellation. Id. sec. 10.06(4).

D.     Background on Section 482 and Applicable Regulations

To determine true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. Sec. 1.482-1(b)(1), Income Tax Regs. The arm's-length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's-length result, which is referred to as the best method rule. Id. para. (c)(1). There is no strict priority of methods, and no method will invariably be considered more reliable than others. Id. An arm's-length result may be determined under any method without establishing the inapplicability of another method; but if another method subsequently is shown to produce a more reliable measure of an arm's-length result, that method should be used. Id.

The regulations provide six methods to determine the arm's-length amount to be charged in the transfer of tangible property: the CUP method, the resale price method, the cost-plus method, the CPM, the profit split method, and

[*130] unspecified methods.  Sec. 1.482-3(a), Income Tax Regs.  The CUP

method evaluates whether the amount charged in a controlled transaction is arm's

length by reference to the amount charged in comparable uncontrolled

transactions.  Id. para. (b)(1).  The cost-plus method evaluates whether the amount

charged in an intercompany sale is arm's length by reference to the gross profit

markup realized in a comparable uncontrolled transactions.  Id. para. (d)(1).  The

CPM evaluates whether the amount charged in a controlled transaction is arm's

length on the basis of objective measures of profitability (profit level indicators)

derived from uncontrolled taxpayers that engage in similar business activities

under similar circumstances.  Sec. 1.482-5(a), Income Tax Regs.

Under the CPM the determination of an arm's-length result is based on the

amount of operating profit that the tested party would have earned on related party

transactions if its profit level indicator were equal to that of an uncontrolled

comparable.  Id. para. (b)(1).  In general the tested party will be the participant in

the controlled transaction whose operating profit attributable to the controlled

transaction can be verified using the most reliable data and requiring the fewest

and most reliable adjustments, and for which reliable data regarding uncontrolled

comparables can be found.  Id. subpara. (2).  Usually, the tested party will be the

[*131] least complex of the controlled taxpayers and will not own valuable intangible property or unique assets. Id.

The regulations provide four methods to determine the arm's-length amount to be charged in a controlled transfer of intangible property: the CUT method, the CPM, the profit split method, and unspecified methods as described in section 1.482-4(d), Income Tax Regs. See id. para. (a). The CUT method evaluates whether the amount charged for a controlled transfer of intangible property was at arm's length by reference to the amount charged in a comparable uncontrolled transaction. Id. para. (c).

E.    Scope and Standard of Review

We previously held in Eaton Corp. & Subs. v. Commissioner, 140 T.C. 410, 417 (2013), that the standard of review is whether it was an abuse of discretion for respondent to cancel the APAs.[15] The relevant inquiry is whether respondent abided by the self-imposed limitations set forth in the applicable revenue procedures. Id. at 418. Petitioner must show that respondent's act of canceling the APAs was arbitrary, capricious, or without sound basis in fact. Id. at 418. In

_____

[15]On June 9, 2016, petitioner filed a motion to reconsider the Court's June 26, 2013, Opinion and order in this case. An oral argument on the motion to reconsider was held on October 21, 2016. Petitioner contends respondent bears the burden of proof for cancellation of the APAs.

[*132] reviewing whether it was an abuse of discretion to cancel the APAs, we review the evidence de novo. See Estate of Gardner v. Commissioner, 82 T.C. 989, 1000 (1984). Whether respondent committed an abuse of discretion is a question of fact. Buzzetta Constr. Corp. v. Commissioner, 92 T.C. 641, 648 (1989).

F.    APA Negotiations

The APA process was designed to solve complex transfer pricing issues. The goal is to reach a mutually acceptable understanding of the appropriate application of the arm's-length standard to the taxpayer's facts. See Announcement 2000-35, 2000-1.C.B. at 924. At the conclusion of an APA negotiation, both parties might believe that a result is not the best method but rather is an acceptable negotiated agreement. To reach agreement, parties often compromise. No regulation requires the parties to reach an agreement; either party can end negotiations at any point. Respondent's expert Harlow Higinbotham testified that an APA is a negotiation and "not a technician's contest over best method". We do not review the APAs to determine whether the APA TPMs were the best method under the section 482 regulations. To determine whether respondent's determination to cancel the APAs was an abuse of discretion, we focus on whether there were any misrepresentations, mistakes as to a material fact,

[*133] or failures to state a material fact. See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec. 10.06(1).

The APA I negotiations began after the audit for petitioner's 1994-97 tax years was complete. During the audit petitioner discussed changing its TPM for the transfer of tangible property from the cost-plus method, which used the Island plants as the tested party, to the CUP method. Petitioner contended that the CUP method, in combination with the CPM, was better than the cost-plus method and that CHI/EEI's U.S. distribution should be the tested party. One of the purposes of beginning the APA negotiations was to give respondent time to review petitioner's CUP method proposal.

The prefiling conference for APA I was held on May 8, 2002, and agreement on the terms of the APA was not reached until November 14, 2003. APA I covered three transactions: (1) the transfer of breaker products from CHPR/EEPR to CHI/EEI; (2) CHI/EEI's license of intangible property to CHC; and (3) a cost-sharing payment made by CHPR/EEPR to CHI. Rev. Proc. 96-53, supra, governs APA I.

The APA II process began in January of 2005, and APA II was executed in December 2006. Petitioner's APA II application sought renewal of APA I. APA II covered only one transaction, the transfer of breaker products from CHC to EEI.

[*134] The APA II process included a de novo review of petitioner's APA materials. The APA II TPM for the transfer of breaker products differed slightly from that of APA I. Unlike APA I, APA II did not include a minimum threshold of SG&A expenses. Rev. Proc. 2004-40, supra, which updated and superseded Rev. Proc. 96-53, supra, applies to APA II.

On December 16, 2011, the IRS notified Eaton that it was canceling APA I and APA II effective as of January 1, 2005 and 2006, respectively. The IRS specifically stated that "[t]hese cancellations are based on numerous grounds, including the failure of a critical assumption, misrepresentation, mistake as to a material fact, failure to state a material fact, failure to file a timely annual report, or lack of good faith compliance with the terms and conditions of the APA."

Respondent's arguments in support of cancellation of the APAs fall into two categories: (1) misrepresentations, mistakes as to a material fact, and failures to state a material fact during the APA negotiations and (2) implementation and compliance with the APAs.

We look at the following nine areas of the APA negotiations to determine whether it was an abuse of discretion to cancel the APAs: (1) profit split, (2) tested party, (3) business losses, (4) mirror ledgers, (5) relationship between breaker products and U.S. assembly, (6) SG&A allocation, (7) southbound

[*135] transactions, (8) APA multiplier, and (9) Lincoln sales.  Some of these areas are also addressed later in our implementation and compliance with the APAs analysis, but our discussion of these nine areas below focuses on their relation to the APA negotiation process, which began with the first contact that petitioner had with the IRS and lasted until the APAs became effective.

1.     Profit Split

During the APA I negotiations petitioner provided the APA I team with information regarding the profit split between the Island plants and petitioner's U.S. operations.  Petitioner provided this information to enable the APA team to compare the relative amount of profit split between CHI/EEI and the Island plants under Eaton's proposed TPM.  Petitioner's information explained CHI/EEI's overall business unit operating profits for 1998-2001.  Specifically, petitioner's information segmented CHI/EEI's total overall business unit operating profits into three categories:  (1) the Island plants' income, (2) CHI/EEI's income from distribution of the Island plants' products, and (3) other consolidated industrial and commercial controls operating income, including income derived from the manufacture of components outside Puerto Rico, the manufacture of assemblies, and sales and distribution activities other than those specifically related to the Island plants' products.

[*136] The information provided established that the Island plants had the greatest percentage of operating profits each year under the proposed TPM, and EEI's "other" operations, including U.S. assembly, incurred either losses or substantially lower operating profits relative to the Island plants each year. Petitioner's information submitted to the APA I team also explained that the use of a profit-split analysis instead of a CUP analysis would fail to reflect the excess costs that petitioner sought to reduce in its non-Puerto Rico operations. Petitioner provided a similar explanation to the IRS during its 1994-97 audit.

A member of the APA I team prepared a spreadsheet analyzing the profit-split that resulted from petitioner's proposed TPM for 2001. The IRS' profit split analysis showed that over 80% of the profits were allocated to the Island plants. There was some concern among the APA I team members that the Island plants had significant profits and that EEI had small losses, warranting consideration of a switch of the tested party. The APA I team further explained to petitioner that it did not believe petitioner's proposed TPM sufficiently compensated EEI for the risks it assumed as a distributor.

During the APA II negotiations the APA II team, which had a different APA team leader, different members, and some of the APA I exam team members, raised the profit split issue to petitioner. The APA II team leader asked petitioner

[*137] to explain the "extraordinarily high operating margin" the Island plants earned under the APA TPM in an industry that "faces strong competitive pressures". Petitioner responded that EEI had successfully established highly efficient production in low cost locations in Puerto Rico and the Dominican Republic, which achieved productivity levels that equaled or exceeded a substantial margin typical of industry productivity levels.

Respondent asked for a profit and loss statement showing the system profit of the breaker products produced by the Island plants and sold by EEI to its customers and constructive customers (EEI's own domestic plants). Petitioner's response specifically acknowledged that the "IRS team has expressed concern regarding split of profit between the factory operations of CHC and the distribution operations of EEI under the CUP methodology".

Petitioner provided the APA II team leader with two separate analyses supporting the use of the CUP method. Petitioner's response contended that these confirming analyses supported its decision to use a CUP method. The first analysis looked at the gross margin on the sale of breaker products manufactured in the Beaver plant and the sale of breaker products manufactured in the Island plants. The response explained that the difference in margins was due to the savings of the Island plants operating in a low-cost jurisdiction. The analysis

[*138] supported the assertion that the bulk of the profits were properly attributable to the manufacturers of the product and resulted from the manufacturers' ability to produce a diverse numbers of styles of complex high-regulated products at low cost, in high volume while meeting quality product standards. The second analysis was based on an activity based profit-split analysis. Petitioner also provided an analysis of the actual system profit and profit split resulting from the application of the APA TPM in 2004. This profit split allocated 14.8% of the profit to EEI's U.S. distribution and 85.2% of the profit to the Island plants.

The evidence supports a conclusion that the profit split between the Island plants and EEI was not only known by both APA I and APA II teams, but was subject to questioning by both APA teams. Respondent contends petitioner misrepresented its profit splits as an "actual" profit split rather than one based on constructed revenue. Respondent, however, was aware that the APA TPM used constructed revenues.

### 2. Tested Party

Regulations define the term "tested party" in connection with the CPM. The term refers to the controlled party whose profitability is being tested. See sec. 1.482-5(b)(2), Income Tax Regs. Usually, the tested party will be the least

[*139] complex of the controlled taxpayers and does not own valuable intangible property or unique assets that distinguish it from potential uncontrolled comparables. See, e.g., id.

Respondent contends that petitioner failed to disclose material facts regarding the use of EEI U.S. distribution as the tested party. During its 1994-97 audit petitioner proposed to use a CUP method which would have changed the tested party from the Island plants to CHI's U.S. distribution. Petitioner responded to the IRS audit team's concerns by providing the IRS with its 2001 CUP study. Petitioner further provided the IRS audit team with an extract from its VISTA database identifying the 29 product groups, the product codes within each group, and the standard costs for each product sold to different categories of third parties in the United States.

The participants in the APA I negotiation included personnel from the IRS audit team. The APA I team had access to the IRS audit team's records. Some members of the APA I team contended that the Island plants should be the tested party, and conveyed to petitioner that it wanted to focus on treating the Island plants as the tested party because the profit split that resulted from petitioner's proposed CUP method had resulted in "significant profits" in the Island plants and "small profits or losses" in the United States. The APA I team further informed

**[\*140]** petitioner that it did not believe petitioner's proposed TPM sufficiently compensated CHI/EEI for the risks it assumed as a distributor. The APA I agreement settled on CHI/EEI's U.S. distribution as the tested party for the APA TPM.

The issue of who should be the tested party also arose during the APA II negotiations. The APA II team economist sent the APA II team leader a memorandum outlining his concerns about petitioner's proposed use of EEI U.S. distribution as the tested party. The APA II team economist's concerns specified that petitioner's proposed method resulted in the Island plants' receiving the "lion's share of profits" while petitioner has not proven that the Island plants are entitled to such profits from location savings. The memorandum further explained that petitioner's proposed method resulted in EEI's receiving a much smaller portion of the profits, which was concerning considering that EEI had material marketing intangibles.

The APA II team leader provided petitioner with a draft memorandum that he prepared for the Associate Chief Counsel (International). This memorandum stated that the APA II team was "currently divided on whether the facts justif[ied] treating EEI as the tested party on renewal". The APA II team leader testified that there were questions and communications regarding the tested party--

[*141] approximately 25 questions were asked about the tested party. There is no evidence that petitioner did not respond to these questions. The evidence supports a conclusion that the APA teams were aware that the Island plants were not the tested party and that some members of the APA teams did not support the proposed TPM.

### 3. Business Losses

Respondent contends that he was not aware that petitioner's U.S. assembly business earned low operating profits or incurred losses. On December 13, 2002, petitioner provided a written response to a request for information from the APA I team leader. The response provided a chart of operating profits, which included an "other" category that included income derived from the manufacturing of components outside Puerto Rico, the manufacture of assemblies, and sales and distribution activities other than those specifically related to CHPR products. This chart showed that the "other" category incurred losses for 1998 and 1999.

The parties dispute the relevance of the financial performance of EEI's other businesses. Petitioner contends that whether EEI's businesses performed well or poorly has no bearing on the arm's-length price for breaker products. Petitioner further contends that the APA TPM applied only to EEI's distribution function and that EEI's entire business was not part of the covered transaction. Respondent

[*142] had information regarding petitioner's other businesses and could have inquired about how EEI's other businesses affected the proposed TPMs before agreeing to the APAs.

4.      Mirror Ledgers

Petitioner kept mirror ledgers, which were also referred to as distribution ledgers. These mirror ledgers recorded the financial effects of the transfer of breaker products from the Island plants to EEI. Respondent contends that petitioner failed to disclose that the mirror ledgers reflected losses.

The APA I and APA II negotiating teams were aware of the distinction between the constructed income statements and the mirror ledgers. Petitioner had disclosed and explained previously the losses reflected on the mirror ledgers. During the 1994-97 audit the IRS audit team requested that petitioner explain the losses reflected on the mirror ledgers. Petitioner provided a written explanation regarding the losses. This response, dated October 31, 2000, explained that the losses occurred because the arm's-length price paid to the Island plants as reflected on the mirror ledgers was higher than the price the mirror ledgers recorded as revenue from U.S. assembly based on Eaton's internal management price. Petitioner's response further explained that profits and losses recorded on the mirror ledgers were unrelated to the economics of arm's-length sales because a

[*143] substantial portion of the revenue reflected on the mirror ledgers was derived from the non-arm's-length internal management price.

Both APA I and APA II include specifications regarding the Berry ratio. Respondent contends that compliance with the Berry ratio should be tested in part on the basis of the mirror ledgers. The APAs defined the Berry ratio as the gross profit from EEI's sales of breaker products divided by its breaker product operating expenses. For each APA year the APAs required that if EEI's yearend breaker product Berry ratio was not in compliance with the TPM, then EEI was required to make an adjustment to the purchase price of breaker products to bring the Berry ratio within the agreed-upon range.

The APAs required that Eaton construct income statements. Respondent contends that the constructed income statements included in Eaton's APA annual reports are not part of Eaton's books and records. Respondent further contends that the Berry ratio should be tested on the basis of the net profit reported on the mirror ledgers, EEI's consolidated income, or on Eaton's Forms 1120. Petitioner contends that its books and records were not organized in such a way that it could isolate the profitability of its U.S. distribution functions.

The constructive income statement brought together four key elements of the profitability of the U.S. distribution function: (1) third party and international

**[\*144]** revenue, (2) CUP-method-based constructed intercompany revenue, (3) related SG&A, and (4) the COGS paid to the Island plants at the transfer price. The third-party and international revenue, and the related SG&A, were all from Eaton's financial records. The CUP-method-based intercompany revenue and the COGS paid to the Island plants were computed under the APA TPM. The components of the constructed income statement and the steps to calculate the TPM were clearly explained in petitioner's APA I application. Petitioners never indicated that the mirror ledgers were being used to calculate the APA TPM.

The losses reflected on the mirror ledgers were expected and did not violate any term or condition of the APA. Petitioner's expert witness Shannon W. Anderson explained that large companies typically use many different internal ledgers to record the financial transactions of different units or divisions within the company. The transfer price at which EEI's U.S. distribution purchased breaker products from the Island plants was determined using a constructed income statement derived from the mirror ledgers. Anderson explained that some of the information on the mirror ledgers was not needed for the purposes of the APA TPM. Neither the APA I nor the APA II TPMs addressed the mirror ledgers.

**[\*145]**     5.     Relationship Between Breaker Products and U.S. Assembly

Respondent contends that petitioner misrepresented the relationship between its U.S. assembly operations and breaker products. Specifically, respondent contends that petitioner represented that there was effectively no relationship between U.S. assembly and the breaker products. Respondent argues that customers who have purchased and installed assembled products tend to acquire EEI's breaker products in the aftermarket instead of purchasing a competitor's product. The relationship between breaker products and U.S. assembly has been described in various ways: marketing intangible, razors and blades, installed base, and the aftermarket.

The relationship between breaker products and U.S. assembly had been a concern since the 1994-97 audit. This concern was the subject of an IDR dated June 2, 2000. Petitioner response to the IDR explained that its electrical business was an integrated business. A substantial portion of CHI's distributor sales is directly related to sales of components it previously made to OEMS and sales of customized electrical assemblies (containing other CHPR products) that it previously made to unrelated third parties. The response explained that third parties regularly purchased additional CHPR products for these assemblies from

[*146] unrelated distributors.  This response compared distributor products to blades and the sales to OEMs as analogous to razors.

Petitioner explained in a response to the APA II team why the previous analogy of razors and blades was incorrect.  Petitioner also responded to the APA II team's concerns regarding the relationship between breaker products and U.S. assembly in the context of marketing intangibles.  This issue had been discussed extensively during a prior meeting between petitioner and APA II team.  The APA II team's questions regarding marketing intangibles specifically asked about the 1995 E&Y study and its conclusion that CHI was more than a simple distributor, and that it owned valuable marketing intangibles.

Petitioner's response contended that no significant marketing intangibles existed in the breaker product business.  Petitioner further explained that the E&Y study was out of date and referred to a time when the Wesco trademark was used.

Petitioner provided inaccurate information during the APA I negotiations concerning the relationship of breaker products with U.S. assembly.  This inaccuracy was corrected during the APA II negotiations.  Even though incorrect information was disclosed, the APAs' TPMs for the transfer of tangible property do not seem to have been affected by the disclosure of erroneous information.  The

[*147] APA II team focused questions on marketing intangibles, and it received detailed responses.

### 6. SG&A Allocation

Respondent contends that petitioner failed to disclose its SG&A allocation method. Respondent further contends that there were SG&A expenses that were not allocated to operated entities in the mirror ledgers and the U.S. assembly ledgers. During the APA I negotiations the APA I team asked a series of questions related to this issue. Petitioner responded to the APA I team leader in a letter dated December 13, 2002.

The APA I team inquired about how CHI allocated SG&A and received a detailed response. According to petitioner SG&A allocations followed long-standing business practices and were not affected by tax considerations. This explanation identified the highest level of corporate expenses in the SG&A allocation as coming from CHI's division headquarters. SG&A was also discussed at a meeting between petitioner and the APA I team on January 15, 2003. Petitioner contends that expenses incurred at the corporate parent of EEI were not specifically included in the APA allocations unless they had already been allocated to the electrical division in accordance with petitioner's regular business practice.

[*148] During the APA II negotiations SG&A was addressed in petitioner's APA application and discussed with the APA II team leader. APA I required a minimum threshold of a 13% floor for the allocation of SG&A to EEI's distribution function. APA II did not require a minimum threshold. Respondent contends that additional facts regarding the SG&A allocation should have been disclosed but does not identify what specific facts should have been disclosed.

### 7. Southbound Transactions

Respondent contends that Eaton's APA materials failed to disclose facts concerning the scope of the subcomponents manufactured in Watertown and Horseheads that CHI sold to the Island plants and which the Island plants incorporated into breaker products.

Southbound transactions cover the inputs and components that the Island plants bought from CHI. This issue came up during the APA I negotiations. The APA I economist inquired about what CHPR bought from CHI. Petitioner's economist communicated to the APA I economist that out of the Island plants' $300 million COGS, approximately $8 to $10 million related to materials purchased from CHI. The APA I economist testified that these transaction were not related to the breaker products transactions covered by the APA.

**[*149]**      8.      APA Multiplier

Respondent contends that petitioner described its proposed TPM as a three-step process:  (1) identify third-party prices and revenues, (2) create an income statement for EEI's distributive activities, and (3) calculate EEI's Berry ratio from the income statement prepared in step 2.  These three steps confirm the arm's-length nature of a transfer price for EEI U.S. distribution's purchase of the breaker products from the Island plants.  Respondent contends that petitioner performed a fourth step involving a multiplier--the numerator was the transfer price calculated by petitioner under the TPM and the denominator was an estimate of the Island plants' manufacturing costs.  Respondent further contends that petitioner did not disclose in its APA materials the existence of a multiplier to calculate EEI's transfer prices for the breaker products reported on its Forms 1120.  Respondent argues petitioner's use of a multiplier changed the APA TPM from a Berry ratio return on a hypothetical distribution function to a cost-plus markup on the Island plants' manufacturing costs.

The APA multiplier was a factor used to express the transfer price as a percentage of manufacturing costs.  The product of the APA multiplier and the Island plants' manufacturing cost was the mathematical equivalent of the transfer price computed under the APA TPM.  Although petitioner used the term "APA

**[*150]** multiplier", the multiplier was not used to compute or modify the transfer price determined under the APA TPM. The multiplier was used by petitioner as an implementation mechanism, incorporating the transfer price in its financials.

Petitioner contends that it calculated the transfer price for the transfer of tangible property using the CUP and CPM methods as provided by the APA TPM. Petitioner further contends the APA multiplier did not change the APA TPM to a cost-plus markup on manufacturing costs. The cost-plus method evaluates whether the amount charged in a controlled transaction is arm's length by reference to the gross profit markup realized in comparable uncontrolled transactions. Sec. 1.482-3(d)(1), Income Tax Regs. The APA multiplier was not derived by reference to a third party's cost-plus markups, and the Island plants' markups were not compared to those of a comparable third party.

9.    Lincoln Sales

The Lincoln plant in Illinois produces a complete residential product offering. Las Piedras and Haina were its primary supplier of breaker products. Most of the Lincoln plant's sales of Island plant products were made to distributors, which were treated as distributor sales for the purposes of the APA I filing. A small share of Lincoln sales was made directly to unrelated OEMs and this information was included in the filed APA I submission. The APA I filing

[*151] further explained that the Lincoln plant did not modify or physically alter CHPR residential breaker products that CHI sold to unrelated distributors through a warehouse in the Lincoln plant. Respondent contends that petitioner failed to provide the Lincoln product line statement used to prepare its constructive income statements.

Petitioner disclosed during the APA II negotiation process that it would not include sales of breaker products to OEMs through the Lincoln ledger in the CUP computations. Petitioner explained that only a small share of the Lincoln sales is made directly to unrelated OEMs. Information regarding Lincoln sales was disclosed during the APA negotiations.

G. Analysis Regarding APA Negotiations

According to respondent there are three primary controlled transactions: (1) EEI's licenses to the Island plants of intangible property, which the Island plants used to manufacture breaker products; (2) the Island plants' purchase of subcomponents, which the Island plants then used to manufacture breaker products; and (3) EEI's purchase of Island plants' manufactured breaker products. We do not dispute that these controlled transactions took place. However, the Island plants purchase of subcomponents is not a covered transaction in the APAs.

[*152] Our analysis focuses on the APAs' covered transactions, and whether petitioner misrepresented information, as well as whether there existed a mistake as to a material fact or whether petitioner failed to state a material fact. We must analyze whether any mistakes or omissions were material to the APAs' covered transactions.

The parties disagree about what should be considered a material fact. Rev. Proc. 96-53, sec. 11.06(1), which is applicable to APA I, defines material facts as those that would have resulted in a significantly different APA or no APA at all. Rev. Proc. 2004-40, sec. 10.06(1), which is applicable to APA II, considers facts material if knowledge of the facts could have reasonably resulted in an APA with significantly different terms and conditions. Petitioner contends that a material fact is a fact that could have resulted in a significantly different TPM being used in the APA had the IRS known about it. Respondent contends that petitioner's interpretation is too narrow and argues that the relevant inquiry is whether the APA itself, or the terms and conditions of the APA, would be different or result in no APA at all.

The primary purpose of an APA is to reach agreement on a TPM. See Rev. Proc. 96-53, sec. 3.02, 1996-2 C.B. at 376; Rev. Proc. 2004-40, sec. 2.04. As part of the APA process the taxpayer provides information to support its proposed

[*153] TPM as the best method. See Rev. Proc. 96-53, sec. 3.03, 1996-2 C.B. at 376; Rev. Proc. 2004-40, sec. 2.07, 2004-2 C.B. at 51. For any fact to be material, it needs to result in a significantly different APA or no APA at all. The TPM is the essential part of the APA, and for a fact to be material it should have an impact on the TPM. For example, if a taxpayer did not disclose certain aspects of its business related to a product line that was not included in a covered transaction under the APA, the failure to make such a disclosure would not likely be material because it would not result in a change to the TPM.

We must also address whether petitioner omitted a material fact. Respondent contends that certain information was never presented to the APA teams but rather was provided to an exam team in connection with a prior year exam or in response to an IDR in conjunction with a specific exam. Petitioner contends that it provided all the relevant materials, including materials provided during the 1994-97 audit.

The revenue procedure applicable to APA I specifically states that "[a]ny previously submitted documents that the taxpayer wishes to associate with the request must be referenced in the request". See Rev. Proc. 96-53, sec. 5.01(2), 1996-2 C.B. at 377. We agree with respondent that information regarding the mirror ledgers previously provided was not referenced in the APA materials.

[*154] However, the purpose of the APA I submission was to request TPMs for three covered transactions and to provide supporting information for why the proposed TPMs were the best method under the section 482 regulations.

Petitioner's APA I submission explained clearly the proposed TPM for the transfer of tangible property in specific steps. The second step explained how an income statement would be constructed and what would be included in it. It is not apparent why petitioner should have been required to explain the mirror ledgers, which were not addressed in the TPM. Petitioner was required to submit representative financial and tax data for the last three taxable years, with other data in support of the proposed TPM. See Rev. Proc. 96-53, sec. 5.03(5), 1996-2 C.B. at 377. The APA I team had the opportunity to ask any questions that they wanted. A prefiling meeting was held, and the member of the exam team that received the October 2000 letter regarding the mirror ledgers was present.

After the APA I submission the APA I team leader sent petitioner a letter with due diligence questions. One of these questions addressed whether there was an apparent inconsistency between numbers in the CHI income statement and the consolidated income statement for the Eaton Industrial and Commercial Controls Division. Petitioner's response divided income data from the annual report into three categories: (1) CHPR income; (2) CHI income from distribution of CHPR

[*155] products; and (3) other consolidated industrial and commercial controls operating income. This information showed that the third category of income had losses. We realize this information is different from that in the mirror ledgers, but the question raised inconsistencies in the income statements. If respondent had questions about the mirror ledgers and their relationship to the constructed income statements, they should have asked.

A taxpayer should not rely on information disclosed previously and is required to submit all information that supports its proposed TPM, as well as provide any requested information. See Rev. Proc. 96-53, secs. 5.01(2), 6.01, 1996-2 C.B. at 377, 380. However, a taxpayer should not be expected to provide information that is not requested and that the taxpayer reasonably believes is unnecessary.

The APA I request began with a prefiling conference, and the total APA I process lasted 18 months. The formal due diligence process lasted about 13 months. There is no evidence of petitioner's not answering a request for information. During the APA I negotiations petitioner made concessions in order to reach an agreement. For example, petitioner agreed to a higher Berry ratio than originally proposed in order to reach an agreement. Respondent also made concessions. Although some of the APA I team members expressed concern about

[*156] using CHI/EEI U.S. distribution as the tested party, there was ultimately no change to the tested party used in reaching the agreed-upon APA TPM.

The APA II request was subject to a de novo review by a different APA team leader and economist. However, some exam team members from the APA I team were also on the APA II team. The APA II team leader testified credibly about the APA process in general and the APA II negotiations. He explained that each member of the APA team brings an expertise and that none of us has "to shoulder the entire expertise by ourselves." The team leader is responsible for the team trying to achieve a consensus among the APA team members and for drafting the APA.

The APA II team leader explained that the APA process often begins with the filing of an application, which is proceeded by a question and answer period that lasts a few months. The questions often ask for more details about the facts surrounding the APA application. He explained that prefiling conferences are helpful and often result in the taxpayer's providing a more complete initial response. He further explained that if the APA team does not like a proposed TPM, the APA team often provides an alternative.

The APA II process began with a prefiling conference on February 2, 2005. Petitioner submitted its application for renewal of APA I on June 23, 2005. The

[*157] APA II team asked petitioner hundreds of questions. Petitioner provided answers to all questions asked. Both APA teams agreed to petitioner's proposed TPM as it related to tangible goods. Each team did a thorough analysis and asked petitioner for additional information. Both APA teams raised concerns about EEI U.S. distribution being treated as the tested party. However, both teams accepted EEI U.S. distribution as the tested party and deemed EEI's payments to CHC for breaker products to be arm's length, provided that EEI correctly applied the TPM and achieved a Berry ratio within a range from 1.20 to 1.27 for APA I and 1.20 to 1.24 for APA II. APA I also required a minimum floor threshold of 13% allocation of SG&A, but this floor was not included in APA II.

APA II had only one covered transaction--the transfer of breaker products from CHC and CHEC to EEI. APA II did not include a transfer price for the transfer of intangibles because of the APA II team's concerns regarding section 367(d), which requires a U.S. person to recognize gain upon transferring certain intangible property to a foreign corporation.

Respondent contends that petitioner relied on documents that it never presented to the APA I or APA II team. For example, respondent argues that petitioner did not disclose information about the mirror ledgers because the information was disclosed during the 1994-97 audit. Throughout the APA I and

**[\*158]** APA II negotiations the APA teams asked petitioner for additional information. The teams were aware of the mirror ledgers, and they could have asked about other ledgers. Respondent contends that petitioner should have provided information about the mirror ledger process. It is doubtful that information about the mirror ledgers would have resulted in significantly different APAs or resulted in no APAs at all.

Respondent argues that petitioner has focused its opposition to the cancellation of the APAs on grounds concerning omission. Respondent argues that any misrepresentation or misstatement is sufficient on its own to show that the cancellation of the APAs was not an abuse of discretion. We disagree with this argument. We agree that either a mistake as to a material fact or a failure to state a material fact is a ground for cancellation. See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec. 10.06(1).

The revenue procedures do not explain what constitutes a misrepresentation. Merriam-Webster's Collegiate Dictionary 794 (2003) defines "misrepresent" as "to give a false or misleading representation of usually with an intent to deceive or be unfair". Black's Law Dictionary 1152 (10th ed. 2014) defines "misrepresentation" as "[t]he act or an instance of making a false or misleading assertion about something, usually with the intent to deceive". Throughout the

[*159] APA process petitioner had one position regarding the TPMs of the covered transactions and it provided information to support this position. Respondent had ample opportunities to question petitioner's position, come up with respondent's own position, or reject petitioner's position and not agree to the APAs. Cancellation of an APA is a rare occurrence and should be done only when there are valid reasons that are consistent with the revenue procedures. We conclude that a misrepresentation has to be false or misleading, usually with the intent to deceive, and relate to the terms of the APA.

We do not believe that a different viewpoint is the same as a misrepresentation. For example, respondent contends that petitioner's system profit analysis was based on an incorrect transfer price and constructed revenues, instead of actual revenues. Respondent further contends that there might have been no APA or a different APA if the actual profit split had been disclosed. The APA negotiations and the terms of the actual APAs made it clear that the TPM was being based on a constructed income statement. Petitioners explained what was included in a constructed income statement and why it was needed.

Looking at the nine areas addressed in detail above in terms of misrepresentations, mistakes as to a material fact, or failures to state a material fact, we conclude that none of these nine areas addressed during the APA

**[*160]** negotiations was a ground for cancellation. Petitioner's evidence that it answered all questions asked and turned over all requested material is uncontradicted.

Respondent now contends that more information was needed, such as information pertaining to the southbound transactions, which were not covered transactions. The negotiation process for these APAs was long and thorough. Either party could have walked away at any time. Several areas of concern were addressed in both APA negotiations. Members of both the APA I and APA II teams raised concerns about the Island plants not being the tested party. There were others who thought the proposed CUP method was appropriate. Each APA team held its own deliberation and came to substantially the same conclusion regarding the transfer of tangible property. More importantly, both APA teams discussed an alternative method, using the Island plants as the tested party for comparing profits. From testimony and evidence, it seems that the IRS was considering that the CPM would be a better method. The section 482 adjustment in the notice of deficiency, which was based on the Hatch report, relied on the CPM with the Island plants as the tested party. Respondent's expert witness Newlon testified that the CPM was the best method and that the Island plants should be the tested party.

[*161] There is no evidence that either APA team proposed to petitioner an alternative TPM. However, there is evidence that members of both APA teams had specific concerns with the TPMs agreed upon in the APAs. Respondent had enough information after two separate APA negotiations to decide whether to enter into an APA instead of rejecting petitioner's proposed TPM for the transfer of tangible property. During both negotiations the APA teams had enough information to consider whether an alternative method, such as the CPM with the Island plants as the tested party, would be a better TPM; yet two separate APA teams accepted petitioner's proposed TPM. On the basis of evidence we do not see any additional material facts, mistakes of material facts, or misrepresentations that would have resulted in a significantly different APA or no APA at all. Respondent had enough material to decide not to agree to the APAs or to reject petitioner's proposed TPM and suggest another APA. Canceling the APAs on grounds related to the APA negotiations was arbitrary. Respondent did not abide by respondent's own guidance.

H. APA Implementation

A taxpayer must file an annual report for each taxable year covered by the APA. See Rev. Proc. 96-53, sec. 11.01; Rev. Proc. 2004-40, sec. 10.01. The annual reports are required to demonstrate the taxpayer's compliance with the

[*162] APAs.  Rev. Proc. 96-53, sec. 11.01; Rev. Proc. 2004-40, sec. 10.01.  An APA may be canceled for lack of good faith compliance with the terms and conditions of the APA.  See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec. 10.06(1).  According to the revenue procedure applicable to APA I, an APA may be canceled if there was a misrepresentation, mistake as to a material fact, or failure to state a material fact in connection with any subsequent submission, including the annual reports.  See Rev. Proc. 96-53, sec. 11.06(1).  According to the revenue procedure applicable to APA II, an APA may also be canceled because of the failure to timely file an annual report.  See Rev. Proc. 2004-40, sec. 10.06(1).  Rev. Proc. 2004-40, sec. 10.06(1), also provides that with regard to annual reports, the Associate Chief Counsel (International) will consider facts as material if, for example, knowledge of the facts would have resulted in an allocation of income, deductions, or credits materially different from that reported in the annual report, or failure to meet a critical assumption.  Id.

The IRS will contact the taxpayer regarding an annual report if it is necessary to clarify or complete the information contained in the annual report.  See Rev. Proc. 96-53, sec. 11.01(3); Rev. Proc. 2004-40, sec. 10.01(3).  According to the revenue procedure applicable to APA I, if the IRS examines a return for a tax year covered by an APA, the IRS may require the taxpayer to establish that:

[*163] (a) the taxpayer has complied in good faith with the terms and conditions of the APA; (b) the material representations in the APA and the annual reports remain valid and accurately describe the taxpayer's operations; (c) the supporting data and computations used to apply the TPM were correct in all material respects; (d) the critical assumptions underlying the APA remain valid; and (e) the taxpayer has consistently applied the TPM and met the critical assumptions.  Rev. Proc. 96-53, sec. 11.03(2), 1996-2 C.B. at 384.  According to the revenue procedure that is applicable to APA II, the IRS may require the taxpayer to establish:  (a) compliance with the APA's terms and conditions; (b) validity and accuracy of the annual report's material representations; (c) correctness of the supporting data and computations used to apply the TPM; (d) satisfaction of the critical assumptions; and (e) consistent applications of the TPM.  Rev. Proc. 2004-40, sec. 10.03(2), 2004-2 C.B. at 62.  If a taxpayer does not meet the examination requirements of the revenue procedures, the IRS may decide to enforce, revise, cancel, or revoke the APA.  See Rev. Proc. 96-53, sec. 11.03(3); Rev. Proc. 2004-40, sec. 10.03(3).

Respondent contends that petitioner did not comply in good faith with the terms and conditions of the APAs and failed to satisfy the annual report requirements.  Respondent further contends that after filing its Forms 1120, petitioner made irreconcilable statements under penalties of perjury, materially

**[*164]** misrepresented facts, and failed to disclose information necessary to demonstrate compliance with its APAs. According to respondent petitioner also violated a critical assumption set forth in its APAs. Petitioner argues that it did not fail to comply with the terms and conditions of the APAs. Petitioner argues that its implementation errors were all computational errors that did not warrant cancellation and instead should have been allowed to be corrected.

Petitioner made numerous errors in complying with its APAs. Petitioner's expert Anderson calculated that the errors in the aggregate overstated the transfer price by 2.5% and 0.3% for 2005 and 2006, respectively. According to the revenue procedures an APA may be canceled for a misrepresentation or mistake of a material fact. See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec. 10.06(1). In addition to looking at the errors in the aggregate, we will look at each error individually.

1. Error in Supporting Data and Computations

Petitioner's 2005 and 2006 tax returns did not reflect the transfer price computed under the APA TPM. An error affecting the APA multiplier caused the transfer price recorded in Eaton's books and records to be inconsistent with the transfer price computed under the APA TPM.

[*165] The VISTA systems did not record actual manufacturing costs. VISTA's standard cost needed to be adjusted for variances in order to determine actual manufacturing costs. Petitioner made this adjustment by using the Island plants' ledgers to derive a PVFF that reflected how each plant's actual manufacturing costs varied from its expected standard costs. Petitioner's tax department made an error by assuming that the standard costs in the Island plants' ledgers and the VISTA system were the same. In 2010 petitioner confirmed that the standard costs in the Island plants' ledgers were not the same as the VISTA standard costs. Petitioner contends that this error was not a deliberate act but the result of inadvertence.

Petitioner contends that the APA multiplier was used after the TPM computations had been done to incorporate the arm's-length price into petitioner's books and records. Petitioner contends further that had the APA multiplier been correct, there would have been no discrepancy between the transfer prices on petitioner's tax return and the APA reports. Petitioner categorizes this error as related to "supporting data and computations" because it cannot affect the validity of the TPM. This error affected the proper incorporation of the tax transfer price into the distribution ledgers, which resulted in the wrong transfer price's being reported on petitioner's tax returns.

[*166] Respondent contends that petitioner filed its 2005 and 2006 Forms 1120 with non-APA-compliant transfer prices. Respondent further contends petitioner's EEI COGS (transfer price) was not in compliance with the APAs because it resulted in a Berry ratio outside the range specified in the APAs.

The tax transfer price is not recorded as a separate line on the tax return. Petitioner's U.S. tax returns include many ledgers, and the COGS on all the ledgers are combined. Included in EEI's COGS are the mirror ledgers that were adjusted to incorporate the tax transfer price according the TPM provided for in the APAs. Confirming that the tax transfer price was correctly reflected on the tax returns could not be done by visually verifying a line on the tax return.

When petitioner's tax department first found this error, it did not appear to warrant further investigation because it fit the pattern of well-known timing differences between when a breaker product was sold from the Island plants to EEI's U.S. distribution, which was recorded on the mirror ledgers, and the subsequent sale to a third party. Petitioner's expert Anderson explained that the tax department personnel mistakenly attributed discrepancies to normal features of accounting when in fact there was an incorrect calculation of the PVFFs that was discovered after thorough review.

[*167] Anderson calculated that the change in the tax transfer price from the original return to the amended returns was 5.1% and 4.9% lower for 2005 and 2006, respectively. She concluded that an overstatement of the tax transfer price reported on the tax returns of 5% is minimal. Petitioner contends that an error is not material if the impact was 5% or less.

Respondent does not agree with petitioner that an error is not material if it has a 5% or less impact. Respondent contends that petitioner relies upon a rule for accounting purposes and that safe harbors for financial accounting purposes do not create safe harbors for tax purposes. See All-Steel Equip., Inc. v. Commissioner, 54 T.C. 1749, 1755 (1970), aff'd in part, rev'd in part on other grounds, 467 F.2d. 1184 (7th Cir. 1972). In All-Steel Equip., Inc., the taxpayer argued that the financial standards of accounting materiality should apply to its method of inventory valuation for income tax purposes. Id. at 1751. The taxpayer valued its inventory by the use of the prime cost method and contended that its method could also be used for income tax purposes. Id. at 1753. We rejected the argument that financial standards of accounting materiality should apply to Federal income tax reporting. Id. at 1756.

Petitioner argues that financial standards of accounting materiality should apply to determine whether an error is material, not to determine the amount of tax

[*168] owed. Petitioner completed income tax returns that corrected the errors and is not disputing what it owes in tax.

We do not think a 5% test should be used to determine whether petitioner's error warranted cancellation of the APAs. We instead use the applicable revenue procedures. These revenue procedures do not provide a bright-line test on whether an error is material on the basis of its size. However, the size of error may be considered. We also need to look at how the error occurred. Anderson's report concluded that this error flowed from human error; incorrect data was used to calculate the APA TPM. Petitioner discovered this error and attempted to rectify it by filing amended tax returns and amended APA annual reports.

The revenue procedure applicable to APA I states that the IRS may, upon request, require the taxpayer to ensure that the supporting data and computations were correct in all material respects. See Rev. Proc. 96-53, sec. 11.03. For purposes of this section the revenue procedure does not define "material". However, for purposes of cancellation, it defines "material facts" as those that if known would have resulted in a significantly different APA or no APA at all. See id. sec. 11.06(1). Petitioner's error pertains to supporting data and computations. At the time of filing its APA annual reports, petitioner believed that the correct data was used for calculating the PVFF. Petitioner was not trying to change how

[*169] the TPM was calculated. We believe this was an inadvertent error that should have been addressed through adjustments. See id. sec. 11.03(4). The error did not change petitioner's calculations or the data needed to perform those calculations. Petitioner used a wrong number when calculating the PVFF, and that was not a material mistake.

The revenue procedure applicable to APA II states that the IRS may, upon request, require the taxpayer to establish the correctness of the support data and computations used to apply to the TPM. Rev. Proc. 2004-40, sec. 10.03(2). Our analysis remains the same, and we conclude that this was an inadvertent error; petitioner thought that it was using the right information. The error should have been addressed through appropriate adjustments.

Both revenue procedures allow for cancellation because of lack of good-faith compliance with terms and conditions of the APA. See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec. 10.06(1). We do not think the PVFF mistake qualifies as lack of good-faith compliance. These revenue procedures also allow for cancellation if there is mistake as to a material fact or a misrepresentation. See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec. 10.06(1). We do not think the PVFF calculation mistake represented a mistake of

[*170] a material fact or a misrepresentation.  This error was not a ground for canceling the APAs under an abuse of discretion standard.

      2.      Errors Affecting the Computation of the Transfer Price Under the APA TPM

      a.      OEM Categorization

For purposes of the CUP method, petitioner used data from its VISTA order-entry system to identify sales to third-party OEMs.  In 2010 petitioner determined that its subcode label merely identified customers who purchased breaker products from more than one Eaton salesperson and that sales to OEMs were also captured by other codes.  To correct this error petitioner amended its tax returns and APA annual reports for 2005 and 2006.  Petitioner's expert Anderson concluded that this error, in isolation, resulted in a 0.69% and 0.82% understatement of the transfer price for tax years 2005 and 2006, respectively.  This error resulted in no tax advantage.

      b.      Purchase Resale Error

EEI purchases and resells products other than Island plants' manufactured products.  These products are not subject to the APAs because they are not Island plants-produced breaker products.  Prices, revenue, and SG&A expenses related to these products should be excluded from the TPM analysis by excluding their

[*171] associated "billing line" field from the IRS report. Petitioner's tax department personnel believed initially that the 2005-08 relevant billing line had been correctly excluded from the IRS reports. In 2010 petitioner discovered that the billing lines were not correctly excluded for 2005-06 and 2008.

Petitioner addressed this error by re-running the IRS reports and excluding the correct purchase resale billing lines. The Anderson report concluded that the quantitative effect of this error was a 1.29% and a 2.02% overstatement of the transfer price for tax years 2005 and 2006, respectively.

### c. Operating Expenses Associated With Breaker Products Not Manufactured by the Island Plants

This error relates to the purchase resale error. SG&A that was allocated to EEI's U.S. distribution included a portion for purchase resales. This error had an effect only on 2006 because APA II had no minimum requirement for SG&A. For 2006 this error overstated the required returns to EEI's U.S. distribution and resulted in an understatement of the tax transfer price, resulting in no tax advantage.

### d. International Sales Error

Petitioner excluded certain international sales from the revenue reported on the constructed income statement resulting in the transfer price's being

[*172] understated. Petitioner discovered and corrected this error in 2010 by using VISTA data to capture international sales. The Anderson report concluded that the effect of this error was a 0.97% and 0.62% understatement of the transfer price for tax years 2005 and 2006, respectively, eliminating a tax advantage to petitioner.

e.     Sales of Industrial Breakers Through Lincoln

The Lincoln plant sold an industrial breaker product line, which included both Island plants manufactured breaker products and Lincoln plant manufactured breaker products. The APA covered only breaker products manufactured in the Island plants. Petitioner did not include revenue from the industrial breaker products line in the constructed income statement for 2005 because it could not segregate reliably the Island plant manufactured breaker products and the Lincoln plant manufactured products.

Beginning in 2006 breaker products in the industrial breaker product line were manufactured only in the Island plants. In 2006, therefore, it was possible to identify the APA-covered sales of these products through the Lincoln plant. However, these sales were not included in the APA computations because petitioner's tax department was not aware of the change. Petitioner discovered and corrected the error in 2010. The Anderson report concluded that the

[*173] effect of the error in isolation was a 0.19% overstatement of the transfer price for 2006.

### f. Lincoln Multiplier Error

Petitioner made an error in computing the Lincoln multiplier, which was used to determine the Island plants' standard costs for the breaker products sold through the Lincoln plant "as is" to third parties. These sales could not be identified at the product level from the IRS reports created with the VISTA data. To determine the quantity of product that went through the Lincoln plant, petitioner backed the internal management price out of the standard cost at the Lincoln plant. Petitioner contends that there was an error due to a misunderstanding of the Lincoln plant's controller's inputs. Petitioner discovered and corrected the error in 2010. The Anderson report concluded there were understatements of 1.96% and 2.22% for transfer prices for 2005 and 2006, respectively. This error did not result in a tax advantage.

### g. Error in Computation of Manufacturing Costs for Nonexact Matches

The PVFF error previously discussed affected the computation of manufacturing products costs for product categories used in the CUP

[*174] computations for nonexact match products.  Correcting the PVFF error corrected this error.

The PVFF adjustment to the Island plants' standard product cost incorporates product cost variances and freight costs to yield the actual manufacturing cost.  The Anderson report concluded that the quantitative effect of this error in isolation was a 0.03% understatement of the transfer price for 2005 and a 0.03% overstatement of the transfer price for 2006.  This error resulted in no tax advantage for 2005.

h.      Analysis of Errors Affecting the Computation of
the Transfer Price Under the APA TPM

For an APA to be canceled because of an implementation error, there must have existed a misrepresentation, a mistake as to a material fact, a failure to state a material fact, or a lack of good-faith compliance with the terms and conditions of the APA.  See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec. 10.06(1).  For APA II the failure of a critical assumption is also a reason for cancellation.  See Rev. Proc. 2004-40, sec. 10.06(1).  The revenue procedures do not specifically address data or computational errors.

Petitioner contends that the decision to cancel the APAs on the basis of implementation errors must be considered in the context of the applicable revenue

[*175] procedures' sections on administering the APA. Petitioner interprets the revenue procedures in a manner which provides a major and clear dividing line for what type of action the IRS is permitted to take. Petitioner's interpretation asks whether "the taxpayer's compliance failure affect the validity of the transfer pricing methodology selected or not". Petitioner further argues that when the taxpayer's compliance encroaches upon this dividing line, the remedies are more serious, including revision, revocation, or cancellation of the APA. When the taxpayer's compliance does not encroach upon this dividing line, such as data or computational errors that can be corrected without affecting the selection of the TPM, the errors should simply be corrected with an adjustment on audit.

Respondent contends that petitioner admits failing to report the correct transfer price on its Forms 1120, as well as seven other APA compliance failures, which petitioner labels data or computational errors that do not implicate the APA TPM itself. Respondent disagrees with petitioner's labeling these errors data and computational. Respondent also disagrees with petitioner's interpretation that there is a dividing line between data or computational errors and a compliance failure which affects the validity of the TPM selected.

All of petitioner's seven errors were computational or related to inadvertence, and all were corrected in the amended APA annual reports. These

[*176] errors were not deliberate. The errors were discovered only because petitioner did a comprehensive review after determining that its first error was not an anomaly caused by interim calculations. Without petitioner's reporting its errors, they would not have been discovered.

We do not agree with petitioner's interpretation that the revenue procedures provide a dividing line regarding the type of error and what type of action should be taken. Each error needs to be analyzed to determine whether it is material. The revenue procedures require, upon examination, that the taxpayer may be required to show supporting data and computations; and if this does not occur, the Associate Chief Counsel (International) may decide to enforce, revise, cancel, or revoke the APA consistent with the revenue procedures. See Rev. Proc. 96-53, sec. 11.03(2) and (3); Rev. Proc. 2004-40, sec. 10.03(2) and (3). Respondent's cancellation letter stated: "The material deficiencies in APA compliance include numerous examples of noncompliance with the terms and conditions of APA I and APA II, errors in the supporting data and computations used in the transfer pricing methodologies ('TPMs') specified in APA I and APA II".

The revenue procedures allow cancellation for a misrepresentation, a mistake as to material fact, or a lack of good faith compliance with regard to the APA annual reports. See Rev. Proc. 96-53, sec. 11.06(1); Rev. Proc. 2004-40, sec.

[*177] 10.06(1). All seven of the above errors were adjustments that were made on petitioner's amended APA annual reports. The Anderson analysis showed that some of petitioner's errors raised the transfer price and others lowered it. She concluded that four of the seven errors lowered the transfer price and were not in favor of petitioner. Her analysis looked at the difference between the originally submitted tax transfer price and the amended tax transfer price on the annual reports. She looked at all seven errors above and the APA multiplier error described previously and testified that some of the errors interacted with other errors. In her report Anderson concluded that

> the unpredictable effects of several of the errors diffuse responsibility for maintaining several data bases and associated information systems, and the separation of duties for maintenance and data use suggested that it would be very difficult to orchestrate an error that would consistently lower Eaton Breaker and Control Products' overall tax liability in the United States.

Material facts are those that would have resulted in a significantly different APA, see Rev. Proc. 2004-40, sec. 10.06, or no APA at all, see Rev. Proc. 96-53, sec. 11.06. Pursuant to the revenue procedure applicable to APA II, facts are material if, for example, knowledge of the facts would have resulted in a materially different allocation of income, deductions, or credits than reported in the annual reports or failure to meet a critical assumption. Rev. Proc. 2004-40,

[*178] sec. 10.06(1). We conclude that although petitioner made these seven errors, they were not material.

In Buzzetta Constr. Corp. v. Commissioner, 92 T.C. at 641, we held that the Commissioner did not abuse his discretion in retroactively revoking a profit sharing plan's favorable ruling. In Buzzetta the taxpayers contended that their overfunding and excess deductions were offset in later years and their operational errors were voluntarily corrected. Id. at 650. We concluded that "the operational errors in the instant case were a material change in the facts on which the plan's favorable ruling was based". Id. at 653. The data and computational errors in this instant case are different. These errors did not constitute a material change in the facts on which the decision to enter the APA was based. These errors did not change the transfer pricing methodology or the factors that were considered during the APA deliberations.

The errors resulted in a difference in the transfer price, but some of the errors in isolation were not in petitioner's favor. These errors were inadvertent and were not deliberate attempts to alter the underlying TPM. These errors would not have resulted in a significantly or materially different APA. We conclude that there was good-faith compliance with terms of the APAs.

[*179] In addition to analyzing the errors individually to determine whether they merited cancellation of the APAs, we analyze the errors in the aggregate. As we discussed above, there is one error which caused the wrong transfer price to flow into Eaton's tax returns. All the errors affected computation of the tax transfer price under the APA TPM. Petitioner's expert Anderson's report shows that errors in the aggregate increase the transfer price by 2.5% ,0.3% , 3.5%, and -0.9% for 2005-08, respectively. A higher transfer price benefits petitioner by reducing taxable income. Conversely, a lower transfer price is not beneficial to petitioner because it increases taxable income.

Even though petitioner's errors are numerous when they are considered in the aggregate, it is not enough to conclude that the aggregate of the errors resulted in a mistake as to a material fact, a lack of good faith or compliance, or failure to meet a critical assumption. The errors in the aggregate did not consistently favor petitioner, and the error amounts were inconsistent. If the errors in the aggregate consistently favored petitioner by the same percentage, we would be more concerned about the impact of the errors and whether petitioner committed a misrepresentation. We conclude that the errors in the aggregate do not merit cancellation of the APAs.

[*180] 3. <u>Compliance With the Terms of the APAs</u>

     a. <u>Book-Tax Differences and Compensating Adjustments</u>

Petitioner closed its accounting books at the end of the calendar year using preliminary APA TPM computations and performed a true-up upon completion of the APA TPM computations. Petitioner reported this true-up on its Schedules M as a book-tax difference. Petitioner contends that it did not report this true-up in its annual APA reports because this change did not affect its computation of the APA TPM. Petitioner further contends that the difference between the estimated transfer price and the final transfer price did not affect the computation of the transfer price. Petitioner did disclose book-tax differences in its APA reports when those differences affected the TPM.

Respondent argues that the book-tax differences between the preliminary and final APA TPM computations should have been part of the APA reports. Respondent further argues that if this information had been included in the APA reports, respondent would have noticed that petitioner had failed to report the correct transfer price on its timely filed income tax returns. Respondent did, however, have the information relating to the book-tax differences on the Schedules M.

[*181] Additionally, respondent contends that petitioner failed to disclose the compensating adjustment made to its true-up that petitioner performed between the estimated transfer price it booked at yearend and the final transfer price it computed a few months later. Petitioner did disclose this information on its Schedules M. The IRS routinely examined the Schedules M as part of its regular audit. Two years before the execution of APA II the IRS audit team asked for an explanation on this issue. Respondent did not ask petitioner to amend its annual reports to include the reporting of the book-tax difference.

b.      Forms 1120 and Compliance With the APA

Respondent contends that in all of its APA requests petitioner represented that under the proposed TPM EEI would receive guaranteed a profit for its distribution activities. Respondent further contends that the constructed income statements in petitioner's 2005 and 2006 annual reports reflect operating profits sufficient to satisfy the Berry ratio requirements of the APAs. Respondent contends that the operating profits reflected on the constructed income statement were not captured within petitioner's financial accounting ledgers and systems used to prepare its Forms 1120, resulting in the Berry ratio profit from the constructed income statements not being reported on its 2005 or 2006 Form 1120.

[*182] Petitioner disagrees with respondent's argument. Petitioner contends its books and records are not organized in a way that isolates the profitability of the U.S. distribution functions. The U.S. distribution function's profitability, as defined for purposes of the APA TPM, is not tracked on one specific ledger because EEI's U.S. distribution, which was the tested party in both APAs, represented a function within EEI that sold and distributed breaker products purchased from the Island plants. There was not a line item on petitioner's tax return that would have provided the information necessary to evaluate whether Eaton complied with the Berry ratio. A constructed income statement was needed to test the U.S. distribution function's profitability under the Berry ratio. Petitioner's expert Anderson's report showed that petitioner's books and records can be reconciled to produce the same profit that is shown on the constructive income statement.

EEI's U.S. distribution profitability, as computed on the constructed income statement, was part of EEI's overall financial performance and therefore was included with the income on Eaton's Forms 1120. The amount of income attributable to U.S. distribution's third-party sales could not be isolated on any ledger or group of ledgers. The computations done on the constructed income statement were done to show that EEI retained a portion of third-party revenue

**[*183]** that was equal to U.S. distribution function's associated SG&A plus the Berry ratio return.

The constructed income statement also included computations on the profitability of EEI's U.S. distribution's sales to U.S. assembly. The CUP adjustment in the APA TPM treated EEI's U.S. distribution as receiving a set amount of arm's-length sales revenue. This was a constructed amount computed under the APA TPM's CUP method by reference to prices that third parties paid for the same products. EEI's distribution function did not actually receive this set amount in cash for selling breaker products to U.S. assembly. EEI did not receive cash attributable to these products until after U.S. assembly incorporated them into larger assembled products and sold them to third parties. The success or lack of success of EEI's U.S. assembly function in selling these assembled products did not have an impact on what comparable third parties would have paid to purchase the breaker products. The set amount derived from the APA TPM's calculation is not an actual amount of sales revenue. It is a proxy that U.S. assembly would have paid to a third party at arm's length to purchase breaker products, the amount of which cannot be found on petitioner's ledgers. Rather, EEI's U.S. distribution ledgers include the amount of revenue U.S. assembly received from selling its assembled products to third parties.

[*184] Respondent contends that petitioner "rolled up" to its Forms 1120 substantial operating losses for EEI's distribution of breaker products as reflected on mirror ledgers. Respondent contends that the interunit transfer of breaker products always generates losses that are recorded on the mirror ledgers, which later roll up to petitioner's Forms 1120. Petitioner contends that respondent's interpretation of how the mirror ledgers works is incorrect.

Petitioner's expert Anderson explained that internal transactions are eliminated and do not affect the consolidated tax return. For example, a $100 loss recorded on the mirror ledgers generated from EEI's U.S. distribution sales to U.S. assembly would not result in a $100 loss on petitioner's tax return. The $100 loss is an internal loss that is eliminated upon consolidation--the "rolling up" of all ledgers into one consolidated ledger. The internal losses recorded on the mirror ledgers had no independent financial or economic significance. The amount of profits or losses recorded on the mirror ledgers made no difference on petitioner's tax return.

### c. Canadian Adjustment

Respondent contends that the Canadian adjustment was not allowed under the APAs. Respondent further contends that petitioner's annual adjustment to EEI's U.S. distribution international sales revenue was a postyear adjustment of

[*185] EEI's U.S. distribution sale of breaker products to Eaton Yale designed to make Eaton Yale sales meet a higher benchmark level of profitability. Respondent contends that Eaton's addition of this adjustment to increase revenues on its constructed income statement, which resulted in an increase in the transfer price under the APAs, was contrary to the APAs.

Petitioner contends that it was not an error for it to use sales revenue based on the arm's-length price for international sales to its Canadian affiliate on the constructed income statement. The IRS questioned this adjustment in relation to petitioner's 2001 and 2002 APA annual reports. Respondent issued a notice of proposed adjustment, and petitioner agreed to it. These were compensating adjustments to the APA, which took into account the compensating adjustment to the prices for sales to Eaton Yale.

Respondent was aware of this issue and accepted compensating adjustments pertaining to this issue. If respondent thought this violated the APA, this issue should have been addressed back in 2004, or at least as part of the APA II negotiations. We do not believe the Canadian adjustment is a ground for cancellation.

**[*186]**         d.      VISTA Data

Respondent contends that petitioner failed to preserve its original VISTA records that were necessary to demonstrate its compliance with the APA TPM. Respondent contends that the Format1 files generated by petitioner's mainframe computer and job logs, which document critical information about the creation of the Format1 files and were necessary to verify the authenticity of Eaton's TPM calculations, were not retained.

Petitioner contends that the Format1 file is merely a work file that never leaves the main frame. The primary source of VISTA data for the IRS report was the MRSB, which is retained. The IRS report provided to petitioner's tax department was the Format3 file. Petitioner contends that it was under no obligation to maintain the VISTA job logs, which were not used in the transfer pricing computations. All master file data relevant to a transaction was retained in the invoice files.

Respondent's expert John Garvey re-created the IRS reports using the MRSB reports. He reviewed petitioner's IRS report, which was then given to KPMG, and KPMG generated a report which contained the underlying financial data for the annual reports. Garvey noticed discrepancies between the KPMG report and petitioner's IRS report. For 2005 and 2006 he replicated the steps taken

[*187] by petitioner to create the IRS reports using the MRSB extracts to produce an IRS report substantially equivalent to petitioner's IRS report. He concluded the difference in his re-creation of petitioner's IRS reports for 2005 and 2006 was insignificant.

### e.     Analysis of Compliance

Respondent contends there was lack of compliance with the terms of the APAs in the following areas: (1) book-tax differences; (2) Forms 1120 and compliance with the APAs; (3) Canadian adjustment; and (4) VISTA data. Petitioner contends that it was in compliance with the terms of the APAs in these areas.

Regarding book-tax differences and the Canadian adjustment, respondent was aware of the information on these areas, which had arisen in the audit of earlier APA years. If these areas created significant problems, the IRS should have, during its audit, brought these issue to the attention of the Associate Chief Counsel (International). See Rev. Proc. 96-53, sec. 11.03(2) and (3); Rev. Proc. 2004-40, sec. 10.03(2) and (3). Regarding the Forms 1120, except for the errors that petitioner tried to correct, we conclude that petitioner was in compliance with the terms of the APA. We agree with petitioner that the APAs apply to EEI's U.S. distribution and not all of EEI and therefore the Berry ratio was appropriately

[*188] applied only to the profitability of EEI's U.S. distribution. Regarding the VISTA data, we conclude that petitioner retained enough information to meet the retention requirements of the APAs. See Rev. Proc. 96-53, sec. 11.04(1), (3), 1996-2 C.B. at 384; Rev. Proc. 2004-40, sec. 10.04(1), 2004-2 C.B. at 62. We conclude that these four areas are not grounds for cancellation.

### 4. Critical Assumptions

The December 16, 2011, cancellation letter included the "failure of a critical assumption" as one of the grounds for cancellation. The cancellation letter did not explain what specific critical assumption petitioner had failed. Appendix B of APA I included five critical assumptions and Appendix B of APA II included one critical assumption.

Respondent contends that petitioner's correction of its PVFF and its change regarding international sales revenue are examples of some of petitioner's critical assumption violations. In particular respondent contends that petitioner ignored the critical assumption which pertains to its methods of estimation. This text appears only in the critical assumption in APA II which states that "financial and tax accounting methods and classification (and methods of estimation) of Taxpayer in relation to the Covered Transaction will remain materially the same as

[*189] described or used in Taxpayers APA Request". The first critical assumption in APA I is similar but does not include "and methods of estimation".

Petitioner contends that it did not fail any critical assumptions. Petitioner contends that the APA II critical assumption refers to financial and tax accounting methods and classifications of the taxpayer and does not refer to the classification or description of products sold by the taxpayer.

Under the revenue procedure that governs APA II, an APA can be canceled because of the failure of a critical assumption. Rev. Proc. 2004-40, sec. 10.06(1). For purposes of annual reports, a material fact is a fact the knowledge of which would have resulted in the failure to meet a critical assumption. See id. We disagree with respondent that these errors pertained to a material fact. We do not believe a critical assumption was violated.

### 5. Amended APA II Annual Reports

Under Rev. Proc. 2004-40, sec. 10.01(5), a taxpayer must, within 45 days of becoming aware of incomplete or incorrect information, or an incorrect application of the TPM, amend its annual report. The revenue procedure allows time to be extended for good cause. Id. Failure to file the annual report is grounds for canceling the APA. Id. sec. 10.01(1).

[*190] Respondent contends that petitioner did not amend its annual reports within the prescribed 45 days. In April 2010 petitioner informed the APA program of the discovery of alleged errors. Petitioner did not submit an amendment to its 2006 APA annual report until October 14, 2010, well past the 45-day deadline. Respondent contends that petitioner's failure to timely file its amendment to the 2006-08 annual reports is grounds for cancellation of APA II. Respondent contends that the errors were known to petitioner in May 2009.

Petitioner argues that to consider the amended APA annual reports as untimely is unjustified because of the communications between petitioner and the APA program. After petitioner informed the APA program of its errors, the parties had a meeting on July 1, 2010, and petitioner followed up that meeting with a letter. The letter explained the complexities in identifying the VISTA data issues and petitioner's ongoing efforts, including the details of the time-consuming process. On September 8, 2010, the APA director sent petitioners a letter, indicating that the APA program did not request that petitioner submit amended APA annual reports. The letter explained that there appeared to be unilateral modifications to petitioner's APA TPMs and that these types of modifications should not occur in APA annual reports or income tax returns

**[\*191]** because that would violate the APAs. The letter further explained that if petitioner wished to modify its TPMs, it should request a revision to its APAs.

The record establishes that petitioner filed amended APA annual reports as soon it had the corrected information. It is unclear when the 45 days for submitting the amended reports should have started. Under Rev. Proc. 2004-40, sec. 10.01(5), a taxpayer must amend its report when it becomes aware of the need to amend the report. The APA annual reports are not supposed to include incomplete or incorrect information. It is unclear whether the APA program did not want amended annual reports within a certain timeframe or that the APA program believed that amended annual reports were not the appropriate solution for correcting the errors. Between the notification of the errors and the filing of amended annual reports, there were several communications between petitioner and the APA program. None of these communications mentioned a 45-day deadline for the amended reports. Petitioner contends that respondent was aware that petitioner was working on correcting the errors and would consequently file amended APA annual reports.

The letter canceling the APAs states that the cancellations were "based on numerous grounds". The letter includes some of the grounds, but failure to timely file an amended APA annual report is not mentioned. It is not clear from the facts

[*192] whether there was an implied extension for submitting the annual reports. Rev. Proc. 2004-40, sec. 10.01(1), states only that "[f]ailure to timely file the annual report is grounds for canceling the APA"; it does not specify consequences when an amended annual report is filed late. We conclude that petitioner's submission of the amended 2006 annual report on October 14, 2010 was not a ground for canceling APA II.

I.    Conclusion

We conclude that it was an abuse of discretion for respondent to cancel APA I for tax year 2005 and APA II for tax year 2006. Since the concept of doing an APA was first discussed, petitioner had advocated the CUP method in combination with the CPM to test the profits with EEI's U.S. distribution as the tested party. All of petitioner's submissions to the IRS and APA teams supported this TPM. Petitioner withdrew its APA III request because of concerns that the methodology applied in APA I and APA II would not be a starting point. Respondent had many opportunities not to agree to APA I and APA II. During the APA I and APA II negotiations respondent never suggested a different TPM as an alternative, even though some on the APA teams thought another method would be a better method.

[*193] Respondent entered into not one, but two APAs. Respondent had an opportunity not to renew APA I and enter into APA II if respondent wanted to change the TPMs. APA II provided an opportunity to look at the agreement de novo. After completing the APA II negotiations, respondent should have had a clear understanding of petitioner's transactions and should not have entered into APA II if the APA II team was concerned that petitioner was omitting or misrepresenting information.

Petitioner made immaterial and inadvertent errors that do not fit the APA governing revenue procedures' definition of "material". Respondent should not be able to use these errors as grounds for switching to a TPM that was contemplated during the APA I and APA II negotiations.

An APA is a binding agreement and it should be canceled only according to the terms of the revenue procedures. It should not be canceled because of a desire to change the underlying methodology of a method that would result in a significantly different profit split. For these reasons the cancellation of the APAs was arbitrary and unreasonable. We do not sustain respondent's determination to cancel APA I and APA II.

**[*194]** II.     <u>Transfer of Intangibles</u>

The notice of deficiency makes an alternative allocation under section

367(d) that may apply if we do not sustain respondent's cancellation of the APAs

or respondent's section 482 allocations in their entirety.  The notice of deficiency

states alternatively "that such value transferred (exclusive of tangible assets

transferred) is taxable under IRC section 367(d).  The notice of the taxable income

of Eaton Corporation and its U.S. subsidiaries is increased in an amount not to

exceed $230,630,598 for 2006."

Section 367(a) provides general rules for the taxation of outbound transfers

of property by U.S. persons to foreign corporation transferees in transactions that

would otherwise qualify as nonrecognition transfers, such as section 351 transfers.

There are exceptions to this rule, and section 367(d) provides special rules for the

taxation of outbound transfers of intangible property.  Temporary regulations

provide guidance on how the transferor should take into income an amount that

represents an appropriate arm's-length charge for the use of the transferred

property.  <u>See</u> sec. 1.367(d)-1T(c)(1)(a), Temporary Income Tax Regs., 51 Fed.

Reg. 17954 (May 16, 1986).[16]  Section 367(d) applies "if a United States person

_____

[16]On December 16, 2016, the Secretary of the Treasury promulgated final
regulations relating to certain transfers of property by U.S. persons to foreign
                                                        (continued...)

[*195] transfers any intangible property (within the meaning of section 936(h)(3)(B)) to a foreign corporation in an exchange described in section 351 or 361". Sec. 367(d)(1).

Intangible property subject to section 367(d) is defined in section 936(h)(3)(B) as follows:

(i)     patent, invention, formula, process, design, pattern, or know-how;

(ii)    copyright, literary, musical, or artistic composition;

(iii)   trademark, trade name, or brand name;

(iv)   franchise, license, or contract;

(v)    method, program, system, procedure, campaign, survey, study, forecast, estimate, customer list, or technical data;

      or

(vi)   any similar item, which has substantial value independent of the services of any individual.

Respondent contends that if we find in favor of petitioner on either the cancellation of the APAs or its transfer pricing methodology, then we should find as a logical corollary that EEPR transferred to CHC and CHEC intangible property

---

[16](...continued) corporations in nonrecognition transactions described in sec. 367(d). 81 Fed. Reg. 91012 (Dec. 16, 2016). These regulations do not apply for the tax years at issue. Id. at 91020.

[*196] with an arm's-length price not to exceed $3.2 billion as of January 1, 2006, which is taxable under section 367(d). Respondent further contends that "[t]he value of the intangibles transferred is logically and mathematically dependent on the pricing of the transactions between * * * [CHC and CHEC] and EEI under section 482."

Respondent's position is that CHC and CHEC must be entitled to a nonroutine return attributable to intangibles if we determine that respondent's cancellation of the APAs was an abuse of discretion, or if we determine that respondent's cancellation was not an abuse of discretion but we do not sustain respondent's section 482 adjustments. Respondent contends this implication leads to the result that CHC and CHEC must have owned significant intangibles, justifying the nonroutine return allocable to each of them, and these intangibles, in turn, must have been transferred to CHC and CHEC during the 2000-06 restructuring. This argument seems to be based on the premise that if we do not agree with respondent's section 482 allocations, we must agree that intangibles were transferred. The gist of respondent's argument is that CHC and CHEC could not possibly be as profitable as they are unless intangibles were transferred to them.

[*197] From the late 1960s and mid-1970s, breaker products were being made in Puerto Rico. Before the 2000 transfer of assets, EEPR actively manufactured breaker products. All of the tangible assets necessary to conduct EEPR's businesses were in Puerto Rico. As part of the transfer EEPR transferred assets to CHC and CHEC in section 351 transactions. Employees were also transferred as part of the tangible asset agreements. For each tangible asset transfer CHI/EEI licensed certain intangible property related to the transferred assets to CHC or CHEC. These licenses covered brand and manufacturing intangibles. The license agreements did not transfer any intangible assets.

Petitioner contends that respondent is arguing for a "per se rule" that if CHEC and CHC are entitled to nonroutine returns, the returns must be attributable to intangibles within the meaning of section 936(h)(3)(B). Petitioner further contends that the only section 936(h)(3)(B) intangibles CHEC and CHC had were pursuant to licensing agreements. Petitioner did indicate on some of its Forms 926 that intangible property within the meaning of section 936(h)(3)(B) was transferred pursuant to the transactions; but the accompanying statements explained that there was a licensing agreement covering these intangibles.

Respondent did not specifically identify any intangible or explain the exact value of any intangibles that should be covered by section 367(d). Before the

**[\*198]** restructuring EEPR had access to intangibles, and they continued to have access through the licenses. On the record before us we do not conclude that intangibles were transferred that should be subject to section 367(d).

III.    Tractech Bonuses

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In the relationship between deductions and capital expenditures, the taxpayer bears the burden of showing the right to a claimed deduction. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs.

Section 162(a)(1) allows a taxpayer to deduct "ordinary and necessary expenses", including a "reasonable allowance for salaries or other compensation for personal services actually rendered". Compensation is deductible only if it is reasonable in amount and paid or incurred for services actually rendered. See sec. 1.162-7(a), Income Tax Regs. Bonuses paid to employees are deductible "when * * * made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated

**[\*199]** salaries, do not exceed reasonable compensation for the services rendered."
Sec. 1.162-9, Income Tax Regs.

Section 263 generally prohibits deductions for capital expenditures. Capital expenditures are not "ordinary" expenses and are therefore not deductible. Sec. 263(a); Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 353 (1971). Nondeductible capital expenditures include "Any amount paid out * * * for permanent improvements or betterments made to increase the value of any property". Sec. 263(a).

In 2003 the Secretary promulgated regulations addressing the capitalization of transaction expenses related to acquisitions. See T.D. 9107, 2004-1 C.B. (Part 1) 447. Under those regulations a taxpayer must capitalize amounts paid to facilitate an acquisition of ownership interest in a business entity if, immediately after the acquisition, the taxpayer and the business entity are related within the meaning of section 267(b). Sec. 1.263(a)-5(a)(2), Income Tax Regs. Employee compensation (including salary, bonuses, and commissions) is treated as an amount that does not facilitate an acquisition. Id. para. (d)(1) and (2)(i).

In section 1.263(a)-5(l), Example (7), Income Tax Regs. (Example (7)), R corporation acquired all of the stock of T corporation. Before the acquisition, certain employees of T held unexercised options issued pursuant to T's stock

[*200] option plan.  As a condition of the acquisition, T was required to terminate

its stock option plan.  T agreed to pay its employees holding unexercised options

certain amounts in consideration of their agreement to cancel their unexercised

options.  These options granted the employees the right to purchase T stock at a

fixed option price.  Id.  T was not required to capitalize the amounts paid to its

employees.  Id.

We must determine whether the bonus payments represent additional

compensation for services.  Petitioner contends that it is entitled to a deduction

under section 162(a) for the bonus amounts paid to the bonus executives because

the bonus payments are compensation.  Respondent contends that petitioner's

expenses should have been capitalized under section 263.

Petitioner contends that the bonus amounts were additional compensation

for services the bonus executives performed.  The bonus agreements specified that

upon completion of petitioner's acquisition of Tractech, the bonus executives

could receive cash in exchange for their release of claims related to any stock

options.  The bonus agreements and the SPA are silent as to the nature of the

bonus amounts.  Petitioner contends that the bonus amounts were paid in

cancellation of employee stock options and should receive treatment similar to that

of the taxpayer in Example (7).  Petitioner contends that its bonus payments are

**[*201]** deductible expenses regardless of whether Tractech had adopted a stock option plan because <u>Example</u> (<u>7</u>) imposes no requirement that stock option grants be reduced to writing. Respondent contends the bonuses did not serve to extinguish any preexisting obligation to compensate the Tractech executives.

On or before August 16, 2005, Tractech planned to give the bonus executives stock option grants, but a stock option plan was never adopted and approved by Tractech's board of directors. There was no evidence of a fixed price to purchase the stock options. Instead, Tractech resolved to enter into agreements with the bonus executives to provide them with cash bonuses in exchange for their release of any claims related to any stock options. The amounts paid to the employees in <u>Example</u> (<u>7</u>) are different from the bonuses paid to the Tractech executives because there was no fixed option price. The regulations do not specifically require that the stock options have a fixed price.

We do not need to rely on <u>Example</u> (<u>7</u>) to decide whether the bonuses should be deductible because the bonuses do not need to be stock options to be compensation. Even though it is unclear what specific services the employees performed to earn the bonuses, there is evidence that the bonus executives were employees at the time they entered into the bonus agreements. The bonus executives were employees and were entitled to bonuses paid by the employer.

**[*202]** Amounts paid to facilitate the acquisition of capital do not include employee bonuses. <u>See</u> sec. 1.263(a)-5(d)(1), Income Tax Regs. Respondent does not dispute that the compensation was reasonable. We conclude that the bonus payments are deductible under section 162(a).

Any contentions we have not addressed are irrelevant, moot, or meritless.

<u>Decision will be entered</u>

<u>under Rule 155</u>.